The CITY OF THORNTON, Applicant–
Appellant/Cross–Appellee,

v.

BIJOU IRRIGATION CO.; Bijou Irriga-
tion District; Andrew Blase & Vivien
Akin; Burlington Ditch, Land & Reser-
voir Co.; Central Colorado Water Con-
servancy District and its Ground Water
Management Subdistrict; Cache La
Poudre Water Users Assoc.; City of Ar-
vada; City of Aurora; City of Brighton;
City of Broomfield; City and County of
Denver, acting by and through its Board
of Water Commissioners; City of Engle-
wood; City of Greeley; Consolidated
Ditches of District No. 2; Colorado Di-
vision of Wildlife; Harold Deane; Delta
Irrigation Co.; Excalibur Resources Co.;
Farmers Reservoir & Irrigation Co.;
Fort Morgan Irrigation & Reservoir Co.;
Henrylyn Irrigation District; Irrigation-
ists Assoc.; Jackson Lake Reservoir &
Irrigation Co.; Jackson Ditch Co.; Lar-
imer & Weld Irrigation Co.; Larimer &
Weld Reservoir Co.; New Cache La Pou-
dre Irrigating Co.; North Poudre Irriga-
tion Co.; Ogilvy Irrigating & Land Co.;
Paul Lind & Sons; Wanda Lee Rankin;
Riverside Irrigation District; Riverside
Reservoir & Land Co.; St. Vrain & Left
Hand Water Conservancy District;
Thompson Water Users Assoc.; Water
Supply and Storage Co.; Western Sugar
Co.; and Windsor Reservoir Co., Objec-
tors–Appellees,

and

Alan Berryman, Division Engineer,
Water Division No. 1, Appellee
pursuant to C.A.R. 1(e),

and

Northern Colorado Water Conservancy
District; Keith Amen; Warren & Viola
Amen; J.W. and Bessy L. Hutcheson;
Dwain & Vera Yetter, Colorado Division
Engineer, Water Division 1 and State
Engineer (by motion to intervene); Pub-
lic Service Company of Colorado; East-
man Kodak Company—Colorado Divi-
sion; City of Fort Collins; and Platte
River Power Authority, Objectors–Ap-
pellees/Cross–Appellants.

No. 94SA66.

Supreme Court of Colorado,
En Banc.

Oct. 15, 1996.

14

**16**

White & Jankowski, Michael D. White, David F. Jankowski, Scotty P. Krob, Joseph B. Dischinger, David C. Taussig, Thomas J. Davidson, Austin C. Hamre, Denver, for Applicant–Appellant/Cross–Appellee the City of Thornton.

Epperson, McClary, Zorn & McClary, Donald F. McClary, Fort Morgan, for Objectors–Appellees Bijou Irrigation Co., Bijou Irrigation District, and the Irrigationists Assoc.

Lind, Lawrence & Ottenhoff, Kim R. Lawrence, Greeley, for Objector–Appellee the Central Colorado Water Conservancy District, and the Ground Water Management Subdistrict of the Central Colorado Water Conservancy District.

Fischer, Brown, Huddleson & Gunn, P.C., William H. Brown, Ward H. Fischer, William R. Fischer, Fort Collins, for Objectors–Appellees Cache La Poudre Water Users Assoc., and the Water Supply and Storage Co.

Sommermeyer, Wick, Dow & Campbell, Timothy J. Dow, Fort Collins, for Objectors–Appellees Larimer & Weld Irrigation Co., Larimer & Weld Reservoir Co., and Winds or Reservoir Co.

Trout & Raley, P.C., Robert V. Trout, Jennifer Russell, Denver, for Objectors–Appellees/Cross–Appellants Northern Colorado Water Conservancy District, Keith Amen, Warren and Viola Amen, J.W. and Bessy L. Hutcheson, and Dwain and Vera Yetter.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Patricia S. Bangert, Deputy Attorney General, Jennifer L. Gimbel, First Assistant Attorney General, Steven O. Sims, Assistant Attorney General, Natural Resources Section, Denver, for Objectors–Appellees/Cross–Appellants Colorado Division Engineer, Water Division 1, and State Engineer.

Gorsuch Kirgis L.L.C., Brian M. Nazarenus, Denver, for Objector–Appellee/Cross–Appellant Public Service Company of Colorado.

Vranesh and Raisch, LLC, Jerry W. Raisch, Michael D. Shimmin, Douglas A. Goulding, Thomas Morris, Boulder, for Objectors–Appellees/Cross–Appellants Eastman Kodak Company—Colorado Division, and City of Fort Collins.

Moses, Wittemyer, Harrison and Woodruff, P.C., John Wittemyer, Christopher G. Wittemyer, Boulder, for Objector–Appellee/Cross–Appellant Platte River Power Authority.

Patricia L. Wells, Michael L. Walker, Henry C. Teigen, Casey S. Funk, Mary B. Rastall, Denver, for Amicus Curiae the City and County of Denver, acting by and through its Board of Water Commissioners (also designated as an Objector–Appellee).

David C. Hallford, Glenwood Springs, for Amicus Curiae Colorado River Water Conservation District.

Anderson, Gianunzio, Dude, Pifher & Lebel, P.C., Mark T. Pifher, Colorado Springs, for Amicus Curiae Twin Lakes Reservoir and Canal Company.

No appearance for the following Objectors–Appellees: Andrew Blase; Vivien Akin; Burlington Ditch, Land & Reservoir Co.; City of Arvada; City of Aurora; City of Brighton; City of Broomfield; City of Englewood; City of Greeley; Consolidated Ditches of District No. 2; Colorado Division of Wildlife; Harold Deane; Delta Irrigation Co.; Excalibur Resources Co.; Farmers Reservoir & Irrigation Co.; Fort Morgan Irrigation & Reservoir Co.; Henrylyn Irrigation District; Jackson Lake Reservoir & Irrigation Co.; Jackson Ditch Co.; New Cache La Poudre Irrigating Co.; North Poudre Irrigation Co.; Ogilvy Irrigating & Land Co.; Paul Lind & Sons; Wanda Lee Rankin; Riverside Irrigation District; Riverside Reservoir & Land Co.; St. Vrain & Left Hand Water Conservancy District; Thompson Water Users Assoc.; and Western Sugar Co.

Justice LOHR delivered the Opinion of the Court.

## TABLE OF CONTENTS

| | | page |
|---|---|---|
| I. | Facts and Procedural History | 19 |
| | A. Facts | 19 |
| | B. Procedural History | 21 |
| II. | Adequacy of Notice | 23 |
| | A. Standing | 23 |
| | B. Statutory and Case Law Standards | 24 |
| | 1. Statutes | 24 |
| | 2. Case Law—General Standards | 24 |
| | C. Notice—Storage Rights | 25 |
| | D. Notice—Refill Rights | 27 |
| | E. Notice—Designation of Replacement Waters | 28 |
| | F. Notice—Transmountain Water Rights | 29 |
| III. | Conditional Water Rights | 31 |

page

A. Introduction 31
B. Overt Acts and Priority/Appropriation Date 31
 1. Elements of Overt Acts; Trial Court Ruling 31
 2. Adequacy of Overt Acts to Give Notice—General Standards 33
 3. Adequacy of Thornton's Acts to Give Notice 34
 a. Signs 34
 b. Surveys 35
 c. Formal Acts 35
C. Intent and Anti–Speculation 36
 1. Overview of Anti–Speculation Doctrine 37
 2. Review of Trial Court's Ruling on Intent and Anti–Speculation 40
D. Can and Will Doctrine 42
 1. Can and Will—Standard 42
 2. Review of Trial Court's Ruling on Can and Will 43
 a. Contingencies 43
 b. Conformity between Decreed Flow Rates and Capacities of Diversion Structures 45

IV. Terms and Conditions of Decree 46
A. Volumetric Limits and Reality Checks 46
 1. Volumetric Limits 46
 2. Reality Checks 49
 a. Volumetric Yield 50
 b. Use or Disposition of Existing Water Rights 52
B. Use of Colorado–Big Thompson Water 53
 1. Overview of Colorado–Big Thompson Project 53
 2. Thornton's Proposed Primary Uses and Trial Court's Ruling 54
 3. Review of Trial Court's Ruling 55
 a. Consistency with Governing Contracts, Statutes, and Rules 55
 i. Water Conservancy Act and Repayment Contract 56
 ii. NCWD Rules and Allotment Contract 58
 iii. Conclusion 59
 b. Consistency with Colorado Water Policy and Statutory Law 59
 i. Contract Provisions 60
 ii. NCWD Rules 60
 4. Thornton's Proposed Use of CBT Seepage Water 61
C. Reuse of Transmountain Water 62
 1. Historical Use and Thornton's Reuse Plan 62
 2. Trial Court Ruling 63
 3. Development of Law of Reuse 65
 a. Native Water 65
 b. Foreign Water 66
 4. Characteristics of Right to Reuse Foreign Water 68
 a. Intent to Reuse 68
 b. Abandonment 70
 c. Injury 72
 5. Laches and Equitable Estoppel 73
 a. Laches 73
 b. Equitable Estoppel 74
 6. Summary 77
D. Recharge Obligations 78
 1. Replacement Directly to Stream 80
 2. Application to Wells Decreed Nontributary 82
E. Revegetation 83
F. Dry–Up Conditions 86
G. Kodak Water Quality Issue 89
 1. Relation Between Appropriation Doctrine and Quality Issues 91
 2. Relation between Quality and Cognizable Injury 92
 3. Relation between Quality and Minimum Stream Flow 93
 4. Conclusion 94
H. Quality of Substitute Supply for WSSC Ditch Exchange 95
 1. Facts 95
 2. Standards and Application to Facts 96
 3. Additional Safeguards 97
I. Payment of Division Engineer's Expenses of Administration 98

V. Conclusion 99

This case involves the City of Thornton's Northern Project, one of the largest municipal water projects to come before this court in recent memory. Thornton appeals, and various objectors who oppose the Northern Project cross-appeal, from portions of a decree entered by the District Court for Water Division No. 1 in four consolidated cases, case nos. 86CW401, 86CW402, 86CW403, and 87CW332. The trial court approved, subject to numerous terms and conditions, Thornton's applications for adjudication of new conditional water rights (including exchanges) and for changes in use of existing water rights. Together, the rights so decreed provide the foundation for the Northern Project, which is expected to yield in excess of 50,000 acre feet of water to Thornton per year. We affirm the trial court's entry of the decree granting Thornton's applications for adjudication of the conditional rights and the changes of use. We also affirm the majority of the terms and conditions imposed by the trial court. However, we conclude that certain of the terms and conditions imposed in the decree are invalid or unwarranted. Thus, we reverse the trial court with respect to those terms and conditions and remand to that court for proceedings consistent with this opinion.

## I. Facts and Procedural History

### A. Facts

The City of Thornton, the applicant in this case, is a municipal corporation of the State of Colorado. Thornton is a suburban community located north of the City and County of Denver on the South Platte River just north of, or downstream from, the confluence of that river with Clear Creek. The city owns and operates a municipal water and sewer system for the benefit of its citizens as well as certain additional consumers not located within the current municipal boundaries. The population served by Thornton's water system at the time of trial was approximately 78,000 people.

Thornton currently derives the majority of the water it provides to its customers from water rights on the South Platte River and Clear Creek. Because Thornton is located

downstream from other municipal and industrial users in the Denver metropolitan area, much of the water available for diversion under Thornton's junior rights is polluted by runoff and effluent discharges before it reaches Thornton's diversion points. Not surprisingly, the quality of this water has been gradually deteriorating, resulting in present or projected future problems for Thornton in complying with the standards set in the federal Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j–26 (1994). Thornton projects that as little as 10,000 acre feet of the expected future annual dry year yield of 26,000 acre feet from its current raw water rights will be available for potable use in the future.

Compounding the city's water quality problems, projections developed by Thornton and its consultants indicate that Thornton's population can be expected to rise steadily and substantially over the next fifty years, greatly increasing the demand on the city's water supply system. These reports suggest that demand within Thornton's water service area may exceed 93,000 acre feet by the year 2056. In the early 1980s, Thornton officials became increasingly concerned about the city's ability to meet these projected demands and began investigating the potential use of a variety of sources to meet the city's future needs. Ultimately, Thornton settled on the Cache La Poudre River (sometimes referred to as the Poudre River) as its intended water source of the future and began to generate plans for what would eventually become the Northern Project.

In late 1985 and 1986, Thornton set the Northern Project in motion by purchasing a 47.23% interest (283.354 out of 600 outstanding shares) in the Water Supply and Storage Company (WSSC), a mutual ditch company organized pursuant to Colorado law. At the same time, Thornton purchased a 5.21% interest (1.25 out of 24 outstanding shares) in the Jackson Ditch Company (JDC), which is also a mutual ditch company. The activities of JDC are coordinated with those of WSSC due to WSSC's ownership of a substantial portion of the JDC shares.[1] Along with its purchase of these shares, Thornton acquired

---

1. WSSC owns 6.25 shares in JDC, constituting 26.0% of the 24 outstanding shares.

approximately 100 farms comprising over 21,000 acres on which the majority of the acquired shares had been historically used for irrigation. The total cost to Thornton of this acquisition was approximately 55 million dollars.

The water rights acquired through the purchase of WSSC shares are the backbone of the Northern Project. WSSC owns water rights in the Poudre basin on the eastern slope and in the adjoining Michigan, Laramie, and Colorado River basins on the western slope. These water rights include direct flow, storage, transmountain, seepage, and river exchange rights. A study of the water years 1950 through 1985 by Thornton's engineering consultant identified three major sources for water diverted by WSSC for distribution to its shareholders: (1) transmountain water, which originated on the western slope and was diverted through one of WSSC's four transmountain diversion structures (average annual diversion of approximately 30,000 acre feet); (2) native water that is obtained by exercise of the direct flow and storage rights owned by WSSC (average annual diversions of approximately 31,500 acre feet); and (3) Colorado–Big Thompson (CBT) water diverted by virtue of WSSC's leasing of water produced by the CBT project (average annual diversions of approximately 14,000 acre feet).[2] The WSSC shares acquired by Thornton have been used by Thornton and its predecessors to irrigate the farms of WSSC shareholders in Larimer and Weld Counties north and east of Fort Collins. The change of use of these rights from irrigation to municipal uses will provide Thornton with access to a high quality source of raw water for its future municipal needs.

To effect the diversion and distribution of these waters to its shareholders, WSSC utilizes a wide variety of structures and facilities. WSSC operates the Larimer County Canal (sometimes referred to as the LCC), which has a capacity of approximately 750 cubic feet per second at its headgate and extends approximately fifty-eight miles from its point of diversion on the Cache La Poudre River near Ted's Place in Larimer County to

U.S. Highway 85 between the towns of Pierce and Ault in Weld County. In addition to the LCC, WSSC operates and utilizes eleven reservoirs, three transmountain ditches, one transmountain tunnel, the Jackson Extension Ditch, the aforementioned shares in JDC, and units in the CBT project. Three major laterals, the Pierce Lateral, the Collins Lateral, and the Lone Tree Lateral, branch out from the LCC and supply water to WSSC shareholders, but these laterals are not owned by WSSC. In exchange for monetary and other considerations, Thornton has secured WSSC's permission to use all of the above facilities in the exercise of its newly acquired rights.

Thornton plans to construct the Northern Project in three phases, incrementally increasing its municipal water supply to meet its projected needs. The planned operation of the Northern Project involves a complex interrelationship of water acquisition and distribution methods, including diversion, exchange, storage, augmentation, and physical transportation. The following description, derived from a report prepared by Thornton's engineering consultants and adopted by the trial court in its Memorandum of Decision (sometimes referred to as the MOD), should provide a sufficient understanding of the project to support our subsequent analysis. We address more specific aspects of the project as they become relevant in the context of our discussion of particular issues raised on appeal.

**Phase I.** In the year 2000, construction will begin on a pumping station at WSSC Reservoir No. 4, a 48 inch pipeline to carry water 56 miles to Thornton, and numerous related facilities. Initially, the Northern Project will deliver a minimum of approximately 1800 acre-feet during the year 2002, and will increase deliveries in annual increments of 500 to 1,300 acre-feet, matching Thornton's increasing need for water. Phase I deliveries will level off at an average of approximately 33,200 acre-feet per year in 2028. Water delivered to Thornton in Phase I will be derived primarily from the gradual retirement of ap-

---

2. During this same period, the average annual diversions by the JDC through the Jackson Ditch, which were comprised solely of native water, were approximately 6200 acre feet.

proximately 14,500 irrigated acres served by WSSC and owned by Thornton and from new (1986) appropriations of water by Thornton from the Poudre.

**Phase II.** In 2026, to meet Thornton system demands over and above those satisfied by Phase I, construction will begin on a parallel 48 inch pipeline to Thornton from WSSC Reservoir No. 4, together with a variety of other facilities, including return pipelines from the Poudre and South Platte Rivers to the Larimer County Canal near Elder Reservoir and south of Cobb Lake. Deliveries of water to Thornton through Phase II facilities will begin in the year 2029 and combined deliveries from Phase I and Phase II facilities will average approximately 56,900 acre-feet per year. Additional water delivered to Thornton in Phase II will be derived primarily from a "ditch exchange" under which Thornton will withdraw water from the WSSC system and, in exchange, return an equivalent amount of water from other sources owned by Thornton. The return water, or "substitute supply," will be pumped to the Larimer County Canal from various locations along the Poudre and South Platte Rivers.

**Phase III.** In 2034 construction will begin on a parallel 72 inch return pipeline to deliver water back to the Larimer County Canal, thereby increasing the yield of the "ditch exchange" with the WSSC system. Additional deliveries from these Phase III facilities will begin in the year 2036 and will increase each year to help meet Thornton's increasing need. New water delivered during Phase III will be derived from the use of Thornton's WSSC shares for irrigation under the WSSC system to allow a ditch exchange on nearly the entire flow of the WSSC system.[3] The yield of the project at full development, utilizing Phase I, II and III facilities, will average approximately 67,000 acre-feet per year.[4]

MOD at 3–4 (quoting Ex. A–649, at pp. xii-xiii, Project Completion Study Report, Draft Report, Addendum, prepared by Rocky Mountain Consultants, Inc.). Thornton estimated that full development of the Northern Project will cost approximately $427,000,000 and will meet Thornton's system demand through the year 2031.

### B. Procedural History

Thornton's planning and acquisitions culminated in the filing of four water right applications seeking adjudication of the water rights necessary to initiate the Northern Project. The first three applications, case nos. 86CW401, 86CW402, and 86CW403, were filed on December 31, 1986. Case 86CW401 involves an application for confirmation of appropriative rights of exchange on the waters of the Cache La Poudre and South Platte Rivers. In its application in case 86CW402, Thornton also seeks confirmation of appropriative rights of exchange for an internal ditch exchange on the water in the LCC. Case 86CW403 involves an application for confirmation of new conditional water rights diverting from the Cache La Poudre and South Platte Rivers. The fourth application, case no. 87CW332, was filed on December 31, 1987. In this fourth application, Thornton sought approval to change the use of the water rights it acquired from WSSC from irrigation to municipal purposes, as well as approval of an extensive plan for augmentation. Because these individual applications were all part of the larger Northern Project, they were consolidated for trial before the water court.

Statements of opposition to the four applications were filed by a total of forty-nine parties. Based on pre-trial negotiations and discussions, twelve objectors withdrew their statements of opposition prior to trial.[5] In addition, Thornton negotiated stipulations with eighteen objectors, including the state and division engineers, eliminating their ob-

---

3. The transfer of water based on exercise of WSSC water rights from the LCC for municipal use in Thornton will be discontinued in Phase III. Instead, this water will be returned to irrigation uses and will be exchanged upon as part of the expansion of the WSSC ditch exchange begun in Phase II.

4. In the final decree, the court limited the total annual average yield during any thirty-six year period from operation of the Northern Project to 56,800 acre feet.

5. An additional objector was dismissed by order of the trial court on August 13, 1990.

jections to Thornton's proposed decree. By the time the cases reached trial in the District Court, Water Division No. 1, fewer than ten objectors remained active participants. The trial progressed intermittently from August 7, 1991, to April 15, 1992, occupying fifty-seven days and producing almost 10,000 pages of transcripts and more than 1,300 trial exhibits. Closing arguments were held on October 8, 1992.

On August 16, 1993, the trial court issued its Memorandum of Decision. In the MOD, the trial court addressed many of the significant legal issues raised by Thornton's applications and ultimately concluded that Thornton was entitled to a decree. Following the issuance of the MOD, the parties and the court took part in numerous decree conferences to work out the terms of a final decree. The trial court issued its Findings of Fact, Conclusions of Law, Judgment and Decree (Decree) on February 18, 1994. In the eighty-eight page decree, the trial court granted Thornton's applications for confirmation of the new conditional appropriative rights with an appropriation date of December 31, 1986, and for the change of use of its WSSC shares to municipal use and the accompanying plan for augmentation.

The court, however, imposed conditions subjecting Thornton's exercise of the newly decreed rights to numerous terms and conditions designed to lessen the impact of the Northern Project on other water users. According to the court:

> Operation of the Plan for Augmentation approved herein, as well as compliance with the terms and conditions imposed herein, will prevent unlawful injury to any vested water right which might otherwise result from the operation of the Thornton Northern Project through its component parts as approved, confirmed, awarded, and decreed herein, including operation of the conditional water rights, appropriative right of exchange, change of water rights, and plan for augmentation.

Decree, ¶ 18, at 29. Among the more significant limitations imposed on Thornton by the decree are: (1) a requirement that Thornton not exceed annual volumetric limitations in its diversion of water under its conditional rights; (2) a requirement that Thornton make certain future showings regarding its need for the claimed water; (3) a prohibition on the use of CBT water for purposes that create benefits for Thornton outside the boundaries of the Northern Colorado Water Conservancy District (NCWCD); (4) a prohibition on the reuse of Thornton's pro rata share of transmountain water diverted through the LCC; (5) a requirement that Thornton recharge certain groundwater aquifers for the benefit of downstream well users; and (6) a requirement that Thornton revegetate farms it will no longer irrigate as a result of its change of water rights to municipal purposes.

Following entry of the decree,[6] Thornton filed an appeal in this court challenging certain portions of the decree and conditions imposed therein.[7] Several objectors also cross-appealed the trial court's decision to enter the decree as well as various portions of the decree as entered, and certain other objectors filed briefs in response to Thornton's appeals.[8] We will not include here a

---

6. Following entry of the decree and prior to appeal, objector Platte River Power Authority filed a motion to amend the judgment. The motion was not ruled on by the trial court and thus was deemed denied pursuant to C.R.C.P. 59(j).

7. We have jurisdiction over these cases by virtue of Colo. Const. art VI, § 2, and § 13–4–102(1)(d), 6A C.R.S. (1987), which statutorily excludes from the court of appeals' jurisdiction appeals from final judgments of district courts in "[w]ater cases involving priorities or adjudications." *See also* C.A.R. 1(a)(2).

8. The objectors who filed cross-appeals are Northern Colorado Water Conservancy District, in conjunction with individual objectors Keith Amen, Warren and Viola Amen, J.W. and Bessy L. Hutcheson, and Dwain and Vera Yetter; the Colorado State Engineer and the Division Engineer for Water Division 1; Public Service Company of Colorado; Eastman Kodak Company—Colorado Division; City of Fort Collins; and Platte River Power Authority. Various other objectors filed briefs in this appeal in opposition to Thornton, including Cache La Poudre Water Users Assoc., and, collectively, Larimer & Weld Irrigation Co., Larimer & Weld Reservoir Co., and Windsor Reservoir Co. All of the above objectors acted in various combinations in briefing and arguing this case on appeal. For simplicity, we refer in some instances in this opinion to issues raised by "certain objectors" without

comprehensive list of the issues raised on appeal, but reserve such identification for our subsequent discussions. Suffice it to say that the issues are numerous and encompass a number of important and previously unresolved questions of Colorado law.

## II. Adequacy of Notice

Among the issues raised by certain objectors on cross-appeal is the sufficiency of the notice provided by Thornton's applications and resumes in this case. Because the issue of notice implicates jurisdictional questions concerning the trial court's authority to enter portions of the decree, we consider this issue as a threshold matter.

Fort Collins and NCWCD challenge the trial court's decree of conditional storage and refill rights based on the alleged inadequacy of Thornton's applications and resumes relating to the Northern Project. In addition, Platte River Power Authority (PRPA) challenges the inclusion of certain water rights among those designated as available replacement waters for augmentation plan purposes in the final decree. Finally, Public Service Company of Colorado (Public Service) asserts that the decree is invalid because Thornton did not provide notice to water users in the basins of origin for certain of its transmountain water rights. The objectors base these challenges on the ground that Thornton's applications and resumes with respect to these claims provided inadequate notice of the nature and scope of the rights claimed, and that the trial court was therefore without jurisdiction to adjudicate these rights. We affirm the trial court's decisions with respect to the adjudication of storage and refill rights and the designation of replacement waters as well as the adequacy of the notices as to transmountain water rights.

### A. Standing

■ Before we can evaluate the sufficiency of the notice provided by Thornton's applications and resumes, we must address the contention by Thornton that the objectors do not have standing to raise this challenge. Thornton argues that a prerequisite for standing to challenge notice in a water proceeding is an allegation of failure to receive actual notice of the claims at issue. In support of its argument, Thornton cites two decisions of this court, *Closed Basin Landowners Association v. Rio Grande Water Conservation District*, 734 P.2d 627, 635–36 (Colo.1987), and *Pueblo West Metropolitan District v. Southeastern Colorado Water Conservancy District*, 689 P.2d 594, 602 n. 9 (Colo.1984) (*Pueblo I*). In these cases, however, we discussed standing in the context of a due process challenge to the constitutionality of the resume notice system as a whole, for which standing requires a finding of actual injury arising from the allegedly defective notice. *See People v. Fuller*, 791 P.2d 702, 709 (Colo.1990). In the present case, the objectors challenge only the adequacy of notice provided by particular applications and resumes, not the constitutionality of the entire notice system. Accordingly, the limitations on standing set forth in *Closed Basin* and *Pueblo I* are inapposite on these facts.

■ Statutory standing requirements to challenge the sufficiency for notice purposes of particular applications and resumes in water court proceedings are broad. Under section 37–92–302(1)(b), 15 C.R.S. (1990) (emphasis added), "[a]ny person ... who wishes to oppose the application" may file a statement of opposition with the water clerk. Once a party files such a statement, that party has standing to challenge on appeal the adequacy of published notice to support the judgment of the water court. *Pueblo West Metro. Dist. v. Southeastern Colo. Water Conservancy Dist.*, 717 P.2d 955, 957–58 (Colo.1986) (*Pueblo II*). In the present case, all of the objectors who are challenging the sufficiency of Thornton's applications and re-

specifically identifying the particular objectors or noting that others did not join.

In addition to the above parties, Water Supply and Storage Company filed an answer brief in response to certain arguments made by the objectors on cross-appeal, and three amici curiae, City and County of Denver, acting through it

Board of Water Commissioners, Colorado River Water Conservation District, and Twin Lakes Reservoir and Canal Company, filed briefs in support of Thornton's proposed reuse of its transmountain waters. Water Supply and Storage Company and the amici are not included in our references to objectors.

sumes previously filed statements of opposition with the water clerk, and thus have standing to appeal the adequacy of published notice to support the judgment of the water court.

### B. Statutory and Case Law Standards

Because the objectors have standing to raise this challenge, we now evaluate the adequacy of the notice provided by Thornton's applications and resumes regarding the nature and scope of the rights claimed by Thornton. To do so, we must first briefly review the applicable notice framework. We then apply this framework to claims for storage and for refill rights and to designation of replacement waters.

### 1. Statutes

■ The resume system that governs the provision of notice in water cases is codified in section 37–92–302, 15 C.R.S. (1990 & 1995 Supp.). Initially, any person who desires a determination of a water right or a conditional water right, a determination with respect to a change of water right, approval of a plan for augmentation, or approval of a proposed or existing exchange of water must file with the water clerk a verified application setting forth facts supporting the ruling sought. § 37–92–302(1)(a), 15 C.R.S. (1990). Pursuant to section 37–92–302(2)(a), 15 C.R.S. (1995 Supp.), the water judges of the various divisions have developed standardized application forms for use in this process. Failure to use these standardized forms, however, does not automatically result in the application being considered insufficient. This court has recognized an exception to the use of the standard forms where "strict conformity may be unsuitable, prejudicial, or impose an unreasonable burden." *Closed Basin,* 734 P.2d at 635 n. 4 (quoting C.R.C.P. 90).

Not later than the fifteenth of each month, the water clerk prepares a resume of all applications filed in the preceding month. § 37–92–302(3)(a), 15 C.R.S. (1990). Pursuant to section 37–92–302(3)(a), the resume must contain the name and address of the applicant, a description of the water right or conditional water right involved, and a description of the ruling sought. Notification of interested parties is then accomplished not through typical service of process methods but rather through the resume notice procedures unique to the determination of water rights. *Gardner v. Enewold,* 200 Colo. 221, 224, 614 P.2d 357, 359 (1980). Specifically, the water clerk must publish the resume in a newspaper of general circulation in the affected counties, § 37–92–302(3)(b), and mail a copy of the resume "to each person who the referee has reason to believe would be affected or who has requested the same by submitting his name and address to the water clerk," § 37–92–302(3)(c). Any person opposing the application may then file a verified statement of opposition. § 37–92–302(1)(b).

### 2. Case Law—General Standards

■ "[The] resume notice procedures are calculated to alert all water users on the stream system whose rights may be affected by the application and to provide these persons an opportunity to participate in the water right proceeding and to oppose the application." *Bar 70 Enters., Inc. v. Tosco Corp.,* 703 P.2d 1297, 1302–03 (Colo.1985). We evaluate compliance with the notice provisions with reference to the underlying purpose of the notice: "to put interested parties to the extent reasonably possible on *inquiry notice* of the *nature, scope, and impact* of the proposed diversion." *Closed Basin,* 734 P.2d at 634 (emphasis added). Any evaluation, therefore, must take into account the particular facts and circumstances of the case, and must assess the reasonableness of the notice in the context of the "practicalities and peculiarities" of the water project at issue. *Id.* at 633 (citing *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15, 70 S.Ct. 652, 657–58, 94 L.Ed. 865 (1950)).

■ In *Monaghan Farms v. City & County of Denver,* we provided a general definition of the inquiry notice standard:

Inquiry notice requires sufficient facts to attract the attention of interested persons and prompt a reasonable person to inquire further. The receipt of inquiry notice charges a party with notice of all the facts that a reasonably diligent inquiry would have disclosed. *Colburn v. Gilcrest,* 60

Colo. 92, 94, 151 P. 909, 910 (1915). Consequently, alleged deficiencies invalidate the resume only if the resume taken as a whole is insufficient to inform or put the reader on inquiry of the nature, scope and impact of the proposed diversion.

807 P.2d 9, 15 (Colo.1991); *accord Board of County Comm'rs v. Collard,* 827 P.2d 546, 552 (Colo.1992). Once the applicant satisfies the initial burden of providing information that would alért a reasonable person to investigate the claims further, the potential objector bears the responsibility of conducting a reasonably diligent inquiry and is charged with all notice that such an inquiry would produce. *Monaghan Farms,* 807 P.2d at 15. The potential objector must be viewed as a "reasonably prudent party" and cannot establish the lack of adequate notice if on the basis of the published resume, he or she should have anticipated that the disputed rights might be at issue. *City of Thornton v. City of Ft. Collins,* 830 P.2d 915, 923 (Colo. 1992).

### C. Notice—Storage Rights

We address first the adequacy of the notice concerning Thornton's claims to storage rights. The challenged storage rights were adjudicated pursuant to Thornton's applications for confirmation of conditional appropriative rights of exchange in the Cache La Poudre and South Platte Rivers (case 86CW401) and in the Larimer County Canal in the WSSC distribution system (case 86CW402), and for confirmation of conditional direct diversion rights in the Cache La Poudre and South Platte Rivers (case 86CW403). Thornton's applications in all three cases contained similar descriptions of the intended uses of the claimed water. Thornton included the following representative description in the application in case 86CW403:

9. Hereinafter spelled "storage" even when referring to the quoted language.

10. The trial court placed certain restrictions on the storage rights adjudicated in the final decree. The court decreed that water stored under the rights granted in case 86CW403 could not be stored for longer than one year in the WSSC

Uses of water. All municipal uses, including but not limited to irrigation, including agricultural irrigation, domestic use, recreational use, aesthetic use, use by direct flow, *by storeage* [sic],[9] by exchange, by augmentation, use for augmentation of other uses and any other use lawfully made by the City of Thornton.

(Emphasis added.) The resumes published and circulated by the water clerk relating to these applications reproduced the applications themselves, and the description of the potential uses of the claimed water listed in each resume was identical to the description printed in the corresponding application. The applications and resumes did not otherwise mention claims for storage rights.

In the final decree, the trial court adjudicated to Thornton conditional storage and refill rights in nineteen lakes and reservoirs.[10] The objectors argue that Thornton's applications and resumes provided insufficient notice of Thornton's claims for storage rights and that without adequate notice the water court had no jurisdiction to decree these rights. The trial court rejected the objectors' arguments. Specifically, in the Memorandum of Decision, the trial court stated that it was "satisfied that it has jurisdiction to grant a decree in this matter and that notice requirements have been met." MOD at 41. In the final decree, the court held that "the storage provided for in this decree in connection with Thornton's appropriations is incidental to, a part of, and implicit in a municipal water system and the municipal uses for which the appropriations were made. Adequate notice of the storage of the water so appropriated, as provided in this decree, was given by the application and resume herein." Decree, ¶ 12.4, at 13. The court expressly held that Thornton's applications and resumes were "adequate to give inquiry notice regarding claims for water storage and for refill consistent with and

System Reservoirs or longer than two months in the Pump Station and Poudre Basin Reservoirs. Decree, ¶ 56.3.2, at 71. The court placed no limitations on the duration of storage for rights decreed under cases 86CW401 and 86CW402 or on the water stored in the terminal storage reservoirs in the vicinity of Thornton.

implicit in the normal operation of a municipal water system." Decree, ¶ 28.3, at 33; *see also id.* ¶ 27, at 33.

We have applied the inquiry notice standard in a number of recent cases. With the exception of cases presenting circumstances that suggested the misleading inclusion or omission of material facts, we have consistently accepted a broad definition of inquiry notice and found adequate the resume notice provided by the applicant. *See, e.g., Thornton v. Fort Collins,* 830 P.2d at 923 (resume that contained a general reference to the source for claimed water right held sufficient to notify potential objectors of specific diversions from that source); *Collard,* 827 P.2d at 552–53 (resume notice adequate where application revealed that substantial flows would be appropriated but did not clearly specify the type of right sought); *Closed Basin,* 734 P.2d at 635 (resume for a water salvage project that notified parties of amount of appropriation and effect on level of water table in a defined area held sufficient, even though specific well sites were not identified); *Pueblo II,* 717 P.2d at 957–58 (resume of application for change of point of diversion for a ditch right held sufficient to describe the water right involved despite failure to mention two wells that had been used as undecreed nearby alternate points of diversion); *Pueblo I,* 689 P.2d at 601–02 (resume of application to make conditional storage decrees absolute provided adequate notice that the source of the water to be stored was western slope streams despite the absence of any specific reference because the resume made reference to prior conditional decrees that identified the source of the water); *see also Monaghan Farms,* 807 P.2d at 15–16 (challenged resume held to provide adequate notice); *State Eng'r v. Smith Cattle, Inc.,* 780 P.2d 546, 551–52 (Colo.1989) (same).

The objectors contend that Thornton's applications are misleading because they follow the format of a direct flow application and omit any details of the extent of its storage claims. We disagree. In those cases in which we have held notice to be inadequate, the resumes are characterized by the complete absence of material information concerning the disputed water rights. For example, in *Stonewall Estates v. CF & I Steel Corp.,* 197 Colo. 255, 592 P.2d 1318 (1979), the applicant's resume of an application for a nontributary water right failed to mention the asserted nontributary nature of the water. We held the resume to be defective because in the absence of any indication that the water was claimed to be nontributary, and thus to be administered outside of the priority system for tributary water that protects senior appropriators, such appropriators had no cause to anticipate injury from the claims. *Id.* at 258, 592 P.2d at 1320. Similarly, in *Danielson v. Jones,* 698 P.2d 240, 246 (Colo.1985), we held that a resume that described an application as requesting a determination of a water right for "domestic, stock, and irrigation purposes" but omitted any reference to storage did not provide notice that the applicant also sought judicial recognition of fish culture and storage uses. *Id.*

The present situation more closely resembles those cases in which we upheld resume notices than the cases in which notices were deemed insufficient. Unlike the applicants in *Danielson* and *Stonewall,* Thornton did not omit all reference to the nature of the disputed right in its applications. The manners of use claimed included "use by direct flow, by storage, by exchange, by augmentation," thereby giving notice of the distinct and separate claim for storage rights. Given the use of the word "storage" in the resume and the expansive nature of Thornton's water project, neither the lack of details concerning the claimed storage rights nor the use of a direct flow application format was so misleading as to render the resulting decree void. *See Pueblo I,* 689 P.2d at 602 (sufficiency of resume notice upheld absent a "serious omission of material information").

The inquiry notice evaluation requires consideration of the facts surrounding each individual application and resume. In the present case, the factual circumstances support a holding that Thornton's reference in its applications and resumes to use of its proposed exchanges and diversions "by storage" was sufficient to trigger an inquiry by the objectors into the extent of the storage rights claimed by Thornton. First, as noted

above, Thornton's failure to use a standard application form designed for storage rights is not dispositive of the notice issue. *Closed Basin*, 734 P.2d at 635 n. 4. Second, given the enormous size of the water project proposed by Thornton and the extensive amounts of water claimed in or affected by its applications, as apparent from the resumes, it is inconceivable that a "reasonably prudent" potential objector would fail to anticipate that storage rights would be included in the project.[11] Once alerted by the reference to storage and the scope of the project, potential objectors bore the responsibility to inquire further into the claims being made by Thornton. *See Collard*, 827 P.2d at 552 (published resume seeking to appropriate substantial flows of identified streams "would raise a red flag (inquiry notice) to any person interested in water in the subject streams that significant water rights were being proposed in the areas described") (quoting water court conclusion). As the trial court noted,

an applicant is not required to predict in the application and resume the exact nature of the water rights that will ultimately be decreed. Therefore, although Thornton's reference to its storage claims contained no specific detail, and perhaps could even be described as more general than would be permissible in most situations, it was sufficient under the circumstances of the present case to provide the objectors with inquiry notice of the storage rights ultimately decreed by the trial court. We therefore affirm the trial court's adjudication of storage rights in the final decree.[12]

### D. Notice—Refill Rights

 In addition to storage rights in nineteen identified lakes and reservoirs, the trial court also decreed to Thornton the right to fill and refill these storage structures subject to certain volumetric limitations imposed by the court. The objectors contend that even

11. Following publication of the resumes for Thornton's applications, 49 objectors filed statements of opposition. The record provides no indication that any potential objector failed to file a statement of opposition based on a lack of detail in Thornton's description of its storage claims, and no individuals or entities who had not previously filed statements of opposition petitioned the court for permission to file a subsequent objection after the details of these claims were furnished. The objectors now asserting this notice challenge were among the original 49 objectors and were afforded the opportunity to investigate further the scope of Thornton's claims. Accordingly, in this particular case, although not dispositive of the adequacy of notice, it appears that all interested parties had a full and fair opportunity to oppose the application and participate in the water right proceeding.

12. By affirming the adjudication of Thornton's storage claims, however, we do not endorse the trial court's description of the storage rights decreed as "incidental to, a part of, and implicit in a municipal water system and the municipal uses for which the appropriations were made." Decree, ¶ 12.4, at 13. Colorado law has long recognized a distinction between the right to use the direct flow of natural waters and the right to store those waters for future use, *see In re Applications of the Upper Gunnison River Water Conservancy District*, 838 P.2d 840, 852 (Colo.1992); *Handy Ditch Co. v. Greeley & Loveland Irrigation Co.*, 86 Colo. 197, 199, 280 P. 481, 481–82 (1929); *Holbrook Irrigation Dist. v. Fort Lyon Canal Co.*, 84 Colo. 174, 191, 269 P. 574, 581 (1928), and an appropriation for one type of right does not encompass the other type, *City &*

*County of Denver v. Northern Colo. Water Conservancy Dist.*, 130 Colo. 375, 387–88, 276 P.2d 992, 998–99 (1954) (*Blue River*); *Handy Ditch*, 86 Colo. at 199–200, 280 P. at 481–82. Whether water diverted pursuant to a decree is used immediately or stored for future use affects the potential impact of the diversion on other water users, *see Danielson*, 698 P.2d at 245, and adequate notice of each particular right sought is required. The right to store water is not an automatic incident of the right to a direct use diversion.

In the present case, Thornton's applications and resumes provided adequate notice of the rights claimed because they contained sufficient information pertaining to both storage and direct flow claims to put potential objectors on inquiry notice of those independent claims. Had Thornton made no mention of storage, it could not have overcome this defect by alleging that its requested direct flow rights carried automatic storage privileges incident to the intended municipal uses. The trial court's classification of Thornton's extensive storage claims, some for reservoirs up to fifty miles outside the city boundaries, as incidental to its direct flow municipal uses erroneously eliminates the distinction between direct flow and storage rights. A municipality has no special license to claim water rights relating to its storage reservoirs and rights relating to its direct flow water system without differentiating between the two. Accordingly, although we affirm the adjudication of storage rights encompassed by the final decree, we specifically reject the above ground as a basis for finding that notice was adequate.

if Thornton provided adequate notice of its storage claims, the applications and resumes did not provide adequate notice of any refill claims. For the reasons discussed below, we disagree with the objectors' argument and affirm the trial court's decree of refill rights to Thornton.

We again evaluate the adequacy of the notice provided by Thornton's applications and resumes under the inquiry notice standard. *E.g., Monaghan Farms,* 807 P.2d at 15. As discussed above, *see supra* p. 25, we must consider the practicalities and peculiarities of the individual case in our evaluation. *Closed Basin,* 734 P.2d at 633. Examining the absence of reference to refill claims in Thornton's applications and resumes in the context of the expansive nature of Thornton's water project, we conclude that Thornton's reference to "use ... by storage" provided sufficient inquiry notice of such claims. The very generality of the claims suggested the need to inquire into the extent of the storage and the manner in which it is to be accomplished.

As we discussed in section II(C), *supra,* the broad scope of the project reflected in Thornton's applications and the amount of water involved, together with the inclusion of "storage" among the designated uses, should have alerted potential objectors to the possibility that Thornton would require storage. Once alerted to potential storage claims, interested parties are required to conduct a reasonable inquiry into these claims and are charged with all knowledge that would result from such an inquiry. *Monaghan Farms,* 807 P.2d at 15. In the context of such a large water project, it is within the scope of the required reasonable

inquiry into storage claims to investigate the possibility that refill rights are also claimed.[13] Accordingly, the notice provided by Thornton's applications and resumes satisfied the inquiry notice standard, and we affirm the trial court's adjudication of refill rights in the final decree.

### E. Notice—Designation of Replacement Waters

Objector Platte River Power Authority (PRPA) challenges the adequacy of the notice provided by Thornton's application and resume. However, PRPA focuses on the trial court's designation of replacement water rights available for use in Thornton's proposed plan for augmentation (case 87CW322). In its application in case 87CW332, which encompassed both the augmentation plan and proposed changes of use of certain water rights, Thornton identified the source of potential replacement waters as WSSC waters or "other sources lawfully available for such use." The resume repeats verbatim the description of replacement waters in Thornton's application.

In the final decree, the trial court provided a seventeen-page listing of the waters allowed for replacement use, which includes waters not specifically listed on Thornton's application or resume. PRPA argues that Thornton failed to comply with the notice requirements for a plan for augmentation and that the trial court exceeded its jurisdiction by decreeing the right to use waters for replacement purposes that were not listed in the application or resume. We disagree and affirm the trial court's identification of

---

13. The objectors argue that they cannot be charged with inquiry notice of Thornton's refill claims because they were entitled to rely on the traditional Colorado common law principle that storage rights in reservoirs are limited to one fill annually. *See, e.g., Upper Gunnison,* 838 P.2d at 851. This argument is not persuasive under the circumstances existing in this case. All of the objectors challenging notice in this action filed statements of opposition and fully participated in the trial court proceeding. Thus, these objectors were in a position to determine the nature of the rights claimed by Thornton. They cannot argue that they were entitled to rely on the one-fill presumption after receiving actual notice of the

substance of Thornton's claims. No evidence has been presented suggesting that Thornton's failure to include specific refill language in its resumes denied any interested party the opportunity to oppose the application and participate in the proceeding.

This is not a situation where a specific storage reservoir was identified and a specific capacity described with no indication of intent to refill. Rather, any interested party here was made aware of the necessity of inquiring into the extent of the claimed storage and whether the storage capacity was to be provided by single annual fills of a large number of reservoirs or multiple fills of a lesser number.

sources for potential use as replacement waters.

To evaluate the adequacy of the notice provided by Thornton's application and resume for its plan for augmentation, we again apply the inquiry notice standard. Thornton argues that this court's decision in *City & County of Denver v. City of Englewood*, 826 P.2d 1266 (Colo.1992) (*Englewood*), which presented a situation factually similar to this case, should control our determination in the present case. We agree.

In *Englewood*, Denver sought the adjudication of conditional water rights to divert by exchange from the South Platte River. *Id.* at 1268–69. The statement of claim and resulting decree specified the uses to include "effectuating an exchange or transfer of water by the use of any public stream or its water." *Id.* at 1272. In a subsequent application to make portions of these conditional rights absolute based on the diversion of South Platte waters and their replacement with transmountain waters imported from the Colorado River, the trial court ruled against Denver and held that Denver's statement of claim in the earlier proceeding had provided insufficient notice of the use of non-South Platte waters for replacement purposes and that the decree did not authorize such a source of replacement water. *Id.* at 1271.

On appeal, this court reversed the determination of the trial court. We noted that both Denver's statement of claim and the conditional decree granted by the trial court stated that the water rights were for all municipal uses including "effectuating an exchange . . . of water by the use of any public stream." *Id.* at 1272. We held that this statement was sufficient to put interested parties on inquiry notice that sources other than South Platte River water might be introduced in replacement for water taken

from the South Platte. *Id.* (citing *Monaghan Farms*, 807 P.2d at 15). The notice was sufficient to ensure that interested parties had a meaningful opportunity to participate in the water right determination process, and these parties were alerted to make additional inquiry into the source of replacement water.

Thornton's statements in its application and resume in case 87CW332 relating to replacement waters are directly analogous to the description used by Denver in *Englewood*. Thornton identified certain replacement waters, specifically waters derived pursuant to its WSSC water rights, but described additional replacement sources as "any source lawfully available for such use." This description was far from detailed or specific but, as in *Englewood*, the information provided was sufficient to alert potential objectors to the possibility that water rights other than the WSSC rights might be used for replacement.[14] Once alerted, these objectors could participate in the determination and conduct further inquiry to discover the full extent of Thornton's claims. Accordingly, the purpose of the notice provisions was served, *see Monaghan Farms*, 807 P.2d at 15; *Closed Basin*, 734 P.2d at 634, and Thornton's application and resume satisfied the inquiry notice standard. We affirm the trial court's determination that resume notice was sufficient to support the court's decree of potential replacement water sources available for use in Thornton's plan for augmentation.

### F. Notice—Transmountain Water Rights

In addition to adopting the notice arguments made by other objectors, objector Public Service raises an independent challenge to the jurisdiction of the trial court to approve Thornton's application for its change of water rights. Public Service argues that applicants for changes of transmountain water rights must provide notice to water users

---

14. PRPA argues that reliance on the *Englewood* case is misplaced because that court was interpreting the notice provisions of the 1943 Adjudication Act, 1963 C.R.S. § 148–9–1 to –27, the predecessor to the current statutory system. *See Englewood*, 826 P.2d at 1268–69. Although the 1943 Act did require slightly less information from applicants in its application process, *compare* 1963 C.R.S. § 148–9–8 *with* § 37–92–

302(2)(a) (1995 Supp.), both the current and former provisions required identification of water sources, the type of information at issue here. Furthermore, in both *Englewood* and this case, the governing standard is inquiry notice, not strict compliance with statutory notice procedures. Thus, we do not find *Englewood* to be distinguishable in any significant manner from the present case.

in both the basin of use (the basin into which the water is imported) and the basin of origin (the basin from which the water is exported). Thornton's resume in case 87CW332 was not published in the basins of origin, Water Divisions Nos. 5 and 6. Public Service contends that the publication of resume notice in the basin of use, Water Division No. 1, was not sufficient to provide inquiry notice to water users in the basins of origin. Public Service further asserts that this lack of notice deprived the trial court of jurisdiction over the change application. We disagree.

In *Department of Natural Resources v. Ogburn*, we determined that jurisdiction over a change of transmountain water rights rested with the water courts in both the basin of origin and the basin of use. 194 Colo. 60, 62, 570 P.2d 4, 5 (1977). However, we noted that the appropriate venue for determination of the requested change of use is the court in the basin of use. *Id.* at 62–63, 570 P.2d at 5. Because Water Division No. 1 is the basin of use in the present case, the case was properly before the water court for that division.

By virtue of its status as the proper venue for adjudication of Thornton's change proposal, the water court for Water Division No. 1 became the administrator of the unique resume-notice process. Thornton was responsible for initiating the process by submitting its change application to "the water clerk." § 37–92–302(1)(a), 15 C.R.S. (1990). The statute does not identify which divisional water clerk should receive the filing, but places no burden on the applicant to submit applications to water clerks in all divisions potentially affected by the proposal. In view of our decision in *Ogburn* concerning venue, Thornton's decision to file only in Division No. 1 was proper.

Once an application is filed, the responsibility for publishing notice shifts to the water court. The water clerk prepares a resume of all applications filed in the clerk's office during the month, § 37–92–302(3)(a), and must cause "publication to be made of each resume or portion thereof in a newspaper or newspapers as is necessary to obtain circulation once in every county affected, as determined by the water judge." § 37–92–302(3)(b). The water judge also has discretion to augment

the published notice through announcements made on radio or television. § 37–92–302(3)(d). In the present case, the trial court exercised its discretion and required that notice be published only in the counties in Water Division No. 1.

In *Ogburn* we held only that proper venue for proceedings to change transmountain water rights is in the basin of use, not the basin of origin. *Ogburn*, 194 Colo. 60, 570 P.2d 4. Based on this precedent, holders of water rights that might be affected by such a change could reasonably expect the resume of an application for change to be published in the basin of use, where the case would be tried. Under these circumstances, and although it may be the preferred practice to publish in both the basin of use and the basin of origin, we cannot conclude that the trial court abused its discretion by limiting publication to newspapers in counties in the basin of use. *See Hock v. New York Life Ins. Co.*, 876 P.2d 1242, 1251 (Colo.1994) ("A reviewing court can conclude that the trial court abused its discretion only if the trial court's ruling is manifestly arbitrary, unreasonable, or unfair.").

We also note that there is no suggestion that any party has been injured by lack of notice. Public Service, the entity that raises the notice issue, is a party to this proceeding and cannot claim injury due to insufficient notice. Furthermore, the record provides no evidence of any other individual or entity on the western slope that alleged a lack of notice either prior to or during the trial. We do not suggest that the adequacy of notice should be evaluated at any time other than when it is due; however, the absence of any cognizable claim of harm resulting from the allegedly inadequate notice suggests that the trial court did not abuse its discretion in this case by electing not to publish notice in the basins of origin.

Finally, we note that the trial court provided protections for the interests of western slope water right holders when it entered the final decree. The court included the following protective provision:

Transmountain Diversions. The water rights represented by Thornton's WSSC shares include rights which divert water

from other basins into the Poudre basin. In general, Thornton's interest in those water rights may not be exercised in a manner that will materially affect the amount and timing of water that historically has been available to water users in other Divisions. The following provisions will prevent such an affect[sic][.]

Decree, ¶ 59.4.2.1, at 77. The court then set forth volumetric and seasonal limitations on Thornton's pro rata shares of diversions from both Water Division No. 5 and Water Division No. 6. *See* Decree, ¶¶ 59.4.2.1.1 to .3, at 77–78.

For the foregoing reasons, we conclude that Thornton was not required to submit its change application to the water clerks in Water Divisions Nos. 5 and 6 and that the trial court did not abuse its discretion by choosing not to require publication of notice in those divisions. Accordingly, the absence of published notice in those basins did not deprive the trial court of jurisdiction to approve the proposed changes of use.

### III. Conditional Water Rights

We have resolved the preliminary issue concerning the adequacy of Thornton's applications and resume notices. We now address the validity of the trial court's decision to decree the conditional water rights, including conditional rights of exchange, requested in these applications.

### A. Introduction

■■■ The next set of issues on appeal concerns Thornton's satisfaction of the requirements necessary to establish its requested adjudication of conditional water rights. A conditional water right is defined as "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is to be based." § 37–92–103(6), 15 C.R.S. (1990). To establish a conditional water right, an applicant must show in general that a "first step" toward the appropriation of a certain amount of water has been taken, that the applicant's intent to appropriate is not based upon the speculative sale or transfer of the appropriative rights, and that there is a substantial

probability that the applicant can and will complete the appropriation with diligence. In the present case, the trial court decreed to Thornton conditional water rights with respect to its planned direct diversions from the Poudre and South Platte Rivers (case 86CW403) and its planned Poudre River and WSSC ditch exchanges (cases 86CW401 and 86CW402, respectively). Thornton and certain of the objectors have appealed portions of the trial court's rulings with respect to each of the elements of the conditional water right determinations. We will examine the requirements of each element as we address the parties' issues on appeal.

### B. Overt Acts and Priority/Appropriation Date

■■■ The first aspect of the trial court's conditional water rights ruling requiring our consideration on appeal is the appropriation or priority date established for Thornton's conditional rights. The court held that the necessary concurrence of an intent to appropriate and overt acts performed in furtherance of that intent was not achieved until December 31, 1986, the date on which Thornton filed its applications, and accordingly fixed that date as the appropriation date. Thornton appeals this decision and seeks an appropriation date of December 24, 1986, the date on which city consultants conducted a field survey of various alternate diversion points and posted signs announcing the city's intention to divert water. We agree with the trial court's conclusion that Thornton did not complete the overt act requirements until it filed its applications. We therefore affirm the December 31, 1986, appropriation date set by the trial court.

#### 1. Elements of Overt Acts; Trial Court Ruling

■■■ To inform our subsequent analysis, we summarize the basic elements for the determination of the appropriation date for a conditional water right, which are set forth in more detail in our recent decision in *City of Thornton v. City of Fort Collins*, 830 P.2d 915 (Colo.1992). Conditional water rights are designed to allow applicants to establish a current priority for a water right to be

developed in the future by making a "first step" toward appropriation of the desired water. *Id.* at 924. To establish this first step toward a conditional appropriation, the applicant must show the " 'concurrence of the intent to appropriate water for application to beneficial use with an overt manifestation of that intent through physical acts sufficient to constitute notice to third parties.' " *Id.* at 925 (quoting *City of Aspen v. Colorado River Water Conservation Dist.,* 696 P.2d 758, 761 (Colo.1985)). Assuming the appropriation is completed with diligence, the date of appropriation for priority purposes will be the date on which the first step is completed. *Id.*

▪▪▪ The first step thus consists of an intent prong and an overt acts prong. With respect to the overt acts requirement, we have held that the relevant acts must accomplish the following three functions: " '(1) to manifest the necessary intent to appropriate water to beneficial use; (2) to demonstrate the taking of a substantial step toward the application of water to beneficial use; and (3) to constitute notice to interested persons of the nature and extent of the proposed demand upon the water supply.' " *City of Thornton,* 830 P.2d at 925 (quoting *Bar 70,* 703 P.2d at 1307). The necessary intent and overt acts need not occur in any particular order, but completion of the first step requires concurrence of the two and the priority date will be the date on which the last of the necessary elements is satisfied. *Id.* at 925–26.

▪▪▪ To conclude this summary, we note the applicable standard of review: "[W]hether the relevant act or acts were sufficiently overt is a 'mixed question of law and fact, the resolution of which must be made by the court through the application of a legal standard to the particular facts of the case.' " *Id.* at 927 (quoting *Bar 70,* 703 P.2d at 1306). However, " 'the determination whether the requisite first step has been taken [still] must be made on an *ad hoc*

basis, taking into account the particular facts in each case.' " *Id.* (quoting *City of Aspen,* 696 P.2d at 761). The applicant bears the burden of proving that an overt act or acts have fulfilled the necessary functions and, assuming the necessary intent has been established, that the first step thereby has been completed on a particular date. *Id.*

In the present case, the trial court's MOD contains specific findings regarding Thornton's completion of the first step requirements. Initially, the trial court stated that the following summary of events relating to the establishment of the first step, which the court derived from Thornton's trial brief, was supported by the evidence:

> Thornton formed a specific, fixed intent[15] to appropriate water rights as part of its Northern Project, and performed overt acts in furtherance of that intent on or before December 24, 1986. On that date, Thornton conducted a detailed field survey of several of the points of diversion and posted signs along the Cache La Poudre river manifesting its intent and providing notice to others of its intent to appropriate. In the months preceding December of 1986, after Thornton obtained a major share ownership of the Water Supply and Storage Company ("WSSC") for use in the same project, the City employed several consultants to determine what additional water rights should be acquired to insure a high-quality water supply for the City. The City staff and utilities attorney were directed to take the actions necessary to appropriate the water rights sought in these consolidated applications. Indeed, the specific applications now before the Court were reviewed and approved by Thornton's Utilities Board prior to their filing.

MOD at 35. The court then evaluated the overt acts performed by Thornton to determine whether these acts satisfied the three

---

15. Certain objectors appealed the trial court's determination that Thornton established the nonspeculative intent required to satisfy the intent prong of the first step test. We review and affirm the trial court's ruling in the next part of our discussion. However, no objector has appealed the trial court's specific ruling in the

MOD that Thornton formed its intent on or before December 24, 1986, and we accept this ruling for the purposes of determining the appropriation date. Accordingly, the appropriation date is the earliest date on which the overt acts prong of the first step test was satisfied.

requisite functions articulated in *City of Thornton*. With respect to the first two functions, manifestation of the intent to appropriate and demonstration of a substantial step toward the application of water to beneficial use, the court found that Thornton presented sufficient evidence to establish the completion of these requirements on or before December 24, 1986.[16]

The court was not persuaded, however, that Thornton's actions on or before December 24, 1986, were sufficient to fulfill the third overt act function—*i.e.*, to constitute notice to interested parties of the nature and extent of the proposed demand upon the water supply. The court found that Thornton's activities with respect to the conditional appropriations prior to December 24, 1986, were not of a sufficiently public nature to put interested parties on notice. MOD at 37. Relying on the cross-examination testimony of Dan Ault,[17] Thornton's chief engineering consultant, the court held that although the signs posted by Thornton were sufficient to provide notice of a general intent to appropriate, "interested parties would have had to wait until publication of the resume—or perhaps more accurately, the filing of the application—to know 'the nature and extent of the proposed demand upon the water supply.'" *Id.* at 37. Thus, the court determined the appropriation date to be December 31, 1986,

the date the applications were filed. *Id.* Thornton appeals the trial court's ruling, arguing that its actions on or before December 24, 1986, entitle it to a priority date of December 24, 1986, as a matter of law. Accordingly, we must examine the standards for evaluating the adequacy of notice in the context of the overt act requirements.

### 2. Adequacy of Overt Acts to Give Notice—General Standards

From the very earliest decisions concerning conditional rights, this court adopted an "inquiry notice" standard.[18] In *Fruitland Irrigation Co. v. Kruemling*, we explained the notice function of the first step test:

> Certainly the first step demanded by the rule is nothing short of an open and notorious physical demonstration, conclusively indicating a fixed purpose to diligently pursue and, within a reasonable time, ultimately acquire a right to the use of water, and as its primary function is to give notice to those subsequently desiring to initiate similar rights, it must necessarily be of such a character that they may fairly be said to be thereby charged with at least such notice as would reasonably be calculated to put them on inquiry of the prospective extent of the proposed use and

---

**16.** The trial court made the following ruling:

> The activities of December 24, 1986, and actions prior thereto, manifested the necessary intent. The court finds that the surveys conducted on December 24, 1986, constituted a substantial step toward the application of water to a beneficial use. In so finding the court may be extending the word "substantial" to its ultimate extreme.

MOD at 36. These findings have not been appealed.

**17.** The testimony relied on by the court was as follows:

> Q [by Mr. Shimmin] Okay. I'm going to ask you to assume that, as an engineer, you weren't working for the City of Thornton in this case, but were rather hired by the owner of one of these ditch structures. Having seen one of those signs posted, and the question the owner poses to you as an expert is, "Tell me what this means, how much are they claiming, what is going to be the demand on the river as a result of this claim." What would your answer have been?

> . . . .

> A [by Mr. Ault] Well, as an engineer, I would be very alert to that sign, and I would advise my client that they better carefully read any resume that comes out to know all the details about it, that they are on notice that the City of Thornton has made a filing here, and with all the rumblings going on up in that area in 1986, I would have advised my client to carefully review any resume notice.

MOD at 36–37.

**18.** There are obvious similarities between the inquiry notice required in the context of overt acts undertaken in pursuit of a conditional water right and the inquiry notice standard for water rights applications and resumes that we discussed in the preceding section. *See supra* part II(B)(2). However, because the two standards require the analysis of different types of activities, one entirely written and the other encompassing other physical manifestations of intent, a slightly different line of authority has developed for each standard. Therefore, in this section we analyze only those cases construing inquiry notice in the overt acts context.

consequent demand upon the water supply involved.

62 Colo. 160, 165, 162 P. 161, 163 (1916). In the overt acts context, applicants must provide sufficient facts not only of a general intent to appropriate but, more specifically, of the "nature and extent of the proposed demand upon the water supply." *Bar 70,* 703 P.2d at 1307. However, such notice does not require an applicant to determine the exact amount of water to be diverted at a precisely located point of diversion. *City & County of Denver v. Colorado River Water Conservation Dist.,* 696 P.2d 730, 747 n. 13 (Colo.1985); *id.* at 751 ("A would-be appropriator must give some notice to others of the claim upon the water from a particular source to establish a conditional water right; locating the diversion points with absolute specificity is not required."). Therefore, the inquiry notice required in the overt acts context is something more than mere notice of an unrefined intent to appropriate but something less than a detailed summary of exact diversion specifications. Ultimately, whether particular acts are sufficient to constitute inquiry notice of the impact on the water supply must be determined in light of the facts and circumstances of each case. *City of Aspen,* 696 P.2d at 761.

### 3. Adequacy of Thornton's Acts to Give Notice

In the present case, the trial court implied that Thornton's activities on or before December 24, 1986, were sufficient to provide notice of a general intent to appropriate water from the Cache La Poudre River. MOD at 35. However, the court ruled that these actions, when viewed either individually or collectively, were insufficient to provide the necessary notice of the nature and extent of the proposed demand of these diversions on the water supply.[19] Our review of the rele-

vant acts leads us to affirm the trial court's conclusion.

#### a. Signs

Initially, we consider the significance of the signs posted by Thornton consultants during their December 24, 1986, survey of potential diversion sites on the Cache La Poudre and South Platte Rivers. According to the testimony of Thornton engineering consultant Dan Ault, handmade signs prepared by the consultants were placed at six different proposed diversion sites along those rivers on December 24, 1986. On December 26, 1986, the consultants posted identical signs at five additional points on the rivers. *Id.* Depending on the intended use of the particular point of diversion, the information on the signs consisted of either the statement, "Initiation of appropriation by and point of exchange for the City of Thornton," or the statement, "Point of exchange for the City of Thornton." Each sign was also numbered as a point of diversion (one through eleven) and contained the date on which it was posted (December 24 or 26, 1986).

Based on their limited informational content, we hold that the signs posted by Thornton, although providing notice of a general appropriative intent, do not provide inquiry notice as to the nature and extent of the demand on the water supply. The signs provided no basis for even a general estimate by interested parties of either the potential uses or potential quantities of water proposed to be diverted. Thornton's consultant conceded as much on cross-examination and, as the trial court noted in the MOD, *see* MOD at 36–37, the consultant's testimony suggests that reference would have to be made to the application and resume to determine the potential impacts of these posted diversions. The signs gave no hint of the huge scope of Thornton's intended diver-

---

19. Thornton argues that the trial court applied an improper standard in making its notice determination. Specifically, Thornton points to the trial court's statement that "interested parties would have had to wait until publication of the resume—or perhaps more accurately the filing of the application ... *to know* 'the nature and extent of the proposed demand on the water supply,' " MOD at 37 (emphasis added), as evidence that the court abandoned the inquiry notice stan-

dard in favor of a higher knowledge requirement. While we are not convinced that the trial court's use of "to know" reflects the application of an improper standard, the standard applied by the trial court cannot be determined with certainty. Regardless, we are satisfied that uncontroverted evidence in the record establishes the facts necessary to enable us to resolve the notice issues under the proper standard without remand. *See Denver v. CRWCD,* 696 P.2d at 746–47.

sions.[20] To hold them sufficient as inquiry notice—*i.e.*, as exciting the interest of the various parties that would be affected throughout the entire Poudre and South Platte Basins—would effectively eliminate the notice requirement in the overt acts context.

#### b. Surveys

We find Thornton's undertaking of the surveys similarly insufficient to provide the requisite inquiry notice. As noted above, on December 24 and 26, 1986, Thornton's consultants staked and posted signs at eleven potential diversion and exchange points that were eventually identified as proposed diversion points in Thornton's applications for conditional water rights and exchange rights. In addition, surveyors with the consulting company apparently surveyed two of the diversion points on December 24, 1986, and another on December 26, 1986. However, the consultants had only limited contact with individuals while engaged in their task and no public notice other than the posted signs accompanied these actions. We have previously held that field trips in the nature of preliminary reconnaissance do not, in and of themselves, constitute overt acts providing adequate notice to interested parties. *City of Thornton*, 830 P.2d at 928; *Bar 70*, 703 P.2d at 1307–08. Although the trial court

apparently viewed Thornton's survey efforts as more significant than the preliminary reconnaissance conducted in *City of Thornton* and *Bar 70*, and thus held that those efforts satisfied the substantial step requirement, here the surveys were not sufficiently public or informative, either in isolation or in combination with the posted signs, to put interested parties on inquiry notice of the extensive nature of the proposed diversions.

#### c. Formal Acts

■ Finally, Thornton argues that various formal acts performed by Thornton and its employees and elected officials were sufficient to satisfy the first step test. According to the testimony of Thornton's mayor, beginning in April of 1986 she and members of Thornton's utilities staff conducted informational meetings with the WSSC board and shareholders and contacted elected officials in several areas to be affected by the project.[21] On May 30, 1986, in connection with the offering of bonds to finance certain aspects of the Northern Project, Thornton issued an official statement in the nature of a prospectus that contained limited information concerning certain parts of the Northern Project.[22] On July 17, 1986, the Thornton Utilities Board passed a resolution to pursue appropriations from the Poudre River.[23] Fi-

**20.** Thornton argues that similar signs were held to provide adequate inquiry notice by this court in *Denver v. CRWCD*, 696 P.2d 730. We do not agree that the present case is factually similar. In the relevant portion of *Denver v. CRWCD*, the City of Denver both posted signs and published notice in locally circulated newspapers, and we found the combination of the two sufficient to provide the requisite notice. *Id.* at 753–54. Furthermore, the information posted on the signs and in the newspaper by Denver contained more detailed information than the signs posted by Thornton. Although Denver's signs did not contain a total diversion amount, the signs at least indicated that a major diversion was planned. We noted that the signs and published notices "consisted of paraphrases of pertinent parts of the resolution [of the applicant]," which identified the intended appropriation as "all of the unappropriated waters" of the Colorado and Eagle Rivers and their tributaries at and above certain designated sections in the United States Government survey system. *Id.* at 753.

**21.** The mayor also testified that Thornton "spent a great deal of time making newspaper con-

tacts," but this testimony is not supported in the record by copies of any newspaper articles or official releases published in any newspaper prior to December 31, 1986. Thornton does not allege that notice of its diversion plans was published in a newspaper prior to that date.

**22.** The project description in this statement referred only to the purchase and subsequent use of WSSC shares and water. The statement does not mention potential appropriations on the Poudre or South Platte Rivers.

**23.** The resolution was memorialized in the Board minutes as follows:

Mr. Reeser moved that the staff and utilities attorney be and are hereby directed to undertake the necessary actions to perfect appropriations of water from the Cache La Poudre River, including but not limited to: a right to divert at least 100 cfs through the headgate at [sic] the Water Supply and Storage Company; a right to exchange upon the water being diverted by the Water Supply and Storage Company from the Cache La Poudre River at a

nally, on December 12, 1986, Thornton entered into an agreement with WSSC regarding the future exchange of water within the WSSC system as part of the Northern Project. In *City of Thornton*, we recognized that formal acts may qualify as overt acts provided that they perform one or more of the three required functions. 830 P.2d at 927. We further held that when a municipality is the applicant, relevant formal acts may include resolutions passed or other official decisions made. *Id.* However, with respect to satisfaction of the notice function, the adequacy of formal acts is necessarily dependent on the degree to which that information is made available to the general public. Formal resolutions, absent publicity attending their passage, are much more likely to provide evidence of the first two steps—*i.e.*, manifestation of the intent to appropriate and completion of a substantial step—than of the third step requirement of notice to interested parties. We do not suggest that formal acts can never satisfy all purposes of the notice requirement, but simply note that internal municipal resolutions are unlikely to come to the attention of interested parties unless further efforts reasonably calculated to impart such notice are taken. *See Fruitland*, 62 Colo. at 165, 162 P. at 163 (requiring notice "of such a character that [interested parties] may *fairly* be said to be thereby charged with at least such notice as would *reasonably be calculated to put them on inquiry* of the prospective extent of the proposed use and consequent demand upon the water supply involved") (emphasis added).

In the present case, the record does not establish that Thornton publicized its formal acts to the extent necessary fairly to charge potentially interested parties with inquiry notice of the proposed extent of the intended appropriations. Thornton's informational meetings with specific entities were certainly

sufficient to provide notice to those entities. However, Thornton has not established that it published details of its intended appropriations on or before December 24, 1986, and does not allege that it discussed its plan with and provided individual notice to all interested parties. Similarly, Thornton provided no evidence that the Utilities Board resolution was published in a newspaper or otherwise circulated in a manner that would reasonably be calculated to bring it to the attention of other water users on the Poudre.[24] Finally, the official statement released in connection with the bond sale did not even mention the proposed diversions from the Poudre, and thus did not provide inquiry notice of a general intent to make those appropriations. Under the circumstances of the present case, we hold that these formal acts did not fulfill the notice function, either individually or in combination with the survey and sign-posting conducted by Thornton.

For the foregoing reasons, we affirm the trial court's determination of the priority date for Thornton's conditional appropriations as December 31, 1986, the date of the filing of the relevant applications.

### C. Intent and Anti–Speculation

We now move to the intent prong of the first step test. Under this prong, an applicant must establish an intent to appropriate water for application to beneficial use. *City of Aspen*, 696 P.2d at 761. Pursuant to the anti-speculation doctrine, an applicant's intent to appropriate cannot be based upon the subsequent speculative sale or transfer of the appropriative rights. In the present case, the trial court held that Thornton formed the necessary nonspeculative intent. Objectors NCWCD and Fort Collins appeal this finding and argue that Thornton's plan violates the anti-speculation doctrine. Reso-

---

point near its headgate; a right to exchange from the confluence of the Cache La Poudre with the South Platte River up to the headgate of the Water Supply and Storage Company, or other points which may utilize water resources as owned or controlled by the city, all in order to help meet the needs of present and anticipated future customers of the City of Thornton. The motion was seconded by Mr. Greer and approved by a unanimous vote.

Ex. A–36.

**24.** Because the resolution was not adequately circulated, we do not address whether the resolution contains sufficient detail to put an interested party on inquiry notice of the prospective extent of the proposed use and consequent demand on the water supply.

lution of the issues raised by NCWCD and Fort Collins requires an examination of the anti-speculation doctrine as it applies to municipalities. Our specific analysis will be informed by a general overview of the anti-speculation doctrine as it has developed in Colorado water law.

### 1. Overview of Anti–Speculation Doctrine

Our seminal case in this area is *Colorado River Water Conservation District v. Vidler Tunnel Water Co.*, 197 Colo. 413, 594 P.2d 566 (1979). In that case, Vidler Tunnel Water Company (Vidler), a private corporation, sought a conditional storage decree for a reservoir as part of a planned transmountain diversion project. *Id.* at 415, 594 P.2d at 567. The corporation planned to sell the water to municipalities on the eastern slope for general municipal use but had not obtained firm contractual commitments binding those municipalities to purchase or receive the water. *Id.* at 415–16, 594 P.2d at 568–69. We held that Vidler's plan, which essentially depended on an unsubstantiated assumption that general population growth would produce a need for more water in the future and that municipalities would seek to satisfy this need from Vidler's supply, did not establish the necessary intent to apply the appropriated water to beneficial use. *Id.* In the absence of firm contractual commitments for the use of water not intended by Vidler for its own use or of agency relationships between Vidler and the intended users, we held Vidler's application unduly speculative. *Id.* Because the applicant in *Vidler* was a private corporation, we did not consider whether these strict requirements applied equally to municipal applicants.

Although *Vidler* has most often been cited as defining the anti-speculation doctrine, we did not articulate a new legal requirement in that case, but rather merely applied long-standing principles of Colorado water law. *See City & County of Denver v. Colorado River Water Conservation Dist.*, 696 P.2d 730, 757 (Colo.1985); *Rocky Mountain Power Co. v. Colorado River Water Conservation Dist.*, 646 P.2d 383, 388–89 (Colo.1982). Thus, we must examine *Vidler*'s predecessors to determine the scope of the application

of the anti-speculation doctrine to municipal applicants.

The question of a municipality's ability to appropriate water to meet future needs first received significant attention from this court in *City & County of Denver v. Sheriff*, 105 Colo. 193, 96 P.2d 836 (1939). In *Sheriff*, the City of Denver appealed the trial court decision granting certain absolute water right decrees requested by Denver but adopting several conditions that limited Denver's ability to lease or sell water obtained by exercise of those water rights to other entities in the event that use of the water was not necessary to meet the city's immediate needs. *Id.* at 198–201, 96 P.2d at 838–40. This court struck down those limitations as an improper restriction on Denver's attempts to ensure an adequate supply of water for its constituents. We emphasized the necessity of preserving the flexibility of municipalities to exercise their managerial judgment in resolving their water supply problems, *id.* at 201, 96 P.2d at 840–41, and made the following statement regarding the unique circumstances of municipal water providers:

The concern of the city is to assure an adequate supply to the public which it serves. In establishing a beneficial use of water under such circumstances the factors are not as simple and are more numerous than the application of water to 160 acres of land used for agricultural purposes. A specified tract of land does not increase in size, but populations do, and in short periods of time. With that flexibility in mind, it is not speculation but the highest prudence on the part of the city to obtain appropriations of water that will satisfy the needs resulting from a normal increase in population within a reasonable period of time.

*Id.* at 202, 96 P.2d at 841. The *Sheriff* decision clearly counsels against a strict application of the anti-speculation doctrine to municipalities seeking to provide for the future needs of their constituents.

We again recognized the unique need of municipalities for planning flexibility in *City & County of Denver v. Northern Colorado Water Conservancy District*, 130 Colo. 375, 276 P.2d 992 (1954) (*Blue River*).

In *Blue River*, Denver sought, in part, a direct flow conditional decree for water from the Blue River, a tributary to the Colorado River on the western slope. *Id.* at 380–81, 276 P.2d at 995–96. Several objectors challenged Denver's application on the ground that the city's water supply was adequate without the claimed Blue River water, and that to base a decree solely on projected future needs would be improperly speculative. *Id.* at 384, 276 P.2d at 997. We noted the divergent estimates of the future growth and needs of the city but ultimately reached the following conclusion:

> We cannot hold that a city more than others is entitled to decree for water beyond its own needs. However, an appropriator has a reasonable time in which to effect his originally intended use as well as to complete his originally intended means of diversion, and when appropriations are sought by a growing city, regard should be given to its reasonably anticipated requirements. *Van Tassel Real Estate & Live Stock Co. v. City of Cheyenne*, 49 Wyo. 333, 54 P.2d 906; *Denver v. Sheriff*, 105 Colo. 193, 96 P.2d 836.... While the witnesses as to Denver's future water requirements were not in agreement, there was substantial evidence to support a finding of future need for water from the Blue River within a reasonable time. This is amply confirmed by the City's rapid subsequent growth.

*Id.* at 384, 276 P.2d at 997. Thus, under *Blue River*, a city may appropriate water for its future needs without violating the prohibition on speculation so long as the amount of the appropriation is in line with the city's "reasonably anticipated requirements."

As discussed above, *Vidler* was decided in the context of a private corporation's application for water rights and did not involve a municipality. However, interpreting *Vidler* in conjunction with *Sheriff* and *Blue River*, we do not read the requirements of firm contractual commitments or agency relationships applied to private parties in *Vidler* to apply with equal force to municipalities. This limited exception to the *Vidler* requirements is supported by actions taken by the General Assembly. In 1979, immediately following the *Vidler* decision, the legislature amended the definition of "appropriation" in the Water Right Determination and Administration Act of 1969 to codify the prohibition on speculation articulated in *Vidler*. Ch. 346, sec. 5, § 37–92–103(3)(a), 1979 Colo. Sess. Laws 1366, 1368 (codified at § 37–92–103(3)(a), 15 C.R.S. (1990)); *see In Re Board of County Comm'rs of Arapahoe County*, 891 P.2d 952, 959–60 & n. 7 (Colo.1995) (*Arapahoe County*). Following the amendment, subsection 103(3)(a) now states:

> (3)(a) "Appropriation" means the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law; but no appropriation of water, either absolute or conditional, shall be held to occur when the proposed appropriation is based upon the speculative sale or transfer of the appropriative rights to persons not parties to the proposed appropriation, as evidenced by either of the following:
>
> (I) The purported appropriator of record does not have either a legally vested interest or a reasonable expectation of procuring such interest in the lands or facilities to be served by such appropriation, *unless such appropriator is a governmental agency* or an agent in fact for the persons proposed to be benefited by such appropriation.
>
> (II) The purported appropriator of record does not have a specific plan and intent to divert, store, or otherwise capture, possess, and control a specific quantity of water for specific beneficial uses.

§ 37–92–103(3)(a), 15 C.R.S (1990) (emphasis added).

By enacting the above provision, the General Assembly endorsed the *Vidler* holding with respect to private parties but also recognized the need for governmental agencies, which include municipalities and other agencies responsible for supplying water to individual users, to exercise some planning flexibility with respect to future water needs. This exception, however, does not completely immunize municipal applicants from speculation challenges. Rather, as part of the statute codifying *Vidler*, the exception must be read as consistent with the scope of the

exception recognized for municipalities in those decisions underlying *Vidler*, such as *Sheriff* and *Blue River*. Thus, under section 37–92–103(3)(a), a municipality may be decreed conditional water rights based solely on its projected future needs, and without firm contractual commitments or agency relationships, but a municipality's entitlement to such a decree is subject to the water court's determination that the amount conditionally appropriated is consistent with the municipality's reasonably anticipated requirements based on substantiated projections of future growth.[25]

Contrary to NCWCD's contentions, the above construction is consistent with our anti-speculation cases decided after the enactment of section 37–92–103(3)(a). We have reviewed numerous challenges to decrees based on the anti-speculation doctrine subsequent to *Vidler* and the enactment of section 37–92–103(3)(a). However, almost all of those cases concerned applications by private parties rather than by municipalities. *See Arapahoe County*, 891 P.2d at 962–66 (evaluating claim initiated by private party and later purchased by county); *Jaeger v. Colorado Ground Water Comm'n*, 746 P.2d 515 (Colo.1987); *Lionelle v. Southeastern Colo. Water Conservancy Dist.*, 676 P.2d 1162 (Colo.1984); *Rocky Mountain Power*, 646 P.2d 383. Our sole post-*Vidler* case addressing speculation in the municipal application context is *City & County of Denver v. Colorado River Water Conservation District (CRWCD)*, 696 P.2d 730 (Colo.1985).

In *Denver v. CRWCD*, the City of Denver claimed various conditional water rights pursuant to adjudication suits filed in 1968. According to the findings of the water referee, Denver intended to use this water not within its own boundaries or for its own future development but rather to sell or lease to water users outside the city limits. *Id.* at 737. For reasons independent of the anti-speculation doctrine, the water referee denied all of Denver's claims and the water court upheld this denial.[26] *Id.* at 737–38.

On appeal, this court tangentially addressed the speculation issue by remanding to the water court for consideration of whether the city complied with the *Vidler* requirements—*i.e.*, whether the city could establish "plans to use that water within its own boundaries, firm contractual commitments to supply that water to users outside its boundaries, or agency relationships with such users." *Id.* at 757. In the present case, NCWCD argues that *Denver v. CRWCD* establishes the applicability of the *Vidler* requirements to municipalities. According to NCWCD, our use of the word "boundaries" refers exclusively to a city's boundaries as they exist at the time of the application rather than the reasonably anticipated future boundaries of the municipal applicant. Thus, NCWCD contends that our language in *Denver v. CRWCD* precludes municipalities from appropriating water based on projected requirements for future growth areas outside the current municipal boundaries. We disagree with this contention.

■ We previously noted that municipalities require sufficient flexibility within the anti-speculation doctrine to allow them to plan for future water needs. *See supra* part III(C)(1). If we adopt NCWCD's contention that plans must be based on use within existing boundaries, we would read this flexibility out of the rule and undercut our prior statements in *Sheriff* and *Blue River*. Such a reading would also be inconsistent with the governmental agency exception in section 37–

---

**25.** Most front range municipalities in Colorado could conjecture growth in the next few decades at exponential rates. To some extent, that growth is directly related to the ability of the municipality to supply water. Hence, the projection becomes a self-fulfilling prophecy if the municipality secures a right to the water necessary to sustain the growth. We do not view such conjecture as sufficient substantiation to support a conditional decree for water. Municipalities must do more than represent to the water court that if they had water, they would be able to grow.

**26.** Although noting that Denver intended to sell or lease the claimed water for use outside of its boundaries, the referee apparently based his holding on an interpretation of Denver's charter and other authorities that denied to the city the authority to appropriate water solely for use outside of its boundaries. *Denver v. CRWCD*, 696 P.2d at 737.

92–103(3)(a), 15 C.R.S. (1990).[27] Our holding in *Denver v. CRWCD* must be viewed as limited to the unique facts of that case. Denver sought the claimed water to sell it for profit to parties outside its own boundaries. The city was acting in the capacity of a water supplier on the open market rather than as a governmental entity seeking to ensure future water supplies for its citizens. Accordingly, the municipal planning exception was simply inapplicable, and Denver was required to comply with the full range of requirements applicable to private parties under *Vidler.* Thus understood, *Denver v. CRWCD* does not eliminate a municipality's ability to plan for the future, and municipal appropriations for reasonably anticipated future requirements, including requirements for projected growth areas not presently within the municipal boundaries, are valid if the municipality substantiates such need.

### 2. Review of Trial Court's Ruling on Intent and Anti–Speculation

■ Having clarified the standard for evaluating anti-speculation challenges to municipal applications for water rights, we now review the trial court's ruling in the present case. Initially, we note that the trial court's resolution of this issue implicates both factual and legal issues. We review the court's interpretation of section 37–92–103(3)(a) and the court's determination of the correct legal standards as questions of law and need not defer to the trial court's decisions on those matters. *Bloomer v. Board of County Comm'rs of Boulder County,* 799 P.2d 942, 944 (Colo.1990).

In its Memorandum of Decision, the trial court discussed the application of section 37–92–103(3)(a) and summarized the standard for evaluating the intent required for municipal applications for determination of conditional water rights as follows: "A municipality may take into consideration facts indicating that its physical area is likely to expand in the course of growth. Planning need not be limited to current geographic limits if there is reasonable expectation that

those limits will expand." MOD at 40. We conclude that the trial court recognized the municipal exception and thus applied the proper legal standard to Thornton's claims.

■ The remainder of the court's decision—*i.e.,* determination of the municipality's reasonably anticipated requirements and intended use—presents questions of fact that necessarily require evaluations of evidence. *See In re Applications of the Upper Gunnison River Water Conservancy Dist.,* 838 P.2d 840, 847, 848 (Colo.1992) (*Upper Gunnison* ). The trial court is entitled to deference on factual issues, and we will not disturb the court's predicate factual determinations on appeal "unless the evidence is wholly insufficient to support those determinations." *Id.* at 847; *Southeastern Colo. Water Conservancy Dist. v. Twin Lakes Assocs., Inc.,* 770 P.2d 1231, 1239 (Colo.1989).

■ Thornton presented extensive evidence to support both its projections of future water demand and its ultimate intent to use all of the claimed water within its future boundaries or service areas. Various witnesses and planning experts employed by Thornton testified that Thornton is projected to achieve a population of approximately 379,000 by the year 2050 with a concomitant water demand of more than 90,000 acre feet per year, a demand that cannot be met by Thornton's current water supply. In support of this testimony, Thornton offered planning documents and studies prepared by its water consultants that explain the calculation of these estimates. Thornton also presented evidence of the city's history of rapid growth and expansion—from one square mile and 10,000 people in 1956 to 25 square miles and 60,000 people in 1991—and planned future economic development. Furthermore, the evidence suggests that Thornton had adopted an aggressive policy of water service expansion and annexation prior to filing the conditional water rights applications at issue. Thornton had entered into agreements with contiguous municipalities, including North-

---

27. Section 37–92–103(3)(a) was enacted in 1979, more than ten years after the City of Denver applied for confirmation of the rights at issue in *Denver v. CRWCD. See* Ch. 346, sec. 5, § 37–92– 103(3)(a), 1979 Colo. Sess. Laws 1366, 1368. Accordingly, the statute was not applicable to Denver's claims and the court did not discuss the governmental agency exception.

glenn, Westminster, and Commerce City, and with Adams County attempting to define Thornton's future growth areas and to limit the ability of other entities to provide water service in those areas. In addition, it had entered into a substantial number of contracts to provide water service, many contingent on annexation, within that future growth area. These activities tend to corroborate Thornton's higher growth projections.

NCWCD and Fort Collins challenged Thornton's projections as unreasonably optimistic and presented contrasting testimony and projections, in particular the population growth projections for the Denver metropolitan area prepared in conjunction with the 1985 Environmental Impact Study for the then-proposed Two Forks Project. However, the trial court ultimately found Thornton's projections, which the court described as "based on studies conducted by experts in the field and appear[ing] to have considerable basis in fact and in theory," to be "optimistic, but not unreasonable." MOD, at 40. Although the evidence presented by the parties is in conflict, the record as a whole provides adequate support for the trial court's finding that Thornton's projections are a reasonable estimation of the city's anticipated future water requirements.[28]

With respect to Thornton's intent to use the claimed water within its future boundaries, several witnesses involved in the planning process for the Northern Project testified that the intent was always to serve its present and future citizens. Moreover, the Thornton Utilities Board resolution approving the project stated that the conditional appropriations were to be made "in order to help meet the needs of present and anticipated future customers of the City of Thornton." This testimony, coupled with Thornton's aggressive attempts to annex and to expand its water service area and customer base, supports a finding that Thornton intends to use the claimed water for its own needs.

Fort Collins and others disputed Thornton's intent to use all of the claimed water within its future boundaries or service areas, charging that statements in planning documents for the Northern Project reveal an original intent on the part of Thornton to sell some of the claimed water to finance the costs of the project. The trial court noted the objectors' allegations of Thornton's intent to sell the water, see MOD at 40, but was not persuaded to deny the decree.[29] The court ultimately found that "[t]he preponderance of the evidence is that the water and exchanges appropriated by Thornton are needed for use and will be used within the City's municipal boundaries, within the City's designated service area, or by persons or entities with which it has either agency relationships or firm contractual commitments." Decree, ¶ 13, at 13. Again, the record as a whole adequately supports the trial court's conclusion that the decreed water was necessary to supply the reasonable future water requirements of the city of Thornton and its service areas and will be used for that purpose.

In the present case, the trial court evaluated the evidence pursuant to the proper legal standard. Furthermore, the trial court's fac-

---

**28.** In the final decree, the trial court made the following additional finding:

Thornton has reason to believe that the firm yield of the City's existing supplies will fall short of anticipated demand around the turn of this century and thereafter.... Demand within the City's 1986 service area (including its extended service area) is expected to reach over 94,000 [acre feet] per year. These concerns are a reasonable basis for Thornton's planning for the future.

Decree, ¶ 8.3, at 5.

**29.** The court made the following statements regarding the allegations of speculative intent:

Certain objectors see in applicant's 1986 Water Resources Development Plan a scheme to sell portions of the water to be produced as a result of these applications to others at higher future prices. They think this will be a method used to finance the huge costs of the project. Applicant denies any such speculative intent.

For these reasons consideration should be given at the time of settling the decree herein as to whether it should include "reality checks" at certain stated intervals to determine if the projections are being met. Perhaps jurisdiction should be reserved so that if it becomes evident that the projected growth will not be achieved, the project can be scaled down accordingly. The court makes no determination of the matter, but only suggests it as a subject for further discussion.

MOD at 40. The final decree ultimately included such "reality checks." We discuss the validity of these provisions in part IV(A)(2), infra.

tual findings that the decreed water is consistent with Thornton's reasonably anticipated water requirements and that the water will eventually be used to satisfy needs within Thornton's boundaries or service areas have an adequate basis in the record. Therefore, we accept these findings and uphold the court's determination that Thornton established a nonspeculative intent to appropriate the claimed water. In view of our conclusion that Thornton accomplished the requisite overt acts as discussed in the preceding section, we hold that Thornton has established the requirements of the first step test.

### D. Can and Will Doctrine

We turn now to the final requirement that must be satisfied to establish a conditional water right. The legislature defined the "can and will" requirement as follows:

No claim for a conditional water right may be recognized or a decree therefor granted except to the extent that it is established that the waters can be and will be diverted, stored, or otherwise captured, possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time.

§ 37–92–305(9)(b), 15 C.R.S. (1990). The trial court specifically held that Thornton met the requirements of the "can and will" test. Fort Collins appeals that conclusion, arguing that substantial gaps remain in the project that render Thornton's ability to complete the project unacceptably uncertain. The findings of the trial court are supported by the evidence; thus we affirm that court's determination that Thornton can and will divert the water to beneficial use and complete the project with diligence and within a reasonable time.

### 1. Can and Will—Standard

The "can and will" requirement, enacted by the legislature in 1979, Ch. 346, sec. 6, § 37–92–305(9)(b), 1979 Colo.Sess.Laws 1366, 1369, is a relatively new addition to the list of requirements that must be satisfied to establish a conditional water right. Due to its relatively brief history, we have addressed this provision in few decisions. However, in *Arapahoe County*, 891 P.2d 952, we had occasion to discuss in detail the legislative history of the "can and will" statute and our prior precedent regarding this provision. Accordingly, rather than repeat that discussion in the context of the present case, we will briefly summarize relevant aspects of that opinion.

In *Arapahoe County*, we noted that the legislative goal of section 37–92–305(9)(b) was "'to reduce speculation associated with conditional decrees and to increase the certainty of the administration of water rights in Colorado.'" 891 P.2d at 960 (quoting *FWS Land & Cattle Co. v. State, Div. of Wildlife*, 795 P.2d 837, 840 (Colo.1990)). Based on our review of the legislative history of the "can and will" provision, we further noted that "the purpose of the statute was to prevent speculation by denying recognition of claims for conditional water rights that have no substantial probability of maturing into completed appropriations." *Id.* at 960 & n. 8 (citing testimony before the House Agriculture Committee). Although the "can and will" requirement is aimed at eliminating speculation, it is not identical to the antispeculation doctrine enunciated in *Vidler*, 197 Colo. at 417–18, 594 P.2d at 568–69, and codified in section 37–92–103(3)(a), 15 C.R.S. (1990). The latter requires that the applicant show a nonspeculative intent to put the water to beneficial use for its own purposes or that it support its application by concrete evidence of commitments from or agency relationships with the ultimate users of the water. However, the "can and will" provision extends further, requiring the applicant to establish a substantial probability that this intended appropriation can and will reach fruition. *Arapahoe County*, 891 P.2d at 961.

Ultimately, we stated the standard for evaluation of an application under the "can and will" statute:

The "can and will" statute should be construed to require an applicant for a conditional water right decree to establish that there is a substantial probability that within a reasonable time the facilities necessary to effect the appropriation can and will be completed with diligence, and that

as a result waters will be applied to a beneficial use. Proof of such a substantial probability involves use of current information and necessarily imperfect predictions of future events and conditions.

*Id.*[30] Implicit in this standard is the legislative focus on preventing speculation. Therefore, the "can and will" requirement should not be applied rigidly to prevent beneficial uses where an applicant otherwise satisfies the legal standard of establishing a nonspeculative intent to appropriate for a beneficial use.[31]

### 2. Review of Trial Court's Ruling on Can and Will

Having set forth the standard for evaluating an applicant's proposal under section 37–92–305(9)(b), we now turn to the facts of the present case. Following its review of the evidence presented by the parties, the trial court made the following ruling: "The waters subject to Thornton's appropriation can and will be diverted, stored, exchanged or otherwise captured, possessed, and controlled and will be beneficially used and the project can and will be completed with diligence and within a reasonable time." Decree, ¶ 12.3, at 13, ¶ 33.5, at 37; *see also id.* ¶¶ 33.1–33.4, at 34–37. Fort Collins appeals the trial court's resolution of this issue based on the following two allegations: (1) the planned diversion facilities cannot accommodate the rate of flow decreed with respect to certain of the decreed rights; and (2) completion of Thornton's project is dependent on contingencies including the future acquisition of additional replacement supplies, storage capacity, and contracts with other water users. We address these contentions in reverse order.

### a. Contingencies

■ It is undisputed that Thornton had not resolved every contingency relating to the completion of the Northern Project prior to the trial court's issuance of the conditional decree. Among the additional requirements necessary for the eventual completion of the exchange portions of the project are an additional 15,000 acre feet of substitute supply water and 25,000 acre feet of storage capacity, as well as first-use contracts with WSSC shareholders to allow completion of the planned WSSC ditch exchange in Phase III. Fort Collins argues that the presence of such contingencies necessarily requires a finding that Thornton has not satisfied its burden of proof with regard to the "can and will" requirements. We disagree.

In prior cases, we recognized various factors that are relevant considerations in evaluating whether the "can and will" statute has been satisfied but which are not necessarily determinative elements of the applicant's proof. *See Arapahoe County,* 891 P.2d at 961–62 n. 9 (citing several relevant factors); *see also In re Gibbs,* 856 P.2d 798, 802–03 (Colo.1993) (present right and prospective ability to use structures and facilities necessary for appropriation is non-dispositive factor in "can and will" determination); *Public Service Co. v. Board of Water Works,* 831 P.2d 470, 478–79 (Colo.1992) (issue of economic feasibility is one relevant factor in "can and will" determination). Under the particular circumstances of the present case, we conclude that the presence of future contingencies is a similarly non-dispositive factor to be considered in combination with other relevant factors in determining whether the

---

**30.** As part of our decision in *Arapahoe County,* we clarified that the applicant must establish the availability of sufficient water to allow the intended appropriation as an element of satisfying the "can and will" requirements embodied in the quoted standard. 891 P.2d at 962. This element is not at issue in the present case. The trial court found that sufficient water was available to satisfy Thornton's claims, and the objectors did not appeal that finding.

**31.** We noted in *Arapahoe County* that the policy of maximum utilization of water, *see, e.g., Fellhauer v. People,* 167 Colo. 320, 336, 447 P.2d 986, 994 (1968); § 37–92–102(1)(a), 15 C.R.S.

(1990), provides guidance in construing the "can and will" statute. *Arapahoe County,* 891 P.2d at 962. Where the evidence presented by the applicant establishes that speculation is not a real concern, the "can and will" statute, while still an important check as to the feasibility of the intended appropriation, should not be applied to prevent on technical grounds an appropriation that would serve the goal of maximum utilization. Accordingly, whether an applicant has established a substantial probability of completing the intended appropriation necessarily requires an ad hoc determination in light of the particular facts and circumstances of each case.

applicant has established a substantial probability of project completion. In our view, despite these contingencies, the record as a whole contains sufficient evidence to establish a substantial probability that Thornton can and will complete the Northern Project with diligence and within a reasonable time.[32]

■ During the course of the trial, Thornton presented substantial evidence concerning its commitment and ability to achieve completion of the Northern Project. Initially, Thornton established the critical element of availability of both unappropriated water and exchange potential to the trial court's satisfaction. Thornton also presented evidence that it had secured stipulations with the owners of most of the existing structures to be used in the project, that necessary additional facilities can and will be constructed to divert, store, and deliver the water, that it had obtained most of the necessary substitute supply of water for the project, and that the city can pay for completion of the project. Regarding its commitment to complete the project, Thornton presented evidence that, prior to trial, it had already invested $73,000,000 and utilized more than 35,000 work hours of consultants on project analysis, planning, and design.

Although substantial steps have been taken by Thornton to secure the facilities and water rights necessary for eventual completion of the Northern Project, future contingencies still remain. However, circumstances relating to these contingencies render them less persuasive in the "can and will" analysis. Initially, both the additional water supply and the additional storage capacity not yet acquired by Thornton are not necessary until Phase III of the project, which is not scheduled to deliver water until the year 2036. See MOD at 3. Thornton presented evidence that it has adequate substitute supplies and adequate storage rights to accommodate planned development through Phases I and II. Furthermore, Thornton's expert testified that the city had investigated and identified, though admittedly not contracted for, potential sources for the necessary additional water supply and storage capacity. Finally, although Thornton has not yet acquired first-use contracts with WSSC shareholders to enable it to complete the planned ditch exchange component of the project, the relevant portion of the exchange is not scheduled to take place until Phase II, which will first deliver water in approximately 2029. See MOD at 3. These actions further support a determination that Thornton can and will successfully resolve these contingencies prior to the projected completion date of the project.

■ As noted above, the legislative purpose underlying the "can and will" requirements is the prevention of speculation. See Arapahoe County, 891 P.2d at 960. Thornton has established a nonspeculative intent to put the Northern Project water to beneficial use, see supra part III(C)(2), and is subject to future diligence requirements to monitor

---

32. The parties dispute whether additional water court decrees must be obtained to effect completion of the project. Fort Collins argues that if we find that additional decrees are necessary to the completion of the project, our decision in *Public Service Co. v. Board of Water Works*, 831 P.2d 470 (Colo.1992), requires us to hold that the "can and will" requirements have not been satisfied. We do not interpret that case as mandating such a holding based solely on the need for a future decree.

In *Public Service*, the applicant sought a decree for an exchange of water rights that included as a crucial component storage in a reservoir mandated for construction pursuant to the terms of a prior decree. 831 P.2d at 474–75. Testimony by the applicant's own expert suggested that the applicant had no present intent to construct the necessary reservoir and, in fact, intended to seek a future decree deleting the reservoir construc-

tion requirement from the original decree. *Id.* at 476. We upheld the trial court's determination that the applicant had not fulfilled the "can and will" requirement. However, this court's focus was on the absence of intent to complete the appropriation as decreed, and we considered the intent to apply for a future decree only as evidence of this lack of intent. *Id.* at 477–78. We did not set forth or even suggest a rule that no project be approved if it requires additional future decrees to allow eventual completion.

In accord with our holding in *Public Service*, we treat the possibility that future decrees will be required as a relevant, but non-dispositive, consideration in evaluating whether a project can and will be completed. Therefore, under the particular facts and circumstances of this case, we can resolve the "can and will" issues without determining absolutely whether future decrees are required to complete the Northern Project.

further its use and need for the appropriated water, *see infra* part IV(A)(2). Furthermore, through its substantial investment in this project, Thornton has shown a commitment to completing the appropriations by application of water to beneficial use. Thornton's evidence of factors supporting the substantial probability of future completion is sufficient to outweigh the presence of future contingencies.

### b. Conformity Between Decreed Flow Rates and Capacities of Diversion Structures

The other "can and will" issue raised by Fort Collins relates to alleged discrepancies between the physical capacity of diversion structures for delivery of water to Thornton from certain decreed diversion points and the decreed flow rates assigned to those points. Fort Collins argues that this court's prior decision in *Southeastern Colorado Water Conservancy District v. City of Florence*, 688 P.2d 715 (Colo.1984), requires a direct connection between the flow rate decreed for a conditional water right and the physical capacity of the diversion structures that the applicant proposes to build to utilize these rights. Thus, with respect to these identified points of diversion, Fort Collins contends that Thornton cannot satisfy the "can and will" requirements.

We disagree with Fort Collins' contention that *Florence* controls our decision in the present case. In *Florence*, we reversed the trial court's grant of a conditional decree based in part on the differential between the rate of the diversion sought and the design capacity of the applicant's water system. However, our decision was based on shortfalls in the applicants' entire system capacity, including storage, and did not impose a rigid requirement of absolute correlation between decreed flows and intake or delivery pipe or diversion structure capacity.[33] Thus, where an applicant establishes that its system design can accommodate through storage or other means any differences between decreed flow rates and lesser carrying capacities at points of ultimate delivery, *Florence* does not act as a barrier to a finding that the applicant can and will divert at the decreed rate.

The record does not establish a shortfall in the entire water system capacity, as was the case in *Florence*. Fort Collins does not identify a lack of capacity in the headgate diversion structures where the initial diversions will be made, and the record shows that these capacities match or exceed the decreed flow rates. Rather, it argues that the pipelines designed for ultimate delivery of the diverted water to Thornton are incapable of delivering the entire decreed flows. However, Fort Collins apparently does not take into account that Thornton's system is not designed to deliver diverted water directly from the headgates to the pipelines. Thornton's expert testified that decreed storage would be available to allow diversion at the full flow rate, with subsequent controlled release at the capacity of the pipeline delivering the water to its ultimate place of use. Moreover, some of this diverted water will not be transported to Thornton but rather will be released to satisfy Thornton's replacement obligations. *Id.* Unlike the situation in *Florence*, Thornton's storage capacity and other applications will allow the diversions to take place at the decreed rates without the need to build or improve upon diversion facilities beyond the plans encompassed in the project proposal. Sufficient evidence was introduced to support the trial court's decree encompassing the flow rates at issue, to establish that Thornton's system design is adequate, and to support the finding that Thornton can and will use the decreed quantities of

---

**33.** In *Florence*, the applicants sought a decree for a conditional water right to divert 100 cubic feet per second (c.f.s.) of water, although their existing water system was designed to handle only 4.7 c.f.s. 688 P.2d at 716. This court reversed the trial court's grant of a conditional decree, holding that the applicants' ability to enlarge their system capacity in the future was not sufficient to establish that the water actually would be diverted. *Id.* at 718. However, the evidence present-

ed in *Florence* was not limited to the capacity of the applicants' diversion structures but rather encompassed the capacity of all elements of the applicants' water system. *Id.* at 716 n. 1 ("testimony indicated that ... the applicants' surface water intake screens and pumping, treatment plant, settling pond and storage capacities all were designed to handle not much more than 4.7 c.f.s. of water").

water. For the foregoing reasons, we affirm the trial court's holding that Thornton can and will divert the water to beneficial use and complete the project with diligence and within a reasonable time.

In sum, based upon our review of the relevant case law and of the voluminous record associated with these issues, we find support for the trial court's conclusion that Thornton fulfilled all the necessary requirements to establish conditional water rights for its Poudre River exchange, its Poudre and South Platte River diversions, and its WSSC ditch exchange. Thornton established the required "first step" by forming a nonspeculative intent to use the claimed water for its future water service needs and completing the required overt acts culminating in the filing of its applications on December 31, 1986. Thornton also established that it can and will complete the necessary facilities and divert the claimed water within a reasonable period of time. Accordingly, we affirm the trial court's decision to decree the claimed conditional rights with an appropriation date of December 31, 1986.

## IV. Terms and Conditions of Decree

In its Memorandum of Decision the trial court aptly stated that "[t]he applicant is clearly entitled to a decree. It is only the terms of that decree which are in dispute." MOD at 42. Having affirmed the trial court's determination that Thornton has established the right to a decree for its Northern Project, we too must address the parties' disputes as to the scope of those rights. In granting the decree, the trial court carefully considered the issues and imposed numerous terms and conditions on the exercise of Thornton's conditional rights. Although only a relatively few conditions are appealed in comparison to the number actually imposed, each appealed condition, or determination that a condition was not necessary, requires individual analysis of the specific facts and circumstances that initiated its imposition. Therefore, the remainder of this opinion is devoted to resolving conflicts over the conditions the trial court imposed or declined to impose.

### A. Volumetric Limits and Reality Checks

We initially address the validity of certain general restrictive conditions imposed by the trial court that relate to Thornton's completion of its appropriations based on its decreed conditional water rights. Specifically, Thornton appeals the volumetric limits imposed by the trial court to restrict the total water diverted through operation of the Northern Project and the "reality checks" provisions affecting Thornton's future diligence requirements.

### 1. Volumetric Limits

The first general provision challenged by Thornton concerns volumetric limits on the yield of the entire Northern Project. The trial court quantified the conditional water rights decreed to Thornton in terms of cubic feet per second, a rate-of-flow measurement. The final decree placed specific limitations, however, on the volumetric yield that Thornton could divert under each of the four proposed appropriations that collectively make up Thornton's Northern Project,[34] as well as on the volumetric yield of the entire project. Thornton appeals the limitations on its new conditional appropriations of river exchange diversions, direct river diversions, and ditch exchange withdrawals, as well as the limitation on total project yield to the extent it affects Thornton's new appropriations.[35]

■ We hold that the trial court may impose this type of limitation, provided that

---

**34.** These four proposed appropriations are the Poudre River exchange (case 86CW401), the WSSC ditch exchange (case 86CW402), the Poudre River and South Platte River direct diversions (case 86CW403), and the change of water rights and plan for augmentation (case 87CW332).

**35.** Thornton concedes that the water court is authorized to limit the yield from a change of

water right or plan for augmentation to prevent injury to other water users under section 37–92–305(3), 15 C.R.S. (1990). Therefore, it does not appeal the limitations placed on the change of water rights decreed by the court pursuant to Thornton's application in case 87CW332, which include limits on the amount of water Thornton may derive from its pro rata share of WSSC's transmountain diversions.

(1) the limitation conforms to the amount of available water for which the applicant has established both a need and a future intent and ability to use, or (2) that the limitation is specifically found by the court to be necessary to prevent injury to other water users. Here, the total volumetric yield limit does not conform to the trial court's findings with respect to Thornton's established water requirements and the availability of water for appropriation, and the trial court made no specific finding that the total yield limitation was necessary to protect other water users against injury. Therefore, we remand to the trial court with instructions either to conform the volumetric yield limitations to its findings of fact regarding Thornton's water requirements or to make specific findings identifying the potential injury that will be ameliorated by the volumetric yield restrictions set forth in the decree.

 Initially, we note that a conditional water right is limited to the amount of water available for appropriation, *Arapahoe County*, 891 P.2d at 962, and for which the applicant can establish a nonspeculative intent to put to beneficial use while satisfying the "can and will" requirements, *FWS Land & Cattle Co. v. State, Div. of Wildlife*, 795 P.2d 837, 841 (Colo.1990). In other words, the amount of a conditional right is limited to that amount of water for which the applicant has satisfied the requirements for a conditional appropriation, and the water court should enter a decree for that amount. *See id.* (water court's function of determining a water right "includes the quantification of the amount and priority of absolute and conditional water rights") (citing §§ 37–92–301(2), –302(1)(a), 15 C.R.S. (1989 Supp.)). In quantifying the permissible yield of a conditional water right, the water court is not imposing an independent limitation; rather, it is merely formalizing in the decree the scope of the conditional water right as it has been established by the applicant. *See Rominiecki v. McIntyre Livestock Corp.*, 633 P.2d 1064, 1067 (Colo.1981) ("diversions are limited to an amount sufficient for the purpose for which the appropriation was made, even though such limitation may be less than the decreed rate of diversion"). Thus, it is within the water court's authority to include conditions in the decree that limit the yield of the rights to the amount for which water is available and for which the applicant has established a need and a future intent and ability to use.

 In the present case, the trial court decreed both conditional direct flow and conditional storage rights to Thornton for use in the Northern Project. With respect to the direct flow rights, the decree specifies the exact diversion rates, measured in cubic feet per second, available to Thornton at each specific point of diversion. However, with respect to the storage rights, the decree identifies the structures in which Thornton may store water but does not impose individual volumetric limitations on storage in each structure. In the absence of further limitations, this combination of decreed flow rates and essentially unlimited storage rights would contravene the scope of the established conditional rights by allowing Thornton to divert an amount of water far in excess of its proven requirements. Thus, the inclusion in the decree of volumetric limits on Thornton's new conditional appropriations was justified.

 However, we cannot affirm the amount set by the trial court as the volumetric limit on total project yield. The relevant provision of the decree reads as follows: "The total amount of project yield shall be limited to no more than the following amounts: 1] 76,000 a.f. [acre feet] in any one year; 2] an average annual yield of 56,800 a.f. during any thirty-six year period; and; 3] during the first thirty-six years of project operation only, an average of 65,300 a.f. during any consecutive ten year period." Decree, ¶ 59.4, at 77. Thus, over the life of the project, Thornton's total available annual yield from all of its decreed diversions is limited to 56,800 acre feet. This figure does not comport with the trial court's findings of fact concerning the amount of water for which Thornton has· established a future need and an intent and ability to use or its findings with respect to available water.

In the final decree, the court recognized that Thornton's future demand for water in its service area is expected to reach over

94,000 acre feet per year, Decree, ¶ 8.3, at 5, and that the water and exchanges appropriated by Thornton were necessary for use and will be used to satisfy the city's future municipal requirements, Decree, ¶ 13, at 13–14. Taking into account the existing water supplies available to Thornton, which range from 10,000 to 26,000 acre feet depending on water quality concerns, Decree, ¶ 8.3, at 5, the trial court's findings support Thornton's claim that it has established a need for between 68,000 and 84,000 acre feet of water per year.[36] Furthermore, the court made express findings that water was available in excess of the diversions to be made by Thornton. Decree, ¶ 14.2.4, at 18; id. ¶ 15.4, at 28. These findings do not support a project volumetric yield limitation of 56,800 acre feet, significantly below the amount of established need and available water.[37] Unless its projected future demand is adjusted downward as a result of future diligence proceedings, and in the absence of any finding of specific need for limitations to protect against injury to other water users, Thornton's new conditional appropriations should be subject only to volumetric limits consistent with the amount of water found by the court to be necessary and available for the city's future requirements.

■ Although not in conformity with the evidence concerning the scope of Thornton's conditional rights, the court's setting of a project yield limit below established need and availability could be valid if necessary to protect other water users against injury to their existing rights. Thornton argues that the water court is not authorized to apply a "no-injury" standard to appropriations other than changes of water rights or plans for augmentation. See § 37–92–305(3), 15 C.R.S (1990). However, our prior decisions reveal that under appropriate circumstances, new conditional appropriations may be decreed subject to conditions designed to protect other appropriators against injury resulting from the appropriations. See Fox v. Division Eng'r for Water Div. 5, 810 P.2d 644, 646 (Colo.1991) (decree of conditional water right may not be granted in absence of concurrent plan for augmentation that will prevent injury to senior rights by ensuring enough available water to exercise conditional right); Southeastern Colo. Water Conservancy Dist. v. City of Florence, 688 P.2d 715, 718 (Colo.1984) (same); Lionelle v. Southeastern Colo. Water Conservancy Dist., 676 P.2d 1162, 1167–68 (Colo.1984) (same). In this case, the court made general findings that "there will be no injury to specific water rights if the Thornton Northern Project is operated in accordance with the terms and conditions established [in this decree]." De-

---

**36.** Pursuant to the "reality checks" provisions, Decree, ¶ 56.2.1, at 69, which we discuss in part IV(A)(2), infra, Thornton's projected need may be decreased based on findings during future diligence proceedings. Should a portion of Thornton's conditional rights be cancelled in the future based on those provisions, the volumetric limits must be reduced accordingly.

**37.** In addition to the limit on the total yield of the project, the court also imposed individual limitations on the four specific appropriations that make up the project. Diversions by river exchange pursuant to case 86CW401 are limited individually at various point of diversion, with an aggregate annual volumetric limit of 8,100 acre feet in any thirty-six year period. Decree, ¶ 59.4.3.2, at 80. Direct river diversions pursuant to case 86CW403 are limited individually at various points of diversion, with an aggregate annual volumetric limit of 27,000 acre feet in any thirty-six year period. Decree, ¶ 59.4.4.2, at 81. Diversions by ditch exchange pursuant to case 86CW402 are limited to an annual volumetric diversion of 41,000 acre feet in any thirty-six year period. Decree, ¶ 59.4.5, at 81–82.

In addition, the exercise of the change of water rights approved pursuant to case 87CW332 is subject to an aggregate volumetric yield limitation of 24,180 acre feet in any thirty-six year period. Decree, ¶ 59.4.2, at 77–79. However, under Thornton's proposal for Phase III of the Northern Project, the exercise of the change of water rights will be discontinued and the WSSC ditch exchange will be expanded to encompass all of the Thornton and non-Thornton WSSC shares. Therefore, these two portions of the project will never be operating at full capacity during the same period.

Because the trial court did not differentiate between operation of the WSSC ditch exchange in Phase II (exchange only on non-Thornton shares) and in Phase III (exchange on both Thornton and non-Thornton shares), it is difficult to determine whether the limits on the individual aspects of the Northern Project are in conflict with the court's findings as to Thornton's future requirements. However, the court should review and alter these limits on remand if necessary to maintain consistency with any changes made to the total project limitation.

cree, ¶ 18, at 29. However, the court made no specific findings relating to the potential injury to existing water rights that would be prevented by the established volumetric limits. *Cf. Southeastern Colo. Water Conservancy Dist. v. Fort Lyon Canal Co.*, 720 P.2d 133, 147, 150 (Colo.1986) (water court erred in failing to enter specific, detailed findings of injury to other appropriators). Absent such a finding, we are not in a position to evaluate the validity of the volumetric limitation as a protection against injury to existing rights.

 For the foregoing reasons, we remand to the trial court with instructions either to conform the total project volumetric yield limitation to its findings of fact regarding water availability and Thornton's water requirements or, if the limitation was intended to protect against potential injury to existing water rights, to make specific findings identifying the injury [38] that will be ameliorated by restricting project yield to an average of 56,800 acre feet per annum over a thirty-six year period as set forth in the decree.

### 2. Reality Checks

Thornton also takes issue with a second general limitation imposed by the trial court, the conditions referred to by the parties and the court as "reality checks." Although the trial court ultimately accepted Thornton's projections of its future growth and anticipated water requirements, the court noted that these projections were "optimistic," and "there is at least a possibility that they will not be achieved." MOD at 40. In addition, the court acknowledged certain objectors' concerns, given the expansive nature of Thornton's claims, that the city intended to sell portions of the water to finance project

costs. *Id.; see supra* note 29. Consequently, the court conditioned its decree of conditional water rights to Thornton in cases 86CW401 and 86CW403 [39] on Thornton's compliance with certain "reality checks." The conditions imposed are as follows:

*Reality Checks and Cancellation.* As part of diligence proceedings and proceedings to make absolute the conditional portions of this decree, Thornton will be required to make showings that the volumetric yield of the conditional water rights has been or will be needed by Thornton's projected growth. *The purpose of these showings is to insure that the water derived from Thornton's newly appropriated water rights is used for the City's own purposes and does not allow Thornton to become a permanent lessor or wholesaler of water yielded by these rights.* In assessing such need, the Court may consider Thornton's service population at that time, Thornton's projected growth at that time, and Thornton's use or disposition of the portfolio of water rights Thornton now owns, including whether Thornton has made reasonable efforts to protect the quality of, and to treat, its existing supply at a reasonable cost, and the reasons for Thornton's manner of use or disposition of such supply. *All or a part of the water rights confirmed in 86CW401 and/or 86CW403 may be canceled if the Court finds, based on subsequent events, that Thornton does not actually need the volume of water appropriated in these cases for the uses provided in this decree.*

Decree, ¶ 56.2.1, at 69 (emphasis added).

Thornton appeals two aspects of the "reality checks" imposed by the court. First, Thornton argues that the requirement that

**38.** The "no-injury" standard applies, with limited exceptions, to protect only existing water rights or decreed conditional water rights. *See, e.g.,* § 37–92–305(3), 15 C.R.S. (1990). The reduction in the amount of unappropriated water available to other users resulting from a new conditional appropriation is an inherent aspect of the prior appropriation system of administering water rights and does not constitute an injury for which water right holders are entitled to protective decree conditions.

**39.** The trial court required satisfaction of the "reality checks" only with respect to the rights decreed pursuant to Thornton's application for appropriative diversions by exchange from the Poudre River in case 86CW401 and direct diversions from the Poudre and South Platte Rivers in case 86CW403. *See* Decree, ¶¶ 56, 56.2.1, at 69. The court did not place similar conditions on its approval of Thornton's application for confirmation of the WSSC ditch exchange in case 86CW402. See *infra* note 43 for a discussion of the validity of this distinction.

the city establish the continuing need for and beneficial use of the "volumetric yield" is inconsistent with traditional diligence requirements for water rights decreed in terms of flow rate (cubic feet per second), as are Thornton's rights here. Second, Thornton contends that the trial court lacks authority to monitor or exercise control over Thornton's use of its existing portfolio of water rights. For the reasons discussed below, we hold that the trial court's imposition of specific diligence requirements was within its authority and uphold the requirement that Thornton show its continuing need for the volumetric amount of water claimed. Furthermore, we conclude that the trial court, with certain limitations, may consider Thornton's use of its existing water rights portfolio as a factor in evaluating diligence. Accordingly, we reject Thornton's challenges to the inclusion of the "reality checks" in the final decree.

### a. Volumetric Yield

 Thornton initially challenges the requirement that it show at future diligence proceedings "that the volumetric yield of the conditional water rights has been or will be needed by Thornton's projected growth." [40] Decree, ¶ 56.2.1, at 69. As explained above, see supra part IV(A)(1), the trial court did not exceed its authority by imposing volumetric limitations on Thornton's conditional appropriations, so long as these limits were based either on the amount of available wa-

ter for which Thornton had established a need and a future intent and ability to use, or on the need to protect other appropriators against injury. Given this holding, particularly with respect to need-based limitations, the court's ability to monitor the accuracy of the limits imposed by evaluating Thornton's continuing needs is a logical extension of the authority to set volumetric limits. Accordingly, the trial court was justified in exercising its monitoring authority under the circumstances of the present case.

 The water court decreed conditional rights to Thornton pursuant to the governmental agency exception to the anti-speculation doctrine, codified in section 37–92–103(3)(a), 15 C.R.S. (1990). This exception allows governmental agencies, including municipalities, some freedom from anti-speculation limitations to allow them to plan for the future water needs of their constituents. See supra part III(C)(1). However, the exception also creates the potential that the water rights decreed will exceed the applicant's needs, because the water court must make its determinations of a city's reasonably anticipated requirements based on projections of water demand that cannot be verified at the time the decree is entered. See Four Counties Water Users Ass'n v. Colorado River Water Conservation Dist., 159 Colo. 499, 512, 414 P.2d 469, 476 (1966) (" 'Passage of time and events occurring prior to granting any final decree will produce definite

---

40. As an element of its argument that the water court may not impose diligence requirements beyond mere physical progress toward diversion at appropriated rates, Thornton appeals the water court's use of the term "volumetric yield" to quantify the showing of need required to establish future diligence. Thornton argues that by decreeing the conditional rights in terms of specific flow rates (cubic feet per second), the court established the terms by which the diligence evaluation must be made—i.e., by reference to Thornton's progress toward diversion at these flow rates. We disagree with Thornton's position.

Initially, as explained above, the water court has the discretion to impose conditions on decreed rights that affect the requirements for establishing diligence. In the present case, the court imposed the "reality checks" for the express purpose of ensuring that Thornton uses its newly appropriated rights for its own purposes and does not become a permanent lessor or

wholesaler of water yielded by these rights. Decree, ¶ 56.2.1, at 69. To accomplish this purpose, the court will measure the future requirements established by Thornton at trial against the city's actual and projected demands at the time of future diligence proceedings. At trial, Thornton expressed its projected future requirements in terms of acre feet, a volumetric yield measurement. The trial court's findings pertaining to Thornton's future needs are also quantified in acre feet, Decree, ¶ 8.3, at 5. Accordingly, to establish a consistent standard for measuring the accuracy of Thornton's initial projections, the trial court acted within its discretion when it cast the standard in terms of volumetric yield. That such a standard increases the time it will take for Thornton to make its rights absolute because of the need to achieve the decreed yield rather than to divert at a decreed rate does not justify altering this requirement. We affirm the trial court's use of a volumetric, rather than a flow rate, standard for evaluating future diligence.

answers to the questions upon which the trial judge made findings based on speculative ... evidence.... Only time can definitely determine whether all, a part or none of the claimed water is needed.' ") (quoting *Metropolitan Suburban Water Users Ass'n v. Colorado River Water Conservation Dist.*, 148 Colo. 173, 194, 365 P.2d 273, 284 (1961)).

If the trial court's requirement that Thornton make future showings of continued need is invalid, there is no remedy to correct inaccuracies in the original projections and therefore ·no mechanism to assure that the conditional decree is in an amount that Thornton predictably can make absolute based on adjusted, realistic estimates of future need. Accordingly, the inclusion of this requirement is consistent with the purpose underlying both the anti-speculation doctrine and the diligence requirement, i.e, preserving unappropriated water for users with legitimate, documentable needs. *Compare Vidler*, 197 Colo. at 417, 594 P.2d at 568 ("To recognize conditional decrees grounded on no interest beyond a desire to obtain water for sale would—as a practical matter—discourage those who have need and use for the water from developing it.") *with Upper Gunnison River Water Conservancy Dist. v.*

*Board of County Comm'rs of Arapahoe County*, 841 P.2d 1061, 1065 (Colo.1992) (requirement of diligence prevents " 'the accumulation of conditional water rights without diligent efforts to complete the projects to the detriment of those needing and seeking to make immediate beneficial use of the same water' ") (quoting *CRWCD v. Denver*, 640 P.2d at 1141). Such concerns were particularly relevant in the present case due to the large quantities of unappropriated water claimed by Thornton and the conflicting evidence concerning Thornton's projected needs and its possible speculative intent. This court has identified speculative intent as a factor for consideration in diligence determinations.[41] *Public Serv. Co. v. Blue River Irrigation Co.*, 829 P.2d 1276, 1280 (Colo. 1992) (holding that the trial court properly considered an objector's claim that the applicant exhibited an "intent to hoard" as part of the totality of the circumstances in its reasonable diligence determination). Under the facts and circumstances of the present case, the trial court was justified in imposing mandatory consideration of that factor ˙through "reality checks" on the accuracy of Thornton's projected needs.[42] Accordingly, we up-

[41] In the present case, the trial court required that Thornton make its showing of need during future diligence proceedings, which are required every six years pursuant to statute. § 37–92–301(4)(a)(I), 15 C.R.S. (1995 Supp.). The statute defines reasonable diligence as follows: "The measure of reasonable diligence is the steady application of effort to complete the appropriation in a reasonably expedient and efficient manner *under all the facts and circumstances.*" § 37–92–301(4)(b), 15 C.R.S. (1990) (emphasis added). We are satisfied that, contrary to Thornton's contentions, the statutory definition is sufficiently broad to encompass the requirements imposed by the trial court in this case. *Cf. Colorado River Water Conservation Dist. v. City & County of Denver*, 640 P.2d 1139, 1142 (Colo.1982) ("A court in making a diligence determination must look at all factors which can be considered as important in determining whether an appropriator is satisfying the terms of a conditional water decree by developing it for a beneficial use in the most expedient and efficient fashion possible under the circumstances.").

[42] Thornton relies heavily on this court's decision in *City & County of Denver v. Sheriff*, 105 Colo. 193, 96 P.2d 836 (1939), to support its argument that the trial court is without authority

to limit use of Thornton's decreed rights after the city has established the requirements necessary for the entry of a decree. However, the relevant portion of the *Sheriff* decision dealt with absolute rather than conditional rights and thus does not control our decision in the present case.

In *Sheriff*, the City of Denver sought an adjudication of water rights in certain western slope waters. The trial court granted Denver an absolute decree for 335 cubic feet per second, making a specific finding that the water had been applied beneficially by the city. *Id.* at 208, 96 P.2d at 842. However, the court imposed a condition that the waters could be used only to supplement the city's current supply of eastern slope water after the city made full and economical use of this existing supply. *Id.* at 198, 96 P.2d at 839. Denver appealed this condition with respect to its restrictive effect on both the city's previously existing eastern slope water rights and its newly decreed western slope water rights, the latter of which are relevant here. This court struck down the restrictive condition, holding that the trial court's finding that the water had been put to beneficial use confirmed that Denver had a vested property right. Accordingly, the court held that restrictions on that absolute right were "invalid and an invasion of vested rights." *Id.* at 208, 96 P.2d at 843.

hold this condition as a valid and reasonable exercise of the water court's authority.[43]

### b. Use or Disposition of Existing Water Rights

■ As part of the future review of Thornton's growth projections mandated by the "reality checks," the trial court permitted consideration of "Thornton's use or disposition of the portfolio of water rights Thornton now owns, including whether Thornton has made reasonable efforts to protect the quality of, and to treat, its existing supply at a reasonable cost, and the reasons for Thornton's manner of use or disposition of such supply." Decree, ¶ 56.2.1, at 69. The trial court's language reflects a valid concern that the receipt by Thornton of vast amounts of Northern Project water will reduce its incentive to preserve and maximize the use of its present water supply. Therefore, with certain limitations noted below, we approve the trial court's consideration of Thornton's use, treatment, and disposition of its existing water rights as a factor in the "reality checks" review.

■ Our rationale for this conclusion is simple: the conduct of Thornton with regard to its existing water rights may be indicative of the reality of its need for the newly decreed rights. Accordingly, the trial court cannot assure the effectiveness of the "reality checks" unless it is allowed to consider such conduct as one among many relevant factors. We do not suggest that the trial court may utilize this provision directly to impede the sale or disposition by Thornton of its existing rights. As we noted in *Sheriff*, 105 Colo. at 201, 96 P.2d at 840, restrictive conditions in new decrees with the express purpose of "prevent[ing] any sale, lease or alienation" of existing water rights are not permissible. However, to shield from mere consideration Thornton's use of its existing rights creates the potential for Thornton to avoid the anti-speculative purpose of the "reality checks" provisions. The trial court must be sensitive in its application of the relevant provision to avoid the situation that arose in *Sheriff*. However, exercised properly, the trial court's consideration of Thornton's conduct with respect to its existing water rights will not inappropriately infringe on the water man-

Unlike the right at issue in *Sheriff*, Thornton's newly decreed rights subject to the "reality checks" are conditional, not absolute. Therefore, these rights remain, by statutory mandate, subject to future diligence proceedings. § 37–92–301(4), 15 C.R.S. (1990 & 1995 Supp.). Thornton's rights are vested, but subject to forfeiture for noncompliance with diligence requirements and the terms of the decree defining the conditional rights. *See supra* part IV(A)(2); *Mooney*, 194 Colo. at 479, 573 P.2d at 539. Accordingly, our invalidation of the restrictive conditions on Denver's absolute water rights in *Sheriff* does not require a similar holding with regard to the "reality checks" on Thornton's conditional rights in the present case.

43. Without express explanation, the trial court restricted the application of the "reality checks" to the conditional rights decreed to Thornton pursuant to its applications in cases 86CW401 and 86CW403. Thus, the court did not require similar showings with respect to the WSSC ditch exchange rights decreed pursuant to Thornton's application in case 86CW402. Fort Collins takes issue with this distinction, arguing that the possibility of speculation by Thornton is equally likely with respect to the ditch exchange rights. We agree with the trial court's decision to distinguish the ditch exchange rights.

Conditional exchange rights on private ditches, although appropriative, do not create opportunities for speculation equivalent to those created by conditional appropriations of previously unappropriated water or public exchange potential. The anti-speculation doctrine prohibits would-be appropriators from tying up unappropriated water for the purpose of extracting a profit rather than accomplishing a beneficial use. *Vidler*, 197 Colo. at 417, 594 P.2d at 568. An appropriation of previously unappropriated water or public exchange potential removes that resource from the total pool of water available for appropriation by other users. The appropriator receives a right in water not previously in its possession or committed to other uses; thus the temptation to make a profitable sale of these rights is substantial.

In an appropriative exchange of water rights in a private ditch, the right decreed to the applicant does not have an effect on the amount of water available to other appropriators. The water subject to exchange is not otherwise available for direct appropriation; any would-be appropriator must purchase or negotiate an exchange agreement, and in this case a right of first use, with the water right holders. The exchanger is not monopolizing a previously unused resource and the future sale of rights diverted by exchange is analogous to the transfer of an absolute right, which is not subject to the anti-speculation doctrine. Accordingly, we do not find it necessary to extend application of the "reality checks" to Thornton's conditional ditch exchange rights.

agement decisions of Thornton's municipal water officials. Accordingly, we affirm the trial court's authority to consider during future diligence proceedings Thornton's use of its existing water rights portfolio in determining the city's need for its newly decreed conditional water rights.

### B. Use of Colorado–Big Thompson Water

We next address the extent to which Thornton may use the units of Colorado–Big Thompson project water it acquired by virtue of its purchase of shares in WSSC. Thornton's proposed Northern Project included two components that involve the use of CBT water for purposes other than those for which that water is presently used by WSSC shareholders, and a third component utilizing return flow credits for CBT waters. Objector NCWCD argued, and the trial court agreed, that all proposed uses of CBT water by Thornton are prohibited attempts to derive benefit from CBT waters outside the boundaries of the NCWCD. Thornton's authority to undertake such uses, or lack of authority as determined by the trial court, is dependent upon the nature of the right to CBT water possessed by Thornton and the extent of permissible limitations placed on that right by the terms of the contracts, statutes, and regulations governing the use of CBT water. Our resolution of these issues requires a brief overview of the CBT project and the role of NCWCD in administering the waters derived from that project. In a prior opinion of this court, *Town of Estes Park v. Northern Colorado Water Conservancy District*, 677 P.2d 320, 323–24 (Colo.1984), we conducted a similar review. The following summary borrows liberally from that discussion.

#### 1. Overview of Colorado–Big Thompson Project

NCWCD is a quasi-municipal corporation that was established in 1937 pursuant to the Water Conservancy Act, sections 37–45–101 to –153, 15 C.R.S. (1990 & 1995 Supp.). The NCWCD boundaries encompass portions of six northern Colorado counties, but do not include the City of Thornton. NCWCD was formed for the principal purpose of participating with the federal government in the construction of the CBT project. *See People ex rel. Rogers v. Letford*, 102 Colo. 284, 294, 79 P.2d 274, 280 (1938). In furtherance of that goal, NCWCD and the United States of America entered into a contract on July 5, 1938, denominated the Contract Between the United States and the Northern Colorado Water Conservancy District Providing for the Construction of the Colorado–Big Thompson Project, Colorado (Repayment Contract). The CBT project effects the diversion of water from the Colorado River system on the western slope via a thirteen-mile tunnel to the Big Thompson River on the eastern slope for ultimate delivery to NCWCD. Under the terms of the Repayment Contract, the United States constructed the facilities necessary for completion and operation of the project, and NCWCD agreed to repay the costs allocated to the irrigation, domestic, and related benefits of the project, exclusive of power benefits.[44] *Estes Park*, 677 P.2d at 323. The Repayment Contract provides that title to the water rights remains in the United States, but vests administrative authority in NCWCD to control the distribution of the CBT water provided to the district. Pursuant to the Water Conservancy Act (sometimes referred to as the WCA), the Board of Directors of NCWCD has enacted rules and regulations (the NCWCD rules) to provide a framework to govern its distribution of this water. *See* § 37–45–134(1)(a), 15 C.R.S. (1990) (water conservancy district board of directors may "make and enforce all reasonable rules and regulations for the management, control, delivery, use, and distribution of water"). NCWCD allocates CBT water by entering into allotment contracts with entities seeking the use of such water.

On July 11, 1986, NCWCD entered into an allotment contract with WSSC, a mutual ditch company, for the supply of 2088 acre feet of CBT water (Allotment Contract).

---

**44.** This repayment was originally scheduled to take place over a forty-year period following completion of the project. Pursuant to a subsequent renegotiation, the repayment did not actually begin until 1962. 2 George Vranesh, *Colorado Water Law* § 7.3, at 789 & n. 129 (1987).

The contract placed certain restrictions on the use of this water and required that WSSC agree to abide by the provisions of the Water Conservancy Act, the terms of the Repayment Contract, and the NCWCD rules. In preparation for the implementation of its Northern Project, Thornton purchased 47.23 percent of the shares of WSSC by late 1986. As a shareholder of WSSC, Thornton is entitled to its pro rata share of the water obtained by exercise of the water rights owned by WSSC, including 47.23 percent, or approximately 981 acre feet, of the 2088 acre feet of CBT water allotted to WSSC. Thus, Thornton's right to CBT water is derived solely and directly from the allotment contract executed between WSSC and NCWCD. As successor-in-interest to WSSC, Thornton can take no greater right to this water than the right held by WSSC under the terms of the Allotment Contract. *Green v. Chaffee Ditch Co.,* 150 Colo. 91, 98, 371 P.2d 775, 779 (1962).

### 2. Thornton's Proposed Primary Uses and Trial Court's Ruling

Thornton proposes two primary uses of CBT water as part of its Northern Project. Following implementation of its Northern Project, which contemplates the dry-up of Thornton's farms in the WSSC service area, Thornton will no longer use its pro rata share of CBT water by directly applying it to lands within the boundaries of NCWCD. Accordingly, Thornton seeks other methods of application that will allow the city to derive benefit from these CBT units. First, beginning in about 2002, Thornton proposes to stop irrigating certain farms and to leave the CBT water associated with those farms in the Larimer County Canal to satisfy its obligations to WSSC for replacement of system losses resulting from other aspects of the Northern Project. This transfer, which Thornton describes as a simple conveyance of water, will allow Thornton to divert more of its remaining share of the WSSC water supply, other than the CBT water, to its own use outside the district, but the direct use of the

CBT water will continue to take place within the boundaries of NCWCD on the lands owned by other WSSC constituents receiving the replacement water. Second, in approximately 2026, as part of Phases II and III of its Northern Project, Thornton proposes an internal ditch exchange. Thornton will pump significant amounts of WSSC water, including CBT water, to Thornton and replace it by exchange with other water of lower quality derived from a variety of Thornton's other water rights. Thornton argues that the substitute supply water becomes CBT water through the "character of exchange" rule, citing section 37–80–120, 15 C.R.S. (1990), and this court's decision in *City & County of Denver v. Fulton Irrigating Ditch Co.,* 179 Colo. 47, 58, 506 P.2d 144, 149 (1972). Thus, Thornton contends that although the CBT water is physically leaving the boundaries of NCWCD, the water remains in the district for purposes of legal analysis.

■ The trial court denied both of Thornton's proposed uses of its CBT units.[45] The court initially focused on the language of the 1938 Repayment Contract. Under the terms of that contract, the court found that CBT water usage is limited to use for "irrigation, domestic, municipal, and industrial purposes." Citing this court's decision in *Town of Estes Park v. Northern Colorado Water Conservancy District,* 677 P.2d 320 (Colo. 1984), which prohibited the use of CBT water for augmentation purposes under a different section of the Repayment Contract, the court held that it is "perhaps doubtful" that replacement falls within the uses authorized by the contract, even though the replacement water will subsequently be used for permitted purposes. MOD at 30. The court also reviewed the provisions of the Water Conservancy Act, specifically section 37–45–118, 15 C.R.S. (1990), which sets forth the powers of the board of directors of a water conservancy district. Based on its review, the court held that section 118(1)(j) of the Water Conservancy Act and the terms of the Repayment Contract manifest an intent that the "direct

---

**45.** The trial court initially noted a possible ripeness issue because Thornton does not propose to implement either of these proposals until at least 2002. However, the trial court found it appro-

priate to address these issues under current law with the understanding that any intervening changes in the law must be addressed if and when they occur. We agree with this decision.

benefits" of the water supply created by the CBT project be limited to the district. MOD at 32. The court posited that this policy, although "parochial," might be explained by the principle of rewarding only those who pay taxes for the district. *Id.*

The court found further support for the prohibition of extra-district benefit in the regulations enacted by NCWCD. Specifically, Book II, Rule IV, limits the allotment of water to entities that make beneficial uses in the area lying within the district. Similarly, the Allotment Contract executed between WSSC and NCWCD limits use and benefit to lands within the district. According to the trial court, these documents prohibit Thornton's proposals for use of CBT water.[46] MOD at 32–34. The trial court did not accept Thornton's argument that the water it exchanges for CBT water becomes CBT water by operation of the character of exchange rule, labelling that rule a "legal fiction" that cannot disguise the removal of CBT water from the district. MOD at 32; Decree, ¶ 36, at 37–38. The court stated its ultimate conclusion on the issue as follows:

> *Colorado–Big Thompson Project Water.* Applicant is entitled to continue to use its pro rata portion of CBT water owned, leased or controlled either by Applicant or by WSSC for agricultural purposes within the WSSC system as has occurred historically, so long as no benefit of CBT water leaves the boundaries of the Northern Colorado Water Conservancy District, either directly, indirectly, or by exchange.
>
> . . . .
>
> 44.2 *Other Uses of CBT Water Proposed by Thornton Not Lawful.* For the

reasons stated in the Memorandum of Decision, the Court finds that Thornton's other proposed uses of CBT are unlawful. Such unlawful uses include, but are not limited to, the following:

> 44.2.1 *Payment of Obligations to WSSC.* Thornton may not receive a credit against ditch seepage losses or other return flow replacement obligations to WSSC for CBT water which Thornton leaves in the ditch for use by other WSSC shareholders.
>
> 44.2.2 *One Component of "Ditch Exchange"* CBT water may not be diverted by exchange from the Larimer County Canal for direct use outside of the District regardless of whether it is replaced by Thornton with other water.

Decree, ¶ 44, at 39.

### 3. *Review of Trial Court's Ruling*

Our review of the trial court's denial of Thornton's proposed uses of its shares of CBT water turns on the resolution of two core issues: (1) whether the terms of the contracts, statutes, and rules governing Thornton's use of CBT water prohibit the accrual of indirect benefits [47] outside of the boundaries of NCWCD; and (2) even if the first question is answered in the affirmative, whether these provisions supersede general Colorado statutes purportedly authorizing Thornton's proposed uses. We address these issues in turn.

### a. *Consistency with Governing Contracts, Statutes, and Rules*

By the terms of the Allotment Contract between WSSC and the NCWCD, to which

---

**46.** The trial court also pointed to what it described as a "more fundamental reason" for denying Thornton's claims. The trial court stated that the CBT project was intended to create a supplemental supply of water for northern Colorado and was never intended to be a base supply for the area. According to the trial court, Thornton's proposed exchange using CBT water will allow removal of substantial portions of the base water supply, thus converting the CBT water from a supplemental to a base supply. The trial court held that such a result should not be permitted. Because we decide the relevant issues on other grounds, we express no opinion on the validity of this component of the trial court's decision.

**47.** Within this section, we use the term "direct benefits" to refer to those benefits that accrue to the user at the point of application of the CBT water. For example, the application of water to irrigate farmland obviously creates a direct benefit to the user of that farmland. "Indirect benefits" refer to those benefits that accrue to the user as a result of the use of CBT water but are received in areas other than the lands on which the CBT water is applied. For example, the application of CBT water to fulfill a water user's obligation to another water user creates an indirect benefit because non-CBT water is not required for this obligation and can be used elsewhere.

Thornton became subject by virtue of its purchase of WSSC shares, Thornton agreed to be bound by the provisions of the Repayment Contract, the Water Conservancy Act, the NCWCD rules, and the Allotment Contract itself, all of which the trial court found to prohibit Thornton from using CBT water in a manner that creates direct or indirect benefits that accrue outside the boundaries of the NCWCD. Thornton argues that the WCA and the Repayment Contract limit only the direct beneficial use of CBT water outside of the district and do not extend this prohibition to indirect benefits. Thornton further contends that the NCWCD rules and the Allotment Contract should also be read as limiting only direct extra-district use to make these latter provisions consistent with the intent exhibited in the controlling documents, the WCA and the Repayment Contract. To determine whether the trial court ruled correctly, we must examine in more detail the provisions of these four governing documents.

### i. Water Conservancy Act and Repayment Contract

The parties agree that the relevant provisions of the Water Conservancy Act and the Repayment Contract are applicable in the present situation. The Water Conservancy Act articulates the scope of authority of water conservancy districts, including the NCWCD. The following provisions define the specific powers vested in the Board of Directors of a water conservancy district:

37–45–118. General powers. (1) The board has power on behalf of said district:

(b)(I)(B) To sell, lease, encumber, alien [sic], or otherwise dispose of water, waterworks, water rights, and sources of supply of water for use within the district;

. . . .

(j) To appropriate and otherwise acquire water and water rights within or without the state; . . . to provide, sell, lease, and deliver water for municipal and domestic purposes, irrigation, power, milling, manufacturing, mining, metallurgical, and any and all other beneficial uses and to derive revenue and benefits therefrom; . . . but the sale, leasing, and delivery of water for

irrigation, domestic, and other beneficial purposes as provided in this section, whether the water is developed by the principal district or a subdistrict thereof, shall only be made for use within the boundaries of either the principal district or the subdistrict, or both.

§ 37–45–118(1)(b)(I)(B), –118(1)(j), 15 C.R.S. (1990).

The Repayment Contract augments the statutory provisions by specifically defining the scope of the NCWCD's authority with respect to the distribution of CBT project water. *See Estes Park*, 677 P.2d at 326 ("The [Repayment C]ontract prescribes the manner in which Colorado–Big Thompson project water is to be used and reused."). Initially, Article 16 of the Repayment Contract provides in pertinent part:

On payment of all construction repayments by the District as required by this contract, and compliance by the District with the covenants it is required to perform, the District shall have the perpetual right to use all water . . . that becomes available through the construction and operation of this project, for irrigation, domestic, municipal, and industrial purposes, but excluding any and all uses for power. It is agreed and understood that the use of water made available by the project shall be primarily for irrigation and domestic uses; and that the manner of delivery shall be to this end.

Articles 17 and 19 also discuss the distribution of CBT project water. Article 17 contains the following relevant language: "It is understood and agreed that the District may dispose of part of its water to parties desiring to use the project water for domestic, municipal and industrial purposes as permitted by the Act of February 25, 1920, (41 Stat. 451), within the limitations provided for in this contract." Article 19 states in pertinent part:

The District will cause all water filings for the project made in its name or in its behalf to be assigned to the United States, and all water filings so assigned, or made by the United States for the project, shall be made and held subject to the provisions of Article 16, primarily for domestic, irri-

gation, municipal, industrial and recreational uses in the District. . . .

Finally, Article 25 addresses the potential for sale of water by the NCWCD to extra-district users:

It is agreed that such part of the project water supply as, in the opinion of the Secretary [of the Interior], may not be required for irrigation and domestic use in the District may be disposed of for irrigation and domestic uses outside the District, either by direct diversion and use or by means of exchange. Any such disposal of water shall be by contract on such terms as the Secretary may fix, subject to the approval of the Board of Directors of the District.

The trial court held that the provisions of both the statute and the contract evince an intent that the direct benefits of CBT water remain within the boundaries of the NCWCD. MOD at 32. Thornton essentially concedes the limitation on direct beneficial use of CBT water outside the district but argues that these provisions do not support a ban on indirect, extra-district benefits. Thornton further contends that certain provisions in the Repayment Contract and in a related Colorado statute pertaining to extra-district use are inconsistent with the trial court's apparent determination that extra-district benefits are per se impermissible. Although we agree with Thornton that extra-district use and benefits are not per se impermissible, we concur in the trial court's conclusion that the WCA and the Repayment Contract evince a general intent to preserve the benefits of CBT water for NCWCD constituents.

Initially, we read the terms of the Repayment Contract to place control of the distribution of CBT water firmly in the hands of the NCWCD Board of Directors. Article 16 grants the district a perpetual right to use

the water for specified purposes and Article 17 establishes authority to dispose of the water in compliance with the terms of the contract. Thus, the NCWCD has discretion, limited by the terms of the Repayment Contract and the provisions of the WCA, to direct the allocation and distribution of CBT project water. The substantive limitation placed on the district's discretion, inherent in both the Repayment Contract and the WCA, is that the benefits of CBT water are to be provided only to those users who apply the water within the district boundaries. Both the statute and the contract explicitly limit permissible uses to those within the district, see Repayment Contract, art. 19, at p. 19; § 37–45–118(1)(b)(I)(B), –118(1)(j), 15 C.R.S. (1990). We are convinced that the WCA and the Repayment Contract reflect recognition of the administrative and financial role of the NCWCD in the CBT project and were intended to reserve the direct benefits of the CBT water for the district. Although neither the statute nor the contract expressly discusses the validity of indirect extra-district benefits, this does not establish that a distinction was intended to be made between the two types of benefits.

We are also unpersuaded that this general intent to preserve CBT benefits for the NCWCD is compromised by the presence of language in the Repayment Contract or water administration statutes authorizing the extra-district use of CBT water under certain regulated circumstances not present here. Article 25 of the Repayment Contract provides for the sale of excess water for use outside of the district, including by exchange. Similarly, section 37–83–106, 15 C.R.S. (1990), allows water conservancy districts to enter into cooperative agreements with other political subdivisions for the lease or exchange of water outside of district boundaries under regulated conditions.[48] These

---

**48.** This section states in pertinent part:

37–83–106. **Authority of political subdivisions to lease or exchange water.** Water conservancy districts and water conservation districts which own or hold rights to water may enter into cooperative agreements with other political subdivisions of the state for the lease or exchange of water produced in the exercise of such district's water rights and the construc-

tion or use of waterworks within or outside of district boundaries, according to such terms as such district and political subdivision agree upon. Conservation districts, conservancy districts, and other political subdivisions of the state may enter into agreements with each other to provide funds or undertake measures to carry out section 37–45–118(1)(b)(IV), including agreements for the exchange or lease

provisions certainly suggest that extra-district use is permissible under certain circumstances and, thus, not per se impermissible under the contract and statutes. However, we do not read these provisions as inconsistent with the focus on intra-district use and benefit that pervades the Repayment Contract and the WCA. These provisions allow extra-district use only in specified situations, and the ultimate authority to approve such transactions rests with NCWCD. This administrative structure is consistent with the vesting of general distributive power in the district and allows NCWCD to exercise protection of its constituents' interests. Accordingly, we conclude that the derivation of extra-district benefits from the use of CBT water, while not per se impermissible, is discouraged and strictly limited by the provisions of the Repayment Contract and the WCA.

### ii. NCWD Rules and Allotment Contract

We now turn to the NCWCD rules and regulations and the terms of the Allotment Contract. Pursuant to rulemaking authority granted under section 37–45–134(1)(a), the NCWCD Board of Directors has enacted rules and regulations that implement the limitations placed on the distribution of CBT water by the WCA and the Repayment Contract. The NCWCD rules provide that, in addition to the rules themselves, "[a]ll water deliveries by the District will be governed by the requirements of the Colorado Water Conservancy District Act, the repayment contract between the District and the United States, and in conformance with all allotment contracts between the District and its water users." NCWCD Rules (Ex. P–12), Book I, sect. 2. In addition, the following provisions of the NCWD Rules are relevant to determining the permissibility of extra-district benefits:

Book II (General Information Section): The authority to allot, reallocate, transfer, and dispose of water by appropriate contracts is given in the statutes to the Board of Directors of the District. However, the Board is precluded, by law, from allotting water which gives rise to beneficial uses outside the boundaries of the District.

Book II, Rule IV: The beneficial uses of water supply allotted by the District shall be restricted to the area lying within the District.

While the statute authorizes the Board to provide, sell, lease, or otherwise dispose of water for beneficial purposes, it does so—". . . provided the sale, leasing, and delivery of water . . . shall only be made for use within the District." (§ 150–5–13(10), C.R.S.1963) [now codified at § 37–45–118(j), 15 C.R.S. (1990) ]

(A) Interpretations and policies of the Board:—

(1) The Directors believe the intent of the water allotment restriction to District lands was to confine the benefits to the taxpayers and allottees who are the financial supporters of the project and its operations. Hence, the Board will not allot water to any organization unless there is included within the District boundaries all lands provided with water service through the water systems or subsidiary systems owned, controlled, or operated by such organization *and whether such water delivery service is provided directly, by exchange, or otherwise.*

(Emphasis added.)

The terms of the WSSC Allotment Contract, from which Thornton derives its right to CBT water, incorporate similar limitations on the use of such water:

2. It is understood and agreed by the Applicant that any water allotted by the Board of Directors of said District shall be for domestic, irrigation, or industrial use within or through facilities or upon lands owned, operated, or served by said Applicant, provided however, that all lands, facilities, and serviced areas which receive benefit from the allotment *(whether water service is provided by direct delivery, by*

---

of such water outside the boundaries of the conservation or conservancy district.... Any water rights leased or exchanged under this section shall be only for the time certain contained in each such agreement or extension

thereof. Any water rights or changes of water rights which are necessary to implement such agreements shall be adjudicated as provided by law.
§ 37–83–106, 15 C.R.S. (1990).

*exchange, or otherwise)* shall be situated within the boundaries of the Northern Colorado Water Conservancy District.

. . . .

6. Applicant agrees that the water allotment shall be beneficially used for the purposes and in the manner specified herein, and that this agreement is made for the exclusive benefit of the Applicant and shall not inure to the benefit of any successors, assigns, or lessees of said Applicant without prior specific approval of the Board of Directors of said District.

(Emphasis added.)

The prohibition on accruing indirect, extra-district benefits from CBT water that was implicit in the WCA and the Repayment Contract is made explicit in the above provisions. Thornton argues that these provisions constitute an impermissible extension of the limitations on distribution of CBT water set forth in the WCA and the Repayment Contract. However, in light of our interpretation of the latter provisions, the NCWCD rules and the Allotment Contract are entirely consistent with the expressed intent that CBT benefits remain within the district. NCWCD did not exceed its authority under the WCA and the Repayment Contract by subjecting CBT water allotments to these restrictions. Therefore, in the absence of exceptions not applicable here, the derivation of any extra-district benefit from the use of CBT water is prohibited.

### iii. Conclusion

Thornton's proposals violate both the spirit of the WCA and the Repayment Contract and the letter of the NCWCD rules and the Allotment Contract. Thornton's proposal to use CBT water to satisfy replacement obligations will allow the city to increase the amount of water that it applies to municipal uses outside the boundaries of NCWCD. Although the direct use remains within the district, Thornton would receive indirect benefits outside of the district that derive from its use of CBT water within the district.[49] Similarly, the operation of the exchange on CBT water, even if the character of exchange rule applies and the direct use is deemed to occur within the district, results in significant quality and quantity benefits to Thornton outside of the NCWCD boundaries. Furthermore, Rule IV(A) of the NCWCD rules and Article 2 of the Allotment Contract specifically preclude the acquisition of extra-district benefits by exchange.[50] The trial court correctly assessed Thornton's proposals as attempts to extend benefits to its lands outside of the district in contravention of the provisions of the governing statutes, rules, and contracts.

### b. Consistency with Colorado Water Policy and Statutory Law

Thornton's second major contention, however, is that the administrative scheme governing the distribution and use of CBT water should not be read to supersede general Colorado water policy and statutory law. Thornton contends that application of the doctrine of maximum use and the general exchange statutes require the trial court to approve Thornton's proposals in the absence of a showing that injury would result to other appropriators. *See, e.g.,* § 37–92–305(3), 15

---

**49.** With respect to Thornton's replacement use proposal, the trial court's ruling also suggested that the Repayment Contract prohibited the use of CBT water for replacement purposes because such use is not among the uses enumerated in the contract. Because we find this proposal prohibited on other grounds, we need not address that aspect of the trial court's ruling. However, we note that the trial court's interpretation may be unnecessarily technical given that the water used for replacement would subsequently be used for permitted purposes.

**50.** Thornton points to other exchanges conducted on CBT water as support for its contention that its own exchange should be approved. Spe-

cifically, Thornton describes an exchange system operated by North Poudre Irrigation Company that uses CBT water as a substitute supply to allow the company to divert Poudre River water at its headgate above the point where CBT water enters the river. However, in contrast to Thornton's proposed exchange, NPIC uses the water it diverts entirely within the NCWCD and does not attempt to derive any extra-district benefit. Thus, the NPIC exchange does not violate the contractual and regulatory prohibition on accruing CBT benefits outside of the district, and the comparison to Thornton's proposed exchange is inapposite.

C.R.S. (1990). Thornton essentially urges that we give no effect to the specific prohibitions in the NCWCD rules and the Allotment Contract when a proposed use of CBT water is otherwise permissible under Colorado water law. A review of our prior cases reveals that Thornton's position is without merit.

### i. Contract Provisions

■ Initially, as discussed above, Thornton derives its right to CBT water solely from the Allotment Contract executed in 1986 between WSSC and NCWCD. This court has recognized that a contractual right to make use of water is "far different" than a water right acquired by original appropriation, diversion, and application to beneficial use. *Green v. Chaffee Ditch Co.,* 150 Colo. 91, 98, 371 P.2d 775, 779 (1962). A contract water user is, in effect, a consumer whose rights are determined by the terms of that contract, and successors in interest can acquire no greater right. *Id.* at 98, 371 P.2d at 779; *see also Wright v. Platte Valley Irrigation Co.,* 27 Colo. 322, 61 P. 603 (1900); *Wyatt v. Larimer & Weld Irrigation Co.,* 18 Colo. 298, 33 P. 144 (1893); *La Junta & Lamar Canal Co. v. Hess,* 6 Colo.App. 497, 42 P. 50 (1895). The terms of the Allotment Contract clearly preclude the accrual of benefits derived from the use of CBT water to lands and users outside the boundaries of NCWCD. Thornton was or should have been aware of these contractual conditions at the time it acquired its interest in WSSC. Thus, Thornton is bound by these conditions in accord with the intent of the original parties.

■ Where, as here, the scope of a water right is defined by contract, the general provisions of Colorado water law are not necessarily inapplicable, but their application is subject to the terms of the contract.[51] *Merrick v. Fort Lyon Canal Co.,* 621 P.2d 952, 955–56 & nn. 3, 4 (Colo.1981) (holding that contract provisions controlled over provisions of plan for augmentation statute, section 37–

92–305(3)); *see also Estes Park,* 677 P.2d at 326–27 (applying contract terms rather than statutory provisions in denying plan for augmentation); *Perdue v. Fort Lyon Canal Co.,* 184 Colo. 219, 223, 519 P.2d 954, 956 (1974) (regardless of statutory provisions, an appropriator may by contract make its priority inferior to another). Thus, Thornton's assertions that its proposals will not injure other appropriators and will comply with the statutory provisions addressing replacement and exchange are not relevant to our evaluation. The injury determination contemplated by the exchange statutes is not applicable because the contract explicitly prohibits extra-district benefits regardless of injury. *See Merrick,* 621 P.2d at 956 n. 5. Were we to hold otherwise and approve Thornton's proposals, the effect would be to alter the terms of the parties' agreement and enlarge the benefits received by Thornton in excess of those for which it contracted. Given the clear contractual limitations on the scope of Thornton's CBT water right, we cannot apply conflicting statutory provisions to create a new contract between the parties.

### ii. NCWD Rules

■ The Allotment Contract also explicitly provides that WSSC, and by succession Thornton, must abide by the rules and regulations enacted by the NCWCD Board of Directors. Thornton maintains that these rules do not override general water right adjudication statutes. We disagree. We have addressed the legitimacy of imposing regulations on water rights more strict than the applicable statutory requirements in cases concerning mutual ditch company bylaws, and we have consistently upheld reasonable limitations on the statutory rights of a water user. *See, e.g., In re Application for Water Rights of the Fort Lyon Canal Co.,* 762 P.2d 1375, 1379 (Colo.1988); *Fort Lyon Canal Co. v. Catlin Canal Co.,* 642 P.2d 501, 509 (Colo.1982); *Model Land & Irrigation Co. v. Madsen,* 87 Colo. 166, 285 P. 1100 (1930). We find this principle equally appli-

---

**51.** The "character of exchange" rule is an example of such a provision. The trial court labeled this rule a "legal fiction," MOD at 32, and declined to apply it when evaluating Thornton's proposed exchange. However, given the terms of the Allotment Contract, we need not discuss

the applicability or validity of this rule. Whether or not the rule was applied, the proposed exchange will result in extra-district benefits for Thornton, a result that is prohibited under the terms of the Allotment Contract defining Thornton's right.

cable to reasonable rules enacted by conservancy districts, entities which have statutory authority to make such rules, *see* § 37–45–134(1)(a), 15 C.R.S. (1990), and we conclude that the NCWCD rules precluding extra-district use and benefit constitute reasonable limitations on Thornton's exercise of its contractual right to use CBT water. NCWCD has a responsibility to protect its water supply for the benefit of its constituents, and the benefits of CBT water may reasonably be reserved for those who have financed the project, the taxpayers within the boundaries of NCWCD. Furthermore, the NCWCD rules do not impermissibly infringe on the jurisdiction of the water court to regulate the exercise of water rights. As evidenced by the presence of this issue before us today, the court has jurisdiction to resolve disputes over the interpretation and application of these rules. *See Catlin Canal,* 642 P.2d at 507–08. Because we find the NCWCD rules to impose reasonable limitations on the use of CBT water, we hold that the prohibitions on extra-district benefit supersede the general replacement and exchange statutes.

For the foregoing reasons, we hold that the Repayment Contract, the WCA, the NCWCD rules, and the Allotment Contract reflect an intent on the part of legislature and the contracting parties to limit all benefits of CBT water to water users and uses within the NCWCD boundaries. Furthermore, we hold that these provisions provide a reasonable framework for the distribution of CBT water that supersedes the general statutory framework governing exchanges and replacement use. Accordingly, we affirm the trial court's denial of Thornton's proposed application of CBT water for replacement and exchange purposes creating benefits for Thornton outside the boundaries of NCWCD.

### 4. Thornton's Proposed Use of CBT Seepage Water

A third element of Thornton's Northern Project also implicates the use of CBT water.

As part of its proposed change of use of its WSSC shares from irrigation to municipal purposes (case 87CW332), Thornton sought to change certain seepage rights originally decreed to WSSC and the Jackson Ditch Company. The water that supplies those decreed rights consists of surface return flows from the irrigation of farms above the LCC by shareholders of North Poudre Irrigation Company (NPIC). For its irrigation, NPIC. uses two types of water: (1) water diverted at its Poudre River headgate pursuant to direct river rights, and (2) additional Poudre River water diverted by exchange with CBT water rights owned by NPIC below its headgate. Thornton sought to change the use of all of these return flows and apply them to municipal use in Thornton. However, the trial court apparently applied the character of exchange rule to classify the NPIC water diverted by exchange as CBT water and thus found that a portion of the return flows from NPIC's irrigation were made up of CBT water. *See* Decree, ¶ 11.4.1.1, at 11–12. The court held that return flows of CBT water were specifically reserved by the Repayment Contract to the United States for the use of NCWCD. MOD at 30–31. Accordingly, the court prohibited Thornton from taking for municipal use outside of the district the amount of seepage water the court identified as deriving from irrigation with CBT water—approximately 300 acre feet per year. Decree, ¶ 11.4.1.1, at 11–12.

■ We affirm the trial court's denial of Thornton's proposal for the change of use and subsequent extra-district use of return flows deriving from irrigation with CBT water. Article 19 of the Repayment Contract specifically addresses the use and reuse of seepage and return flows attributable to the use of CBT water,[52] and we reviewed that portion of the contract in *Town of Estes Park*

---

**52.** Article 19 provides in pertinent part:

There is also claimed and reserved by the United States for the use of the District for domestic, irrigation and industrial uses, all of the increment, seepage and rerun flow water which may result from the construction of the project and the importation thereby, from an extraneous source, to-wit, from the Colorado River watershed, of a new and added supply of water to average 320,000 acre-feet, or more, annually, into the streams of the South Platte watershed from which the irrigable lands within the District derive their water supply; and the right is reserved on behalf of the District to

v. *Northern Colorado Water Conservancy District,* 677 P.2d 320 (Colo.1984). In *Estes Park,* we held that it is apparent on the face of the agreement that "the parties intended Article 19 of the [Repayment C]ontract to reserve return flows for the use of the district." *Id.* at 326. Noting the importance of return flow rights to the organizational and operational scheme of the district, we further stated that the "reservation expressly extends to all return flow water resulting from the construction of the project and importation of Colorado River water into the South Platte watershed." *Id.* Given our interpretation of Article 19 in *Estes Park,* we cannot approve Thornton's proposed change of use and credit for return flows to the extent that these flows consist of CBT water. The return flows Thornton seeks to change to municipal uses and to use outside of the district are specifically reserved for allocation and use by NCWCD,[53] thus prohibiting Thornton's extra-district application. Although these seepage waters were previously allocated to and used by WSSC, WSSC applied these waters on lands within the district and such use did not conflict with the allocative authority of the NCWCD. Based on the terms of Article 19 of the Repayment Contract and our holding in *Estes Park,* we

affirm the trial court's denial of seepage credit from CBT waters to Thornton.

### C. Reuse of Transmountain Water

The next issue is one of great importance to water users statewide and drew substantial comment from the parties in their briefs and at oral argument. We refer to Thornton's proposed reuse of transmountain water[54] it obtained by virtue of its purchase of shares in WSSC. The trial court prohibited Thornton from reusing these transmountain waters and required the replication of return flows associated with the historical use of these waters for irrigation. Thornton, with the support of several amici, appeals the trial court's ruling.

### 1. Historical Use and Thornton's Reuse Plan

We first summarize the historical use of the transmountain water rights at issue and then review Thornton's plan to reuse these waters. As has been noted, the first phase of the Northern Project is comprised of the change in use of water rights acquired from WSSC and subsequent delivery of water associated with these rights to Thornton. Historically, the water diverted by WSSC has been derived from three sources: (1) native

---

capture, recapture, use and reuse the said added supply so often and as it may appear at the stream intake headgates of ditches and reservoirs serving lands within the District.

Said captured, recaptured and return flow water shall be, by the Board of Directors of the District, allocated only to the irrigable lands within the District already being partially supplied with water for irrigation, using as a basis for such allocation the decreed priorities existing at the date of this contract, and without other or additional consideration or payments by the owners of such lands therefor; provided no such captured, recaptured or return flow water shall be taken and held as supplying any appropriation or decreed priority of any such ditch or reservoir.

Any overplus of such captured, recaptured and return flow water shall be rented, sold or disposed of for domestic, irrigation and industrial uses within the District, at such times under such conditions, and upon such terms as the Board of Directors of the District may, from time to time, determine.

It is understood and agreed that the United States does not abandon or relinquish any of the increment or seepage or return flow water

coming from the irrigation of lands or other uses supplied with water from or through the works constructed by the United States, but that the same is reserved and intended to be retained for the use and benefit of the District.

53. Thornton argues that by its express wording Article 19 reserves the district's right in return flows only to the extent that these flows "may appear at the stream intake headgates of ditches and reservoirs serving lands within the District." *See* Repayment Contract art. 19, at p. 19. We did not adopt such a narrow reading in *Estes Park,* and we decline to do so here. In the context of the entire article, which conveys a clear intent to claim and reserve all CBT return flows for the use of the NCWCD, the language cited by Thornton is merely descriptive and does not limit the extent of the return flow reservation.

54. In this section, we use the terms "transmountain water," "imported water," and "foreign water" interchangeably to refer to water diverted from streams on the western slope and transported for use in the river basins on the eastern slope.

water from the Poudre River on the eastern slope; (2) imported water from the basins of the Laramie, Michigan, and Colorado Rivers on the western slope; and (3) water derived from the Colorado–Big Thompson Project in accord with the allotment contract entered into with NCWCD.[55] Decree, ¶ 11.4, at 11. Based on a study of WSSC's historical diversion practices, the shares now owned by Thornton have produced an average annual diversion of 16,041 acre feet of native water and 14,222 acre feet of transmountain water. Decree, ¶ 11.4.1, at 11.

The transmountain water rights utilized in the WSSC system are exercised by diversions via four separate collection ditches for ultimate delivery to the headgate of the Larimer County Canal, the main artery of the WSSC system. The shareholders of WSSC have traditionally used the transmountain water associated with these diversions to irrigate farms located in Larimer and Weld Counties. The return flows and seepage water associated with this irrigation historically accrued to the South Platte and Poudre Rivers, where they have been further utilized by appropriators on those streams.[56] With the exception of the limited use of tailwater ponds to capture wastewater, neither WSSC nor its shareholders had ever exercised a right of reuse with respect to these transmountain waters prior to their sale to Thornton.[57] Furthermore, WSSC apparently did not formulate an intent to reuse these waters until at least 1978. Thornton completed its acquisition of WSSC shares in 1986. As part of its Northern Project, Thornton proposed

the change of these shares from irrigation to municipal uses for application within its water service area beginning in the year 2002. The result of this change would be the discontinuance of irrigation with this water and the concomitant loss of associated return flows and seepage. Thornton claimed that it was not required to replicate these return flows and seepage water, which had historically totaled approximately 6700 acre feet annually, for the benefit of downstream users in the South Platte basin. *See* Decree, ¶ 11.4.6, at 12. Instead, Thornton proposed to change the use of the 14,222 acre feet of transmountain water historically produced and attributable to its share of the WSSC water rights to municipal uses within Thornton and to successively use and reuse these waters to extinction. Thornton proposed to continue this practice until the initiation of Phase III of the Northern Project in approximately 2034, when the city will change the use of its shares back to irrigation in preparation for the full operation of the WSSC ditch exchange. Various objectors challenged Thornton's proposal on the related grounds that reuse of this water was prohibited and that replication of return flows was required.

### 2. Trial Court Ruling

In its Memorandum of Decision, the trial court identified the core legal issues raised by the parties as (1) whether an importer of transmountain water seeking to reuse that water must have an intent to reuse at the

55. The CBT water is also water imported from the western slope. However, as explained in the preceding section, the distribution and use of this water is governed by an independent statutory and contractual scheme. Thus, our discussion of foreign or imported water in this section does not encompass CBT water.

56. As discussed in the next section, *see infra* part IV(D)(1), certain of these flows travel through an alluvial aquifer on their way to the rivers and are intercepted by a number of wells in the north Poudre basin.

57. Within the last two decades, WSSC completed a series of improvements in its collection and distribution system, most notably a substantial enlargement of the storage capacity of Long Draw Reservoir, that allowed WSSC to increase the utilization of its transmountain decrees. These improvements resulted in the creation of a supply of "new" foreign water, as distinguished from the "old" foreign water historically derived by exercise of those rights. On August 10, 1978, WSSC entered into an agreement with Fort Collins and PRPA in which the latter parties recognized WSSC's right to reuse these "new" foreign waters. The right to reuse these waters was subsequently confirmed by a decree of the water court. *In re Application of Platte River Power Auth., Water Supply & Storage Co., and the City of Fort Collins, Colo.*, Case No. W–9322–78 (Colo. Dist. Ct., Water Div. No. 1 1979). The parties do not dispute that Thornton may reuse the "new" foreign water subject to the terms of the decree in Case No. W–9322–78. Therefore, our discussion of the reuse issue concerns only Thornton's right to reuse the "old" foreign water.

time of the original appropriation, and (2) whether the right to reuse transmountain water is subject to abandonment. To resolve these questions the court undertook a review of the law of Colorado and of other western states. This review culminated in the following holding:

> The decree in these cases will deny the right to reuse the "old" transmountain diversions of the Water Supply and Storage Company on two separate grounds, each of which is sufficient to support that denial:
>
> 1. The Water Supply and Storage Company had no intent to reuse at the time of the original appropriation of the "old" transmountain waters.
>
> 2. The Water Supply and Storage Company had abandoned the right to reuse the water diverted as a result of the "old" transmountain diversions.

MOD at 17.

The trial court drew support for an initial intent requirement from various sources, including case law from Colorado, see *City & County of Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 58, 506 P.2d 144, 150 (1972), and California, see *City of Los Angeles v. City of San Fernando*, 14 Cal.3d 199, 123 Cal.Rptr. 1, 43, 537 P.2d 1250, 1292 (1975), and the scholarship of Samuel Wiel, a California water lawyer who wrote on water law in the early decades of this century, see Samuel Wiel, *Mingling of Waters*, 29 Harv. L.Rev. 137 (1915).

Convinced that initial intent to reuse is a precondition to the reuse of transmountain waters, the court reviewed the evidence concerning WSSC's intent at the time of initial importation. With respect to this issue, the court made the following factual finding:

> The preponderance of the evidence clearly indicates that the original developers of the transmountain diversions involved here had no intention of recapturing or reusing

the water. No such plans were developed for over fifty years after the initial appropriations. There were numerous improvements in the collecting system to increase the yield of the system, but no efforts to establish a reuse plan. Indeed, the whole question does not seem to have been broached until the 1960's.

MOD at 10. The court did not accept Thornton's argument that WSSC could not have formed such an intent because it had no knowledge that the right to reuse existed until the 1969 passage of the imported water reuse statute, § 37–82–106, 15 C.R.S. (1990). The court found it "unlikely" that the early developers of the WSSC system were unaware of the possibilities of reuse, given the Colorado courts' recognition of reuse in the developed underground water context and the discussion of such rights in the scholarship of the period.

The trial court's determination that reuse rights can be abandoned also resulted from its examination of numerous sources and precedents. The court initially reviewed section 37–82–106, 15 C.R.S. (1990), pertaining to the reuse of imported water. The court found this statute unhelpful in determining the applicability of abandonment to Thornton's right to reuse its "old" foreign water based on the statute's admonition that "[n]othing in this section shall be construed to impair or diminish any water right which has become vested." § 37–82–106(1). According to the trial court, if the reuse right were considered to be abandoned prior to the 1969 enactment of section 106(1), then this sentence would bar the revival of such a right. The court found existing Colorado case law to be non-determinative and declared the abandonment question to be "a completely open one in Colorado."[58] MOD at 16.

Thus, the trial court found both Thornton's and the objectors' interpretations of the relevant cases to be plausible but not clearly controlling. MOD at 15–16.

The court also reviewed and discussed decisions of the courts of other states, including California, Wyoming, Montana, and Nevada, but found these decisions to be unhelpful or inapposite.

58. The trial court conceded that no Colorado court has declared an abandonment of an importer's right to reuse. However, the court noted that this court made statements in certain imported water cases that suggest the possibility of abandonment in certain circumstances. MOD at 15 (citing *Fulton*, 179 Colo. at 58–59, 506 P.2d at 150; *Brighton Ditch Co. v. City of Englewood*, 124 Colo. 366, 371, 237 P.2d 116, 119 (1951)).

Ultimately, the trial court stated its belief that the right to reuse transmountain water should be subject to abandonment and determined that WSSC had abandoned its right to reuse prior to Thornton's acquisition of a pro rata share of the "old" foreign water. MOD at 17. Thus, the trial court ruled that Thornton did not have the right to reuse the "old" foreign water and could not effect its proposed change of water rights without replacing return flows associated with these waters. The trial court implemented its holding by imposing the following condition in the final decree:

> *Replacement of Old Foreign Water Return Flows.* This Court concludes that Thornton shall have the same obligations regarding return flows from the change of use of its pro rata share of the old foreign waters within the WSSC System as it has regarding the return flows from the change of use of its pro rata share of the native waters within the WSSC System. Applicable rulings concerning return flows from native water sources contained in the Court's Memorandum of Decision, shall be equally applicable to both native and old foreign waters within the WSSC System. However, nothing herein shall be interpreted to require a continuation of the importation of foreign water.

Decree, ¶ 45.2, at 39; *see also id.* ¶ 19, at 29–30; *id.* ¶ 48.3, at 40. Accordingly, Thornton was required to comply with the replacement and recharge requirements imposed elsewhere in the decree, *see* Decree, ¶ 54.3.3, at 48–58, to the full extent of the return flows and seepage waters historically produced by the use of the "old" transmountain waters.

On appeal, Thornton takes issue with both of the trial court's bases for denying its reuse claims. The gist of Thornton's argument is that the right to reuse foreign water is inherent in the initial appropriation and importation of the water. Accordingly, Thornton contends that WSSC's right to reuse the "old" transmountain waters was neither subject to an initial intent requirement nor subject to abandonment. Thus, Thornton asserts that the trial court decision is erroneous as a matter of law and that the requirement that Thornton replicate the his-

torical return flows associated with its shares of foreign water is invalid. The various objectors who submitted briefs on this issue raise numerous counterarguments and urge us to affirm the trial court's ruling.

### 3. Development of Law of Reuse

Resolution of this issue requires that we decide various questions concerning the use and reuse of foreign or imported water that have been alluded to, but not squarely addressed, in our prior opinions. We begin our analysis with a review of our general treatment of water producers who introduce "new" water into a watershed, as well as the contrasting treatment afforded users of native water.

### a. Native Water

With respect to seepage and return flows from the use of native water, the rule in Colorado has been clear and unambiguous for at least seventy years:

> It is elementary that the waters of the public streams of this state belong to the people, and that appropriators acquire only a right of use. It is also settled law that an appropriator is limited in his use of water to his actual needs. He must not waste it, and if there is a surplus remaining after use, it must be returned to the stream whence it came.

*Pulaski Irrigating Ditch Co. v. City of Trinidad,* 70 Colo. 565, 568, 203 P. 681, 682 (1922). Appropriators of water native to a public stream have no automatic right to capture and reuse this water after the initial application to beneficial use. Instead, these return flows and seepage waters become water tributary to a natural stream and subject to diversion and use under the appropriations and associated system of priorities existing on the stream. Thus, a user of native water can secure a right to reuse return flows only by establishing the elements necessary to complete an independent appropriation of those waters. *See Water Supply & Storage Co. v. Curtis,* 733 P.2d 680, 682–83 (Colo. 1987).

### b. Foreign Water

■ However, a different standard has evolved for water that is brought into a watershed or stream system from a source unconnected with the receiving system. This so-called "foreign water" includes nontributary groundwater introduced into a stream as well as water imported from an unconnected stream system. In the present case, we are addressing the latter, water transported from westward-flowing river systems on the western slope to eastward-flowing river systems on the eastern slope. A review of Colorado case law [59] and statutory provisions concerning such transmountain foreign water reveals that importers of such water enjoy greater rights of use and reuse than do users of native water.

We first noted the unique status of transmountain water in *Brighton Ditch Co. v. City of Englewood,* 124 Colo. 366, 237 P.2d 116 (1951). The case focused on an application for a change in point of diversion and change of use by the City of Englewood.[60] However, as support for our holding that the downstream appropriators could not establish injury based on a potential diminution of transmountain water return flows from Englewood's change in diversion point, we cited a California case for the proposition that "appropriators on a stream have no vested right to a continuance of importation of foreign water which another has brought to the watershed." *Id.* at 377, 237 P.2d at 122 (citing *Stevens v. Oakdale Irrigation Dist.,* 13 Cal.2d 343, 90 P.2d 58 (1939)). This court's adoption of this principle in *Brighton Ditch* suggests an implicit recognition that an importer has a greater right to use the water for its own beneficial purposes than do appropriators of native water.

■ There were no further developments in the law concerning foreign water until 1969, when the General Assembly enacted an imported water statute as part of the Water Right Determination and Administration Act

59. This court first recognized an exception to the priority system for native waters for producers of water extracted from an underground source unrelated to the natural flow of the stream, referred to as "developed water." *See, e.g., Ripley v. Park Center Land & Water Co.,* 40 Colo. 129, 90 P. 75, (1907) (water trapped behind impervious granite layer in abandoned mine shafts). To reward the producer's efforts to increase the availability of water in the system, we upheld a right to this water in the producer that was independent of the priority system already in place on the stream. *See Comrie v. Sweet,* 75 Colo. 199, 201, 225 P. 214, 214 (1924) ("That one who artificially develops or produces water and adds or turns the same into a natural stream, which water would not in due course otherwise have reached the stream on the surface or in the underlying sands, may acquire a right thereto superior to the adjudicated rights of earlier appropriators of the natural waters of the stream only, may be conceded."); *Ripley,* 40 Colo. at 133, 90 P. at 76 ("We have held that such contributions [of developed water] to a natural stream belong to the one who made them."); *Platte Valley Irrigation Co. v. Buckers Irrigation, Milling & Improvement Co.,* 25 Colo. 77, 82, 53 P. 334, 336 (1898) (water users entitled to use of water in a stream to the extent that by their efforts and expenditures they had increased its average, continuous flow). The theme of rewarding contributors of "new" water was also subsequently incorporated into the context of "transbasin" diversions, i.e., water transported out of the particular basin of origin but into an interrelated stream, as between two tributaries of the same river. *See Coryell v. Robinson,* 118 Colo. 225, 194 P.2d 342 (1948); *San*

*Luis Valley Irrigation Dist. v. Prairie Ditch Co.,* 84 Colo. 99, 268 P. 533 (1928); *see also City & County of Denver v. Fulton Irrigating Ditch Co.,* 179 Colo. 47, 53, 506 P.2d 144, 147 (1972) ("[W]e see no distinction between the rights of owners of developed water from a mine and the rights of Denver as to its imported water.").

Whether these transbasin diversions would be considered foreign water under the doctrine as it operates today is doubtful. *See infra* pp. 84–85. However, the traditional principle of rewarding the importers of foreign water that drove these decisions is also evident in more recent statutory and common law precedent.

60. The water rights at issue were South Platte River rights purchased by Englewood for the purpose of developing a water supply independent of water provided by Denver. *Brighton Ditch,* 124 Colo. at 368–69, 237 P.2d at 118–19. One of several arguments offered by objectors was "that Englewood now derives its supply of water from Denver; that because of that requirement Denver requires and diverts water from the Western Slope, the waste and return flow of which go to the benefit of appropriators down the stream; that if Englewood obtains its supply of water from a source other than Denver, the latter city will require less water from Western Slope diversion, and appropriators down the stream will suffer loss of the waste and return flow of such water heretofore enjoyed." *Id.* at 377, 237 P.2d at 122. Thus, the issue of foreign water constituted only a tangential aspect of the case.

of 1969. *See* Ch. 373, sec. 21, § 148–2–6, 1969 Colo. Sess. Laws 1200, 1223–24. That statute is now codified at section 37–82–106(1) and reads:

> *37–82–106. Right to reuse of imported water.*
>
> (1) Whenever an appropriator has lawfully introduced foreign water into a stream system from an unconnected stream system, such appropriator may make a succession of uses of such water by exchange or otherwise to the extent that its volume can be distinguished from the volume of the streams into which it is introduced. Nothing in this section shall be construed to impair or diminish any water right which has become vested.

§ 37–82–106(1), 15 C.R.S. (1990).[61] Section 106(1) expressly establishes that the rules applicable to foreign water differ from the rules that govern the use of native water. The parties dispute the scope of the right encompassed by this provision, and we will discuss their differing interpretations later in this section. However, in view of the language of this statute, it cannot credibly be disputed that some right to reuse foreign water exists.[62]

Soon after the enactment of section 106(1), this court decided *City & County of Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 506 P.2d 144 (1972), a case that involved the new statute and the City of Denver's rights in water it obtained through transmountain diversions. In *Fulton*, Denver sought a declaratory judgment that it had the right to make successive uses of its diverted transmountain water while it maintained dominion over that water. *Id.* at 51, 506 P.2d at 146. Specifically, Denver sought to reuse sewage effluent derived from the treatment of transmountain water originally used within the city. The defendants opposing this plan were water users downstream from the point where the effluent was previously returned to the stream.

This court in *Fulton* ultimately upheld Denver's right to reuse its transmountain water. We initially held that the imported water statute, then codified at 1969 Perm. Supp., 1963 C.R.S. 148–2–6, authorized Denver to "re-use, make successive uses, and after use to have the right of disposition of imported water," subject to contrary contractual obligations. *Id.* at 52, 506 P.2d at 147. However, we also held that such a right in foreign water existed independently of the statute, citing our early developed water cases. *Id.* at 52–53, 506 P.2d at 147; *see also supra* note 59. This court dismissed the downstream appropriators' objections, viewing its holding as a logical extension of the holding in *Brighton Ditch* that downstream appropriators have no right to the continuation of water importation. *Id.* at 53, 506 P.2d at 147. We also reasoned that permitting reuse of western slope water by eastern

---

61. A second section was added to this statute in 1979. *See* Ch. 346, sec. 2, § 37–82–106(2), 1979 Colo. Sess. Laws 1366, 1366–67. Section 106(2) reads as follows:

> (2) To the extent that there exists a right to make a succession of uses of foreign, nontributary, or other developed water, such right is personal to the developer or his successors, lessees, contractees, or assigns. Such water, when released from the dominion of the user, becomes a part of the natural surface stream where released, subject to water rights on such stream in the order of their priority, but nothing in this subsection (2) shall affect the rights of the developer or his successors or assigns with respect to such foreign, nontributary, or developed water, nor shall dominion over such water be lost to the owner or user thereof by reason of use of a natural watercourse in the process of carrying such water to the place of its use or successive use.

§ 37–82–106(2), 15 C.R.S. (1990). We will discuss this section in greater detail in the context of our discussion of the applicability of abandonment principles to reuse rights in foreign water. *See infra* part IV(C)(4)(b).

62. Fort Collins proposes a conflicting interpretation of section 106(1) based on the use of the word "appropriator." *See* § 37–82–106(1), 15 C.R.S. (1990). According to Fort Collins, this reference means that all rights in foreign water, both of initial use and reuse, are limited to appropriators who, as the term suggests, establish their rights through appropriation. We discern a more limited meaning in the relevant portion of section 106(1). In the phrase, "[w]henever an appropriator has lawfully introduced foreign water into a stream system," the word "appropriator" refers to the importer's status as one who has lawfully appropriated the foreign water in the basin of origin. The appropriation referred to is the appropriation of the water for original use, not for reuse.

slope importers would achieve the goal of minimizing the amount of water imported. *Id.* at 54, 506 P.2d at 148.

The *Fulton* decision leaves no doubt that separate reuse rules, grounded in both statutory and common law, apply to foreign water, and in subsequent decisions we have consistently upheld, if not clearly defined, a right of reuse for importers of transmountain water that does not exist for appropriators of native water. *See, e.g., Public Serv. Co. v. Willows Water Dist.,* 856 P.2d 829, 833 n. 8 (Colo.1993) ("An appropriator of native, tributary water, which historically flows back to the stream from whence it comes, is permitted only one use of the water because the return flows are subject to water rights on the stream in the order of their priority. By contrast, the owner of a water right which has been imported into a stream system has the right to successive reuse, to extinction, of the water."); *City & County of Denver v. City of Englewood,* 826 P.2d 1266, 1272 n. 7 (Colo.1992) ("Currently, an appropriator who introduces imported water into a stream system has at least a limited right to reuse the water it imports."); *Town of Estes Park v. Northern Colo. Water Conservancy Dist.,* 677 P.2d 320, 326 (Colo.1984) ("Subject to contractual obligations, and possibly other limitations not relevant here, a developer of foreign water has the right to use, reuse, successively use, and dispose of such water."). This right allows the flexible and efficient use of foreign water, minimizes the amount of water imported from the western slope, and recognizes that absent the importer's efforts, the water would never have been available for use or reuse. *See City of Florence v. Board of Waterworks,* 793 P.2d 148, 153–54 (Colo.1990); *Water Supply & Storage Co. v. Curtis,* 733 P.2d 680, 685 (Colo.1987).

### 4. Characteristics of Right to Reuse Foreign Water

■ We thus confirm the existence of an importer's right to use and reuse transmountain water. The crux of the present case, however, is an issue of first impression in Colorado: the characteristics of that reuse right and the extent to which it is limited by other principles and provisions of Colorado water law. The objectors argue, and the trial court held, that there are two significant limitations on the reuse rights of an importer: (1) the importer must establish an intent to reuse at the time of the initial appropriation and diversion of the transmountain water, and (2) the importer's reuse right is subject to abandonment based on nonuse. Thornton contends that these limitations are unsupported by either the statutory or common law of this state. Based on our review of the reuse statute, section 37–82–106, 15 C.R.S. (1990), and the case law of this and other western jurisdictions, we hold that the limitations imposed by the trial court are inapplicable to foreign water. Accordingly, we reverse the trial court's determination that Thornton is prohibited from utilizing the return flows deriving from its rights in foreign water and remand to that court for proceedings consistent with this decision.

### a. Intent to Reuse

We first analyze the objectors' contention that an importer of foreign water must establish an intent to reuse foreign waters at the time of original appropriation and diversion. Our starting point is the reuse statute. The first sentence of section 37–82–106(1) reads as follows:

> Whenever an appropriator has lawfully introduced foreign water into a stream system from an unconnected stream system, such appropriator may make a succession of uses of such water by exchange or otherwise to the extent that its volume can be distinguished from the volume of the streams into which it is introduced.

On its face, the statute does not include a requirement that the importer establish an initial intent to reuse to preserve its right to reuse this foreign water in the future. Indeed, the plain language of this provision supports precisely the opposite conclusion. The phrase "[w]henever an appropriator has lawfully introduced foreign water" suggests that the reuse right is inherent and self-actuating—*i.e.,* "whenever" importation takes place, the right to reuse simultaneously and automatically attaches. Thus, a plain reading of the statute suggests that legal importation of foreign water is the only prerequi-

site for future reuse and successive use of such water.

 However, certain objectors assert that interpreting the reuse right as inherent in the importation of foreign water is in violation of the constitutional doctrine of prior appropriation. They argue that Article XVI, section 5, of the Colorado Constitution reserves all unappropriated water of natural streams to the people of the state, and the automatic reservation of foreign water for reuse would impermissibly prohibit its appropriation. Thus, the objectors contend that an importer must meet the requirements for appropriation, including intent and beneficial use, to acquire a right of reuse. We disagree with this assertion.

Our prior cases concerning foreign water establish that such water does not fit squarely within the definition of waters of a "natural stream" as contemplated by the constitutional provision cited by the objectors. *See, e.g., Florence v. Board of Waterworks,* 793 P.2d at 154; *Curtis,* 733 P.2d at 685. Although transmountain water begins as tributary water in its basin of origin, by virtue of its importation into a different stream system it takes on the character of foreign water. Thus, like developed water and nontributary groundwater, transmountain water is not regulated entirely within the prior appropriation system. Because foreign water is not considered part of the natural stream in its basin of use, the absence of a requirement that reuse of such water be established by appropriation does not run afoul of the constitutional provision cited by the objectors. Absent a constitutional conflict, the objectors' reading of the statute to require an additional appropriation for reuse is insupportable. Such an interpretation would subject importers of foreign water to the same standard applied to native water appropriators, a result that would render void the reuse right recognized for importers and their successors at common law and by statute. *See supra* part IV(C)(3)(b).

Although this court has not specifically ruled on the existence of an initial intent requirement, our reading of the statute is consistent with our discussion of reuse rights

in prior cases. In *Fulton,* in the context of a discussion of abandonment that we acknowledged as nonbinding, we made brief mention of facts in the record pertaining to Denver's intent to reuse its imported water. 179 Colo. at 58–59, 506 P.2d at 150. However, we noted only that Denver may have had in mind the reuse of its imported water "*possibly* since its first transmountain diversion." *Id.* at 58, 506 P.2d at 150 (emphasis added). Had we contemplated a strict initial intent requirement in *Fulton,* this limited reference would have been insufficient to support affirmance of Denver's reuse rights.

In *Curtis,* 733 P.2d 680, the applicant before the court was seeking to reuse stored water that consisted of a mixture of both native and imported water. With respect to the native water, we denied the request based on the applicant's failure to establish that it possessed a fixed intent to reuse and successively use the water in a beneficial manner. *Id.* at 685. However, with respect to the imported water, for which the applicant had presented no additional evidence of intent to reuse, we approved this reuse. *Id.* The *Curtis* decision certainly suggests that initial intent to reuse foreign water is unnecessary, although we did not explicitly so state.

Most recently, in *Public Service Co. v. Willows Water District,* 856 P.2d 829, we considered the right to reuse nontributary groundwater. The defendant had begun pumping this groundwater in 1974, but did not formulate a plan to reuse the water until 1986. *Id.* at 831. Analogizing to *Fulton,* we upheld the defendant's right to reuse this nontributary groundwater. *Id.* at 832–34. Although we did not focus on the initial intent issue, we arrived at our decision notwithstanding the absence of an intent to reuse during the first twelve years that the defendant diverted these waters. Other than the above cases, our prior decisions either do not consider intent to reuse or touch on it only in the context of dicta concerning the issue of abandonment. Based on our review, we find no support for an initial intent requirement in Colorado case law.[63]

---

**63.** Certain objectors urge the importation of an

intent requirement from the law of California.

In view of the absence of any statutory or decisional support, we cannot agree with the trial court's initial intent ruling. Rather, we conclude that an importer of transmountain water need not have an intent to reuse this water at the time of the original appropriation and importation to maintain the subsequent right of reuse.

### b. Abandonment

Having decided that an importer of foreign water need not possess the intent to reuse such water at the time of the original appropriation, we now turn to the question of whether the reuse right may be abandoned if reuse is not initiated within a reasonable time after first use. The trial court held that reuse rights in foreign water are subject to abandonment and that the rights at issue in this case were abandoned. We disagree with the first holding and therefore need not consider the second. We conclude that under the present statutory scheme governing foreign water, the right of reuse is not subject to abandonment.

"Abandonment of a water right" is statutorily defined in pertinent part as "the termination of a water right in whole or in part as a result of the intent of the owner thereof to discontinue permanently the use of all or part of the water available thereunder." § 37–92–103(2), 15 C.R.S. (1990). Under this definition, the crucial elements for finding abandonment are the intent to abandon and non-use of the water right. *People v. City of Thornton*, 775 P.2d 11, 17–18 (Colo.1989). Thus, the elements of abandonment are essentially the converse of those essential for appropriation of native water and reuse rights, i.e., intent to use and actual beneficial use of the water.

The native water right construct is not applicable to foreign water reuse rights, however. As we discussed in part IV(C)(4)(a), *supra*, importers of foreign water need not make an additional appropriation of return flows to gain the right to reuse these waters. The reuse right is inherent in the importation and is triggered whenever foreign water is lawfully introduced. § 37–82–106, 15 C.R.S. (1990). Thus, unlike reuse rights in native water, such rights in foreign water do not require either intent or beneficial use to come into being. As a logical matter, rights that do not require intent and use for their formation cannot be abandoned solely on the basis of an absence of a contemporaneous intent to use and a period of non-use. The reuse right remains with the importer until the right is transferred by the importer or the importation ceases.

Our conclusion that foreign water reuse rights are not susceptible to abandonment finds support in the provisions of section 37–82–106, 15 C.R.S. (1990). In addition to defining the genesis of the reuse right as the original importation, section 106(1) indicates that the reuse and successive use of foreign water is perpetual "to the extent that its volume can be distinguished from the volume of the streams into which it is introduced." § 37–82–106(1). The focus of this requirement is on quantification and measurement of the water to be reused, and the statute does not require an importer to maintain continuous physical control over the water. *Willows*, 856 P.2d at 833–34. When the foreign water can no longer be distinguished volumetrically, it becomes part of the natural stream and cannot be reused by the importer. However, the requirement attaches to each importation so that a current failure to distinguish the volume of foreign water from the receiving stream does not preclude future distinction and reuse.

This theme is continued in section 37–82–106(2). That section provides that foreign water,

> when released from the *dominion* of the user, becomes a part of the natural surface stream where released, subject to water rights on such stream in the order of their priority, but nothing in this subsection (2) shall affect the rights of the developer or

However, in view of the substantial and material differences between the water law of this state and that of California, *see generally* William R. Attwater & James Markle, *Overview of California Water Rights and Water Quality Law*, 19 Pac. L.J. 957 (1988), we are not persuaded that California water law provides assistance in resolving the issues before us.

his successors or assigns with respect to such foreign . . . water.

§ 37–82–106(2) (emphasis added). By using the words "released from the dominion" rather than the word "abandon," the provision apparently contemplates relinquishment of specific portions of water, a physical substance over which an importer can establish dominion, rather than relinquishment of the future reuse right, which would not normally be associated with the concept of dominion. In other words, the physical release of specific *water* to the stream does not result in the abandonment of the future *right* to discontinue this release and to reuse the imported water to extinction.[64] Our interpretation is fully consistent with the common law rule that downstream users of return flows from foreign waters gain only a right in the water that they actually divert and do not have a vested right in future importation. *E.g., Brighton Ditch,* 124 Colo. at 377, 237 P.2d at 122.

Both Thornton and the objectors cite existing case law of Colorado and other jurisdictions to support their respective positions. However, our review of the relevant authority has revealed no case suggesting that our interpretation of section 37–82–106 is incorrect. Although we have noted the unresolved status of abandonment in the context of foreign water rights on numerous occasions, any such discussion has been either dicta, *see, e.g., Fulton,* 179 Colo. at 58–59, 506 P.2d at 150, or included a disclaimer that we were not deciding the abandonment question, *see, e.g., Curtis,* 733 P.2d at 685 n. 3. Accordingly, we are not governed by, and find little assistance in, prior Colorado decisions. Furthermore, we discern no clear directives in the decisions of courts in other western states. In our view, the language of section 37–82–106 and the established policy of rewarding importers for their efforts in bringing "new" water to a watershed are compelling.[65] For the reasons discussed above, these considerations weigh against the extension of abandonment principles to foreign water reuse rights.[66] Accordingly, we con-

---

**64.** In *Denver v. Fulton Irrigating Ditch,* we took note of the following excerpt from the California case of *Stevens v. Oakdale Irrigation District:*

> Waters brought in from a different watershed and reduced to possession are private property during the period of possession. When possession of the actual water, or corpus, has been relinquished, or lost by discharge without intent to recapture, property in it ceases. This is not the abandonment of a water right but merely an abandonment of specific portions of water, i.e., the very particles which are discharged or have escaped from control.

*Fulton,* 179 Colo. at 58, 506 P.2d at 150 (quoting *Stevens v. Oakdale Irrigation Dist.,* 13 Cal.2d 343, 350, 90 P.2d 58, 61–62 (1939)).

We took no position in *Fulton* on whether this quote accurately reflects the common law in Colorado prior to the enactment of § 37–82–106, and we take no position now. Section 37–82–106 reflects an intent that the release of foreign water return flows does not terminate the reuse right. Whether the statutory language is derived from California law is unclear, but in the absence of controlling Colorado precedent we base our determination that abandonment does not apply solely on the plain statutory language. *Dunton v. People,* 898 P.2d 571, 573 (Colo.1995) (where language of statute is clear, court should apply statute as written).

**65.** The trial court was unconvinced that the policy of rewarding importers should extend to Thornton as a "remote successor" of a developer of transmountain water. However, precisely such a result is suggested by the language of § 37–82–106(2), which states that "[t]o the extent that there exists a right to make a succession of uses of foreign, nontributary, or other developed water, such right is personal to the developer or his successors, lessees, contractees, or assigns."

**66.** Certain objectors argue that failure to subject reuse rights to the possibility of abandonment is in derogation of the policy of maximum beneficial use. They contend that if importers retain the rights to reuse foreign water even in the absence of any beneficial use, then the water could go unused for extended periods of time until the importer chooses to exercise its rights. This argument ignores the reality of the diversion of water in the South Platte basin. These stream systems are largely overappropriated, *see Cache La Poudre Water Users Ass'n v. Glacier View Meadows,* 191 Colo. 53, 58, 550 P.2d 288, 292 (1976), and any water that is released from dominion by Thornton can be expected to be diverted to satisfy appropriative rights. Although individual appropriators cannot gain vested rights in the continuation of these releases, any water released becomes part of the natural stream and will be distributed in conformance with the priority system on the stream. Thus, the question is not whether the water will be reused but who will have the right to do so. Even in times when Thornton is not reusing its foreign waters, other users on the stream will predictably take advantage of these excess waters. Viewed in this light,

clude that the right to reuse foreign water is not subject to abandonment by non-use.

### c. Injury

We have determined that an importer of foreign water need not establish an initial intent to reuse to initiate the reuse right and that such right is not subject to abandonment. However, certain objectors further argue that even if foreign water may be reused without initial intent and cannot be abandoned, this reuse remains subject to "no-injury" review to protect the rights of junior appropriators. These objectors base their argument on two grounds. First, they rely on the language of the second sentence of section 37–82–106(1), which protects vested rights against impairment resulting from the reuse of foreign water. Second, these objectors argue that Thornton attempts to secure the reuse of this water as part of a change of water rights proceeding and thus the statute governing such changes, section 37–92–305(3), 15 C.R.S. (1990), must be applied. Under this theory, the trial court's requirement that Thornton replicate foreign water return flows was a valid condition necessary to prevent injury to downstream appropriators. We disagree with these contentions.

The second sentence of section 37–82–106(1) reads as follows: "Nothing in this section shall be construed to impair or diminish any water right which has become vested." The objectors argue that they have established vested rights in the return flows from Thornton's foreign water based on the failure of Thornton and WSSC to reuse this water for over eighty years, and that these are the rights intended to be protected by the statutory language. The trial court held that if any reuse right had been abandoned prior to passage of this provision and the water put to beneficial use by another appropriator, this sentence "would prevent a revival of that right." MOD at 15. However, this interpretation conflicts with both our holding in this case that foreign water reuse rights are not subject to abandonment, *see supra* part IV(C)(4)(b), and our prior statements that downstream appropriators have no rights to the continuance of importation, *e.g., Brighton Ditch,* 124 Colo. at 377, 237 P.2d at 122. By holding that abandonment does not apply to reuse rights in foreign water, we clarify that downstream users of foreign water return flows gain a right only in the water actually released to the stream. Thus, although Thornton has no claim to water previously released, the downstream users cannot compel Thornton to continue the release of this water based solely on the downstream users' history of diversions. Moreover, we have consistently maintained that appropriators on a stream have no vested right to a continuance of importation of foreign water which another has brought to the watershed. *E.g., Willows,* 856 P.2d at 834; *Fulton,* 179 Colo. at 53, 506 P.2d at 147; *Brighton Ditch,* 124 Colo. at 377, 237 P.2d at 122. Because the ability of downstream users to divert imported water exists entirely at the sufferance of the importer, any right of these users to such water does not vest even after an extended period of use. Accordingly, the objectors cannot gain rights to this imported water that rise to the vested status necessary to secure protection under section 37–82–106(1).[67]

Similar reasoning precludes the application of the change of water rights statute to foreign water. Section 37–92–305(3) provides for the approval of a change of water right if the change "will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right...." As discussed above, any right in imported water return flows possessed by downstream users is not a vested water right. Thus, these users are not among those slated for protection in a change of water right proceeding.[68]

the exemption of foreign water reuse rights from abandonment principles does not conflict with the policy of maximum use.

67. In our prior cases, we have recognized the right of an importer to sell or lease its reuse rights and to limit those rights by contract. *See*

*Estes Park,* 677 P.2d at 326; *Fulton,* 179 Colo. at 52, 506 P.2d at 146. Such rights of a transferee are among the rights that derive protection from the final sentence of § 37–82–106(1).

68. Fort Collins argues that this court's decision in *Department of Natural Resources v. Ogburn,*

See Willows, 856 P.2d at 834 & n. 13 ("distinguishing water brought into a natural drainage from another drainage ... is synonymous with non-injury" because appropriators have no vested rights in such water that may be injured). We reached a similar conclusion in *City of Florence v. Board of Waterworks,* 793 P.2d 148 (Colo.1990). Based on a review of the legislative scheme and prior case law governing imported water, we held that foreign water was exempt from the restrictions of section 37–92–305(3):

> [I]mporters of foreign water are accorded wide latitude as to the use and disposal of the appropriated water.
>
> . . . .
>
> For example, the appropriator of such waters may reduce or eliminate the amount of foreign water available to junior appropriators, by changing the time, place or manner in which these waters are used, even if junior appropriators are adversely affected.... Because these actions involve foreign water and are addressed by section 37–82–106, 15 C.R.S. (1989), the general change of water right criteria, defined in section 37–92–103(5), 15 C.R.S. (1973), ... are inapplicable.

*Id.* at 154 (citations omitted). The scheme governing foreign water contemplates that such water will be administered independently of the system governing native water. Accordingly, the "no-injury" provisions do not present a barrier to Thornton's reuse of its foreign water, and the trial court's replication requirement was not justified under the statutory provision governing changes of water rights.

194 Colo. 60, 570 P.2d 4 (1977), requires the opposite conclusion. In that case, we held that the proper venue for a proceeding for change of use of a transmountain diversion water right is in the importing basin. The city bases its argument on the following language in Justice Erickson's dissent: "The majority ignores the legal fact that appropriators of water rights in the 'gaining' division [the division receiving imported water] cannot establish rights in the imported water as against the importer." *Id.* at 63, 570 P.2d at 6 (Erickson, J., dissenting). According to Fort Collins, the majority in *Ogburn* did not ignore the principle cited by Justice Erickson, but rather rejected it by declining to adopt the reasoning of the dissent. However, the majority makes no mention of the relative rights of users of foreign water in the receiving basin, and we find no

### 5. Laches and Equitable Estoppel

We thus conclude that Thornton retains a legal right to reuse the "old" foreign waters it acquired by purchasing shares in WSSC. However, certain objectors argue that our holding does not resolve this issue. They seek relief in equity, arguing that Thornton lost its right to reuse these waters under the doctrines of laches and equitable estoppel. We address these contentions in turn.[69]

#### a. Laches

"Laches is a form of estoppel and contemplates an unconscionable delay in asserting one's rights which works to the defendant's prejudice or injury in relation to the subject matter of the litigation." *Lin Ron, Inc. v. Mann's World of Arts & Crafts, Inc.,* 624 P.2d 1343, 1345 (Colo.App.1981). The elements of laches are: " '(1) full knowledge of the facts; (2) unreasonable delay in the assertion of available remedy; and (3) intervening reliance by and prejudice to another.' " *Manor Vail Condominium Ass'n v. Town of Vail,* 199 Colo. 62, 64, 604 P.2d 1168, 1170 (1980) (quoting *Herald Co. v. Seawell,* 472 F.2d 1081 (10th Cir.1972)). Fort Collins argues that junior appropriators on the Poudre River have relied for almost 100 years on return flows from irrigation with transmountain water of the lands associated with Thornton's WSSC shares. Fort Collins maintains that the delay by WSSC and Thornton in asserting their reuse rights is unexcused and will cause extreme prejudice to these downstream users. We disagree.

evidence in the majority opinion of the intent envisioned by Fort Collins. In the absence of an explicit ruling, we do not interpret this case to overrule established precedent conditioning the ability of downstream users to avail themselves of foreign water return flows on the importer's continued importation and release. *E.g., Fulton,* 179 Colo. at 53, 506 P.2d at 147; *Brighton Ditch,* 124 Colo. at 377, 237 P.2d at 122.

69. Because the trial court held that Thornton's right to reuse its foreign waters was barred by the absence of an initial intent and the presence of facts establishing abandonment, the court did not specifically address the issues of laches or estoppel in the Memorandum of Decision or the final decree.

 In light of our holdings concerning the creation and life of a reuse right in transmountain water, *see supra* part IV(C)(3)(b), Fort Collins' allegations of laches are without merit. Initially, laches is not applicable to a party who has no duty to act. *Atchison v. City of Englewood,* 193 Colo. 367, 377, 568 P.2d 13, 20 (1977); *Michels v. Clemens,* 140 Colo. 82, 88–89, 342 P.2d 693, 698 (1959). Because WSSC gained the right to reuse its transmountain water by virtue of the act of importing it, *see supra* part IV(C)(4)(a), WSSC was not required to assert a claim to this water. Accordingly, Thornton's right, derived by transfer from WSSC, cannot be defeated by a perceived delay in taking an action it was not required to take.

 Furthermore, the prejudice required to establish the defense of laches, as a form of estoppel, must necessarily result from reliance on the actions of the opposing party that is justifiable under the circumstances of the case considered as a whole. *Simineo v. Kelling,* 199 Colo. 225, 228, 607 P.2d 1289, 1291 (1980). We noted above that it has long been the rule in Colorado that downstream users cannot establish vested rights in the continuation of the importation of foreign water. *See, e.g., supra* part IV(C)(3)(b). In light of this rule, Fort Collins and the other downstream users were not justified in relying on the continued release of these foreign water return flows. Because their reliance was unreasonable, the downstream users cannot establish the requisite prejudice attributable to WSSC's alleged delayed initiation of its reuse right. Thus, we hold that Thornton's proposed reuse of its foreign water is not barred by the doctrine of laches.

### b. Equitable Estoppel

Objectors NCWCD and PRPA assert that WSSC relinquished its rights to reuse its transmountain water, and that Thornton is now estopped from claiming such reuse rights, by virtue of statements allegedly made to that effect by Mr. Ward Fischer, WSSC's attorney in previous water right matters. Resolution of this issue requires an examination of the facts and circumstances giving rise to the objectors' claims.

In the late 1970s, PRPA, an electric utility owned by four northern Colorado cities, began seeking a totally consumable source of water for one of its power plants. PRPA entered into negotiations with Fort Collins and WSSC concerning a plan that would provide transmountain water for use within Fort Collins and subsequent capture and reuse at PRPA's power plant. The water to be used under this plan consisted of so-called "new" foreign water, *i.e.,* newly created transmountain water associated with an increase in the utilization of WSSC's transmountain decrees by reason of improvements in its collection and distribution system, as opposed to "old" foreign water, *i.e.,* water diverted under these transmountain decrees prior to such improvements. These three parties entered into an agreement on August 10, 1978, confirming their intent to complete the plan (Three–Way Agreement) and submitted an application to the water court for approval. The water court approved the application in case W–9322–78 and entered a decree on April 24, 1979.

One element of the plan envisioned in the Three–Way Agreement required the use of Horsetooth Reservoir, a storage facility owned by NCWCD. Accordingly, the parties were required to secure NCWCD's consent to use this facility prior to obtaining the decree in this case. Negotiations ensued, and NCWCD ultimately opted not to file an objection with the water court in case W–9322–78.

The terms of the Three–Way Agreement and the application and decree in case W–9322–78 explicitly state that the plan at issue contemplated the reuse of only the "new" foreign water. Paragraph 7 of the Three–Way Agreement includes the following language:

Water [Supply and Storage] Company and Fort Collins recognize that each of them could, under the law, make claim to all of the benefits provided by [§ 37–82–106, 15 C.R.S.] in relation to all of said [imported] waters.... It is therefore their intent to limit the plan contemplated by this Agreement to the re-use of new foreign waters,

without affecting their rights, if any, to make a succession of uses of all foreign waters.[70]

Similarly, the revised application filed with the water court contained the following language:

> 8. Water [Supply and Storage] Company and Fort Collins recognize that each of them could, under the law, make claim to the right to reuse all foreign waters imported by them into the Cache La Poudre Basin. However, they expressly do not assert this claim in this proceeding and, therefore, for the purpose of this plan have separated their foreign waters into two categories and defined these as "old foreign waters" and "new foreign waters."

Finally, the water court noted in the decree that "[w]hile [WSSC] and Fort Collins assert that all foreign water is properly reusable under the law, each restricts, for the purposes of the present plan, the amount of water from foreign sources which it intends to deliver to [PRPA] for a successive use." The court ultimately stated:

> The Court is not called upon to conclude, and does not conclude, what further succession of uses beyond those approved in this plan may or may not be legally or factually proper. This decree is not *res judicata* as to whether reuse of volumes of water in excess of the volumes of water decreed herein is or is not legally or factually allowable.

Ex. P–1A, p. 17.

Early in 1979, about the time of the trial court's entry of the decree in case W–9322–78, the 146 Company, a shareholder of WSSC, filed an application in the water court seeking approval of the reuse of certain "old" foreign waters (the 146 plan). Upon learning of this filing, WSSC attorney Ward Fischer wrote a letter to Bill Southard, the president of 146 Company, in which he expressed WSSC's opposition to the 146 plan. WSSC continued its objection in the water court proceedings on the 146 plan, and the court eventually denied the application on June 12, 1981.

The preceding history brings us to the present case. NCWCD and PRPA contended at trial that by the actions of Mr. Fischer, WSSC's attorney in the negotiations leading up to the Three–Way Agreement and in the proceedings relating to the 146 plan, WSSC waived its rights to reuse its "old" foreign water and that Thornton, as successor to WSSC, is estopped from now asserting these rights. The objectors initially claimed that Mr. Fischer made representations during negotiations preceding the Three–Way Agreement that the proposed plan only contemplated the reuse of "new" foreign water and that WSSC did not contemplate ever asserting the right to reuse its "old" foreign water in the future. NCWCD claims that its decision to refrain from objecting to the reuse of the "new" foreign water was based on the assurances allegedly made by Mr. Fischer regarding reuse of WSSC's "old" foreign water.

In support of this claim, the objectors sought to introduce testimony of parties present at these negotiations regarding their recollections of alleged representations made by Mr. Fischer. Chief among the witnesses who asserted such recollections was John Sayre, counsel for NCWCD during the relevant negotiations. Mr. Sayre's testimony was presented in the form of a videotaped deposition because he was unable to appear at the trial. The trial court initially admitted Mr. Sayre's testimony as an exhibit, but later struck the testimony as irrelevant. The court ruled, in pertinent part:

> All right. I'm going to sustain the motion to strike that. It appears to me that this is totally irrelevant. I don't believe that the apparent authority of attorneys acting on behalf of their clients extends anywhere near as far as has been related.
>
> And I don't think that, unless it was shown that Mr. Fischer—assuming—and I would say, and I hope I'm not influenced by that, that I didn't believe it anyway—but, assuming that all that was true, Mr. Fischer has know [sic] apparent authority

---

70. The parties expressly recognized that others had historically relied on return flow from the old foreign water and sought to avoid the conflict that could be expected to result from attempts to reuse such water, while simultaneously continuing to assert their rights to do so.

or actual authority, as far as the evidence shows, to indicate, to waive these water rights valued at, you know, millions of dollars.

And it's inconceivable to the Court—although I might say, this is another ground for the motion—but I think a thing of that nature, of that importance, would not be left to mere recollections of counsel 20 years later and that it wouldn't have been incorporated in some written document.

I am going to strike that. I'm doing that partly because it seems to me that this whole—and I think counsel recognize this is somewhat out of character for me—but the whole thing, it seems to me, was a red herring and was putting Mr. Fischer in a very unfortunate position, and, to my mind, for absolutely no reason.

Volume 53 of trial transcript at 13–14.

The objectors also offered the letter from Mr. Fischer to Mr. Southard regarding the 146 plan as evidence that these previous representations had been made and that WSSC had given up its reuse rights. The trial judge, who also presided over the trial involving the 146 plan, made the following statement regarding this issue:

May I suggest, since the witness doesn't seem to have much of a recollection of any of this, and since the Court's recollection is pretty clear, and just so everybody knows what it is; that ... although the [WSSC] opposed Southard's application, they in no way at no time indicated that they didn't think they had a right to use [the "old" foreign water].

They didn't think that Southard had a right to a decree, but they did not do anything to indicate that they didn't think they had a right to use [the "old" foreign water].

Volume 64 of trial transcript at 153.

Although the above passages imply the trial court's disinclination to accept the objectors' claims, the court was not required to rule on the estoppel issue because of its holding that WSSC had not formed an initial intent to reuse its "old" foreign water and had abandoned those rights.

Both PRPA and NCWCD appeal the trial court's ruling on the admissibility of the Sayre deposition and reassert their claims of estoppel that were not ruled upon by the trial court. For reasons explained below, we affirm the exclusion of the Sayre testimony. We also conclude that neither objector has satisfied the elements necessary to establish estoppel.

We have previously addressed the application of equitable estoppel to claims involving water rights and articulated the necessary elements as follows:

The essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially....

*Aubert v. Town of Fruita,* 192 Colo. 372, 374, 559 P.2d 232, 234 (1977) (quoting *Jacobs v. Perry,* 135 Colo. 550, 556, 313 P.2d 1008, 1012 (1957) (citation omitted)). We need not attempt to assess the satisfaction of all the elements here, for the failure to establish any one of the elements of estoppel bars such a claim. *Federal Lumber Co. v. Wheeler,* 643 P.2d 31, 36 (Colo.1981). It is well-established that a party claiming estoppel must show that its reliance on the actions or statements of the other party was justified and reasonable under the circumstances of the case considered as a whole. *Simineo v. Kelling,* 199 Colo. 225, 228, 607 P.2d 1289, 1291 (1980). In the present case, neither objector can establish the reasonable reliance neces-

sary to prevail on its estoppel claims.[71]

The trial court specifically found that the evidence presented by the objectors did not establish that Mr. Fischer, as WSSC's attorney, had the actual or apparent authority to waive forever WSSC's potential right to reuse its "old" foreign water. This ruling, which the court made in the context of determining the admissibility of the testimony of Mr. Sayre, was based on its review of the evidence presented to that point, including the Sayre deposition. We are satisfied that the court's finding is supported by the evidence, and we conclude that this factual finding serves to defeat the estoppel claim made by the objectors.

The objectors contend that they relied on statements made by Mr. Fischer concerning WSSC's future intent to reuse its foreign water and further contend that this reliance was justified based on the authority they perceived to be vested in Mr. Fischer as WSSC's attorney. The trial court did not find support for this perception of authority in the record, implicitly suggesting that it was not reasonable to believe that counsel would have the blanket authority to waive, by unrecorded oral statements, water rights potentially worth millions of dollars. Absent facts supporting the reasonableness of the objectors' perception that Mr. Fischer had the apparent authority to waive these rights, the objectors' reliance on Fischer's alleged statements was not reasonable or justified. Accordingly, the objectors [72] have not established the reasonable reliance necessary to prevail on an estoppel claim.[73] We conclude that WSSC was not estopped, and therefore Thornton is not estopped, from asserting its right to reuse its transmountain waters in the future.

### 6. Summary

To summarize, we conclude that an importer of transmountain water need not have the intent to reuse this water at the time of the initial appropriation and importation to preserve the right to reuse this water in the future. Furthermore, we hold that this reuse right is not subject to abandon-

71. Although our present discussion does not require further review of estoppel principles, we note that we have consistently required that claimants meet a high standard to establish such a claim in the water right context:

> [B]efore the conduct of one party will create an estoppel in favor of another with respect to the title of the subject-matter of dispute between them, it must appear that the party against whom such estoppel is sought to be established was apprised of the true state of his own title; that by such conduct he intended to deceive or thereby was guilty of such negligence as to amount to a fraud; that the other was not only destitute of all knowledge regarding the true state of his title, but of the means of acquiring such knowledge. *There must be some degree of turpitude in the conduct of a party before a court of equity will estop him from the assertion of his title, when the effect of the estoppel is to forfeit his property, and transfer its enjoyment to another.*

Lower Latham Ditch Co. v. Louden Irrigating Canal Co., 27 Colo. 267, 274–75, 60 P. 629, 631 (1900) (emphasis added) (citations omitted); *see also Aubert*, 192 Colo. at 374, 559 P.2d at 234; *Upper Harmony Ditch Co. v. Stunkard*, 177 Colo. 6, 12, 492 P.2d 631, 634–35 (1972); *Jacobs*, 135 Colo. at 556–57, 313 P.2d at 1012; *Farmers Reservoir & Irrigation Co. v. Fulton Irrigating Ditch Co.*, 108 Colo. 482, 500, 120 P.2d 196, 205 (1941).

72. In addition to failing to establish that it reasonably relied on Mr. Fischer's statements, PRPA did not establish that it was prejudiced by its alleged reliance. PRPA was a party to the Three–Way Agreement and participated in the development of the associated plan through and beyond the issuance of the decree in case W–9322–78. Unlike NCWCD, which alleged that it refrained from entering an objection in case W–9322–78 in reliance on Mr. Fischer's statements concerning the reuse of "old" transmountain water, PRPA does not allege any facts that might establish a prejudicial change in position. *See Baumgartner v. Tweedy*, 143 Colo. 556, 558, 354 P.2d 586, 588 (1960) (estoppel arises only where one detrimentally alters his position in reliance on another's conduct). The absence of evidence of prejudice provides additional support for our decision that PRPA's claim of estoppel is not supported.

73. We also affirm the trial court's decision not to admit the deposition testimony of John Sayre. The objectors sought to introduce Mr. Sayre's testimony for the purpose of introducing statements of Mr. Fischer that allegedly supported the objectors' claims of abandonment and estoppel. Given (1) our holding that abandonment principles do not apply to transmountain reuse rights, and (2) the trial court's ruling that Mr. Fischer did not have the authority to waive these rights, which we affirm in this decision, Mr. Sayre's testimony regarding Mr. Fischer's alleged statements is not relevant.

ment principles, and approval of the change of use of such a right does not require compliance with the "no-injury" requirement of section 37–92–305(3). Finally, we hold that Thornton's proposed reuse of its pro rata share of WSSC's "old" foreign water is not barred by the doctrines of laches or equitable estoppel. Accordingly, we reverse the ruling of the trial court on this issue and remand to that court for proceedings consistent with our decision, including the elimination of the condition in the decree requiring Thornton to replicate return flows associated with its transmountain water.

### D. Recharge Obligations

In addition to requiring that Thornton replicate return flows from its foreign water to downstream surface water users, the trial court also required that Thornton maintain historical return flow patterns associated with the irrigation use of its native water. This condition, which Thornton appeals, was imposed by the court in part to protect junior appropriators drawing groundwater from an aquifer supplied by these return flows against injury resulting from the city's proposed change of its WSSC water rights from irrigation to municipal uses (case 87CW332). Thornton's proposal contemplates changing the use of the city's proportional interest in water rights held by WSSC and the Jackson Ditch Company from their historical agricultural uses to municipal uses in Thornton's water system. As a result of this change, Thornton will no longer irrigate a substantial portion of the lands previously irrigated with water from those shares. This cessation of irrigation will reduce or eliminate return flows [74] from these farms, which amount to approximately 10,430 acre feet per year. Decree, ¶ 11.4, at 12.

The return flows from the Thornton farms have historically fed an alluvial aquifer that underlies those farms and adjacent lands between the farms and the Poudre and South Platte Rivers. This aquifer is relatively thin and could not support extensive groundwater extraction prior to the commencement of irri-

gation under the WSSC system. Hydrologic evidence suggests that the water moves through channels in the aquifer and, if uninterrupted, flows in the direction of, and would eventually reach, the river system. As irrigation return flows and deep percolation enlarged the aquifer, a sharp increase in the use of agricultural wells took place on the north side of the Poudre basin. These wells, which number approximately 1,400 and divert as much as 90,000 acre feet of groundwater per year, are junior in priority to downstream surface rights. The majority of these wells, including those operated by objectors Amen, Hutcheson, and Yetter, were constructed in the area between the WSSC farms and the Poudre and South Platte Rivers to intercept the return flows from the irrigation of these farms as the water passes through the aquifer on its way to supply users on these rivers.

Although current hydrological data suggests that the aquifer supplying the wells at issue is dependent on return flows from WSSC irrigation and is tributary to the Poudre and South Platte Rivers, these facts were apparently not always recognized. In a voluminous 1953 decree adjudicating both surface and groundwater rights in the area then classified as Water District No. 3, Water Division No. 1, State of Colorado, the trial court for that jurisdiction made the following ruling:

> In the findings and decree herein, unless otherwise stated, as to each well or system of wells awarded a priority number, the source of water is found to be subjacent ground water not substantially tributary to any natural stream and which would not appreciably by natural conditions reach or augment the flow of any natural stream, and such water is thus appropriated and reasonably used for beneficial irrigation of the lands, or adjacent lands, upon which each well is located and belonging to or possessed by the owner or claimant of such well. . . .

*In re Adjudication of Priorities in Water Dist. No. 3, Water Div. No. 1, State of Colo.,*

---

**74.** Return flows consist of "irrigation water seeping back to a stream after it has gone underground to perform its nutritional function." *City*

*of Boulder v. Boulder & Left Hand Ditch Co.*, 192 Colo. 219, 223, 557 P.2d 1182, 1185 (1976).

Civil Action No. 11217, (Larimer County District Court Sept. 10, 1953) (entered in the record as Ex. A–713) (hereinafter 1953 decree). This decree applied to approximately 400 of the wells in the north Poudre basin, including the well currently operated by individual objectors J.W. and Bessy L. Hutcheson. Pursuant to this decree, these wells have been operated as nontributary and are not subject to augmentation requirements applicable to tributary wells for the protection of downstream appropriators.

The parties agree that the standard for water court approval of a change of water right has been established by the General Assembly. Pursuant to section 37–92–305(3), 15 C.R.S. (1990), an application for a change of water right shall be approved if such change "will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right." At trial, Thornton conceded its duty to protect other water users against the loss of return flows of native water resulting from its proposed change but argued that it need only replace these flows to senior appropriators on the South Platte River and not to junior well diverters dependent on Thornton's irrigation for maintenance of the alluvial aquifer. The well owners argued that their groundwater diversions were also entitled to protection and that Thornton must replicate its return flows in a manner that recharges the aquifer supplying these wells.

The trial court initially addressed this issue in its Memorandum of Decision. The court rejected Thornton's contention that it need not maintain an artificial condition created by its return flows, noting the dependence of substantially all South Platte basin water rights on return flows. The court also recognized that underground water that is tributary to a natural stream is subject to appropriation in the same manner as surface water in a stream. Accordingly, the trial court determined that junior appropriators of tributary underground water are entitled to the same protection against injury in a change of water right proceeding as surface appropriators. MOD at 24. The court found that return of the replacement flows directly to the river would be insufficient to protect

the well operators from injury and held that the replacements "must be in amounts and at times and locations which parallel the historic return flows from the Thornton farms." MOD at 25. The court noted, but specifically did not give effect to, the provisions of the 1953 decree declaring certain of the affected wells to be nontributary. MOD at 24.

The court implemented this decision in the final decree by imposing a groundwater recharge program to be conducted concurrently with Thornton's operation of its change of water rights. The court divided the lands historically irrigated by Thornton shares into five geographic sectors and one sector associated with "floating" shares not specifically assigned to identified farms and imposed varying recharge requirements in those sectors "to account for subdrainages within the watershed, geology, hydrology and other factors." Decree, ¶ 11.4.7, at 13. Specifically, the court found that replacement of 5,125 acre feet of return flows attributable to historical irrigation of those farms located in sectors 4 and 5 and to irrigation with "floating" shares was necessary to prevent injury to the well operators. Id. ¶¶ 21.6, 21.7, at 31. With respect to sectors 1, 2, and 3, the court found that the historical recharge that occurred in those sectors did not significantly accrue to the benefit of wells and that the removal of that recharge would have no injurious impact on ground water levels in the vicinity of existing wells. Id. ¶ 21.7, at 31. Accordingly, Thornton was not required to replace return flows in these sectors. The mechanics of the groundwater recharge program are set forth in decree paragraph 54.3.3.4 and its accompanying subparagraphs, see Decree, ¶ 54.3.3.4, at 49–54, but the ultimate result is that Thornton must replace 5,125 acre feet of return flows through artificial recharge pits, injection wells, or other similar means.

Thornton appeals the trial court's determination that the well operators are entitled to maintenance of return flows that would otherwise be lost by Thornton's change of water rights. By satisfying its replacement obligations by delivering water 68–172 directly to the surface stream, Thornton would be able to make an initial use of the water for munic-

ipal purposes prior to using it for replacement purposes. Therefore, Thornton argues that it should be allowed to repay these return flows directly to senior appropriators on the South Platte who would receive these waters absent the initial diversion by Thornton and the subsequent interception of return flows by the well operators. In the alternative, Thornton argues that any recharge obligation should be limited to tributary wells and should not accrue to the benefit of wells decreed and operating as nontributary.

### 1. Replacement Directly to Stream

 We first address Thornton's contention that return flows should be replaced directly to the stream to which they historically returned, for the benefit of senior appropriators on the stream, without regard to intervening junior wells that have intercepted this flow. One of the basic tenets of Colorado water law is that junior appropriators are entitled to maintenance of the conditions on the stream existing at the time of their respective appropriations. *Orr v. Arapahoe Water & Sanitation Dist.*, 753 P.2d 1217, 1223 (Colo.1988); *City of Westminster v. Church*, 167 Colo. 1, 11–12, 445 P.2d 52, 58–59 (1968); *Farmers Highline Canal & Reservoir Co. v. City of Golden*, 129 Colo. 575, 579, 272 P.2d 629, 632 (1954). Equally well established is the principle that a change of water rights cannot be approved if the change will injuriously affect the vested rights of other water users. § 37–92–305(3), 15 C.R.S. (1990); *Orr*, 753 P.2d at 1223; *Green v. Chaffee Ditch Co.*, 150 Colo. 91, 106, 371 P.2d 775, 783–84 (1962); *City of Colo. Springs v. Yust*, 126 Colo. 289, 294, 249 P.2d 151, 153 (1952). This protection extends not only to surface water users but to users of all water tributary to a natural stream, including appropriators of tributary underground water. *See* §§ 37–92–102(1)(a), –103(11) (incorporating all waters of a natural stream in scope of Water Right Determination and Administration Act of 1969, and including tributary underground water as a component of a natural stream); *see also Danielson v. Vickroy*, 627 P.2d 752, 757–58 (Colo.1981) (distinguishing tributary groundwater from designated groundwater); *Safranek v. Town of Limon*, 123 Colo. 330, 334, 228 P.2d 975, 977

(1951) (recognizing presumption that all groundwater is tributary and subject to prior appropriation doctrine as part of the waters of the stream). Furthermore, this protection extends to junior appropriators' rights in return flows:

> It has been fundamental law in this state that junior appropriators have rights in return flow to the extent that they may not be injured by a change in the place of use of the irrigation water which provides that return flow.

*City of Boulder v. Boulder & Left Hand Ditch Co.*, 192 Colo. 219, 222, 557 P.2d 1182, 1184 (1976).

 Thus, the law clearly mandates that junior appropriators with vested rights in underground water tributary to a natural stream are entitled to protection against injury resulting from another water user's change of water rights. Thornton argues that this protection does not extend to water users that depend solely on an "artificial" water supply, as it characterizes the affected well operators in this case. Thornton adopts this characterization because the irrigation water used on the Thornton farms and the resulting return flows to the wells would not be available to the affected wells in the absence of the initial transportation of the water through the LCC. Specifically, Thornton argues that under natural conditions—*i.e.*, absent diversion of Poudre River water north and east of the river via the LCC—the wells would not have physical access to Poudre River water. Citing cases pertaining to imported and developed water, Thornton asserts that the junior well appropriators are not entitled to the continuance of this "artificial" supply of water. We decline to equate the water used by Thornton for irrigation in the present case with imported or developed water entitled to special treatment under Colorado law.

 We have recognized in prior cases that appropriators of certain types of water rights are burdened with fewer restrictions on the use of such rights than are applicable to normal appropriative rights. *See supra* part IV(C). For example, water users that import "foreign" water from the western

slope to the eastern slope have rights of reuse not associated with native water flows and, in that context, we have held that "appropriators on a stream have no vested right to a continuance of importation of foreign water which another has brought to the watershed." *City of Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 53, 506 P.2d 144, 150 (1972); (quoting *Brighton Ditch Co. v. City of Englewood*, 124 Colo. 366, 377, 237 P.2d 116, 122 (1951)). Similarly, entities that produce or develop artificial water that would otherwise have been unavailable to the stream system—*e.g.*, water trapped in abandoned mine shafts—can exert a continuing right to such water outside the existing priority system on the stream. *See Comrie v. Sweet*, 75 Colo. 199, 201, 225 P. 214, 215 (1924).

However, we have also recognized a distinction between the introduction of entirely new imported or developed water from an unconnected system and the mere transportation of water to different areas within the same general system. In *Benson v. Burgess*, 192 Colo. 556, 561, 561 P.2d 11, 15 (1977), we discussed an appellant's claim that water transported from one stream to another stream, both of which were tributary to the same river, should be treated as imported water for the purpose of evaluating rights in return flows. Although that issue was not dispositive, we incorporated the following discussion relevant to the present case:

> We wish to mention another distinction in *Fulton* [*Irrigating Ditch*, 179 Colo. 47, 506 P.2d 144], involving transmountain diverted water. Here, Surface Creek and Currant Creek are in close proximity to each other. Their confluences with the Gunnison River are only about four miles apart. As illustrated by the Cedar Mesa irrigation, surface flow could be transported by gravity over a relatively short distance from Surface Creek to Coryell Gulch, the tributary of Currant Creek. We need not, and do not, express an opinion as to the rights of a municipality where there is, as appellants characterize it, a "transbasin" diversion with uses such as Denver employed in *Fulton*. We merely point out that there is a vast distinction between a transmountain diversion as was involved in

*Fulton* and a so-called transbasin diversion of irrigation water as here.

*Id.* at 561, 561 P.2d at 15. Although our discussion of this issue constituted dicta in *Benson*, we see no distinctions in the present situation that convince us that a contrary line of reasoning should be adopted. Through its use of the Larimer County Canal, Thornton transports water from the Poudre River to an area that the river otherwise would not have reached. However, the area to which the water is carried is not within an entirely different watershed or drainage area. The water was initially diverted from the Poudre River, a tributary of the South Platte River, and the aquifer fed by the return flows from irrigation with this water remains a part of the tributary system of these rivers. Thus, unlike water imported from across the Continental Divide, Thornton's irrigation water is not new to the system; Thornton essentially changed only the place of use of that water. This type of diversion is common in Colorado and users downstream from these diversions have every reason to believe that they are among those protected against injury. Therefore, we decline to extend the special treatment afforded imported and developed water to the "transbasin" diversion within the same general water system at issue here.

Thornton further suggests that it should be able to replace the return flows directly to the river because the South Platte surface diverters hold rights more senior than the well operators and have a superior entitlement to return flow maintenance. Such a distinction is both unsupported and impermissible. Neither the statute nor the case law conditions the protection that must be provided to other users in a change of water right proceeding on the relative priority of the potentially injured users. *See* § 37–92–305(3), 15 C.R.S. (1990); *see also Southeastern Colo. Water Conservancy Dist. v. Rich*, 625 P.2d 977, 980–81 (Colo.1981). Although a junior well operator's ultimate ability to divert return flows may be subject to a call by a more senior appropriator with surface rights downstream, the administration of these competing priorities is vested in the state and division engineers. *See* §§ 37–92–501, –502, 15 C.R.S. (1990); *Rich*, 625

P.2d at 980–81. The relationships among these potentially injured downstream users have no bearing on the duties of Thornton as the applicant for a change of water rights. Thornton must protect all vested water rights affected by the proposed change against injury.[75] For the foregoing reasons, we affirm the trial court's determination that well operators drawing from tributary groundwater are entitled to the maintenance of return flows as a condition of a change of water right.

### 2. Application to Wells Decreed Nontributary

▮ Our holding that Thornton must replace return flows for the benefit of tributary well users does not terminate our review of the recharge condition. Thornton argues that even if tributary well operators are entitled to replacement of return flows, this protection should not extend to those wells decreed and operated as nontributary wells. The record shows that the well operated by objector Hutcheson and approximately 400 other wells in and around the recharge area were decreed as nontributary in a 1953 adjudication. The trial court refused to give effect to this decree, declaring in hindsight that the decree reached erroneous scientific conclusions. MOD at 24. Notwithstanding the trial court's determination, we hold that the principle of collateral estoppel requires us to honor the 1953 decree and to treat the wells covered in that decree as nontributary.

▮ The doctrine of collateral estoppel, or "issue preclusion," mandates that the final decision of a court on an issue actually litigated and determined is conclusive of that issue in any subsequent suit.

*City of Denver v. Consolidated Ditches Co.,* 807 P.2d 23, 32 (Colo.1991); *Pomeroy v. Waitkus,* 183 Colo. 344, 350, 517 P.2d 396, 399 (1973). Collateral estoppel bars relitigation of an issue if: (1) the issue is identical to that actually and necessarily adjudicated in a prior proceeding; (2) the party against whom estoppel is asserted was a party or in privity with a party in the proceeding; (3) there was a final judgment on the merits; and (4) the party against whom estoppel is asserted had a full and fair opportunity to litigate the issues in the prior proceeding. *City & County of Denver v. Block 173 Assocs.,* 814 P.2d 824, 831 (Colo.1991); *Industrial Comm'n v. Moffat County Sch. Dist. RE No. 1,* 732 P.2d 616, 619–20 (Colo.1987).

The applicability of the doctrine of collateral estoppel to the present case is clear. The proceedings culminating in the 1953 decree were directed at determining the priority of competing rights in both surface water and groundwater in the area then classified as Water District No. 3. Because nontributary groundwater was not integrated into the surface water priority system, the trial court necessarily received evidence as to the tributary or nontributary status of the approximately 400 wells at issue in order to determine the relative priority of well diversions. Based on these proceedings, in which the current well operators or their predecessors participated or had an opportunity to participate, the court specifically found that the source of water for the wells at issue was "not substantially tributary to any natural stream and which would not appreciably by natural conditions reach or augment the flow of any natural stream." Ex. A–713, at p. 7. Following an adjudication process in which the relevant parties had an opportunity to

---

**75.** Thornton asserts that the record does not establish evidence of injury to wells other than the three operated by the named objectors, Amen, Hutcheson, and Yetter. However, an applicant must bear the initial burden of showing the absence of injurious effect from a proposed change of water right. *Southeastern Colo. Water Conservancy Dist. v. Fort Lyon Canal Co.,* 720 P.2d 133, 146 (Colo.1986); *Rominiecki v. McIntyre Livestock Corp.,* 633 P.2d 1064, 1068 (Colo.1981); *Weibert v. Rothe Bros.,* 200 Colo. 310, 316, 618 P.2d 1367, 1371 (1980). Only if the applicant can make a prima facie showing of no injury does the burden of going forward shift to objec-

tors to show evidence of potential injury. *In re Application for Water Rights of Certain Shareholders in the Las Animas Consol. Canal Co.,* 688 P.2d 1102, 1108 (Colo.1984). In the present case, the trial court reviewed the evidence and determined that Thornton's plan to return replacement flows directly to the river would not be sufficient to prevent injury. MOD at 24–25. We will not overturn this factual determination on appeal. *See In re Gibbs,* 856 P.2d 798, 801 (Colo.1993) (factual findings of water court that are supported by competent evidence in the record will not be disturbed on appeal).

litigate the issue, the court issued a final judgment that these wells are nontributary. Under the doctrine of collateral estoppel, this judgment is enforceable against the original well operators and their successors.

 Based on evidence in the present case, the trial court stated that the Larimer County District Court's 1953 determination that the wells were supplied from nontributary sources was erroneous. Although the evidence seemingly supports this conclusion, we do not agree with the trial court's decision that the 1953 decree need not be given effect. As we have previously noted, a "trial court has jurisdiction to render an erroneous decision, which may be reviewed on appeal. Consequently, a judgment entered within the jurisdiction of the court, even though wrong, is not subject to collateral attack." *Closed Basin Landowners Ass'n v. Rio Grande Water Conservation Dist.*, 734 P.2d 627, 637 (Colo.1987) (citation omitted). Pursuant to the 1953 decree, the decreed wells have been operated under the rules governing nontributary wells—*i.e.*, they have operated free from the requirements placed on tributary wells that downstream flows be augmented to compensate for out-of-priority diversions. The operators of these decreed nontributary wells are not now free to seek partial tributary status for these wells under circumstances where nontributary status is no longer advantageous. Although the trial court does not purport to overturn the 1953 decree, its holding essentially amounts to a collateral attack on the initial nontributary determination. Such an attack, even on an erroneous decision, is barred by the doctrine of collateral estoppel. *See State Eng'r v. Smith Cattle, Inc.*, 780 P.2d 546 (Colo.1989) (holding that the doctrine of res judicata barred relitigation of an allegedly erroneous court determination that certain waters were not tributary to the Arkansas River).

The wells adjudicated nontributary in the 1953 decree must therefore be treated as nontributary in the present matter as well. Nontributary groundwater users are not specifically excluded from the injury protection provisions of the Water Right Determination and Administration Act of 1969, *see* § 37–92–

305(3), 15 C.R.S. (Colo.1990) (protecting "vested water rights" against material injury from change of water right), and rights in such water may be adjudicated under the Act, *see* § 37–92–203(1), 15 C.R.S. (1990). However, the right to withdraw nontributary groundwater is not governed by the doctrine of prior appropriation but derives from a separate legislatively-prescribed system based on ownership of the overlying lands. *American Water Dev., Inc. v. City of Alamosa*, 874 P.2d 352, 369 (Colo.), *cert. den.*, —— U.S. ——, 115 S.Ct. 575, 130 L.Ed.2d 491 (1994). Because the 1953 decree essentially found no hydrologic connection between the source for the wells decreed nontributary and the underground flows tributary to the Poudre River, it would be logically inconsistent to grant protection for these decreed nontributary wells against the loss of return flows recognized as tributary to that river. Accordingly, those wells decreed as nontributary in the 1953 decree are not entitled to maintenance of return flows. We therefore remand to the trial court for identification of the location of these decreed nontributary wells and for revision of its recharge condition in light of our decision.

### E. Revegetation

As a condition of the approval of Thornton's change of use of its WSSC shares, the trial court imposed future revegetation requirements for the presently irrigated lands that will be taken out of irrigated agricultural production following its proposed change of use. Because the revegetation conditions are complex and detailed, we include only a brief summary here.

Under the terms of the decree, prior to converting its WSSC shares to municipal uses, Thornton must establish one of the following on the lands that will no longer be irrigated: (1) dryland farming practices; (2) native grasses or other self-sustaining suitable dryland ground cover; or (3) suitable nonagricultural uses. Decree, ¶ 54.9, at 65–66. If dryland farming is chosen, Thornton must obtain an initial determination from experts approved by the Division Engineer that the land is suitable for such farming and must again obtain such a determination after

the land has been operated as dryland farm for three years. If Thornton chooses to establish dryland ground cover, the determination that such ground cover is suitable shall be made in accordance with the standards used by the United States Department of Agriculture Soil Conservation Service in its Conservation Reserve Program by a person with appropriate expertise in the field of agronomy as determined by the Division Engineer. The trial court also retained jurisdiction "to review the Division Engineer's approval of experts as well as those experts' determinations," Decree, ¶ 59, at 66, and "to review determinations as to whether a self-sustaining suitable dryland ground cover has or has not been established." Decree, ¶ 63.1.3, at 87. Thornton challenges the validity of these conditions.

The change in use of a water right from irrigation to other purposes often results in serious detrimental consequences for the land no longer receiving water. In 1992, the General Assembly stressed the importance of mitigating these negative effects by enacting a statute requiring conditions on such changes in use that ensure the revegetation of the dewatered lands. The revegetation provision, originated as Senate Bill 92–92, reads as follows:

*Standards with respect to rulings of the referee and decisions of the water judge.* (4.5) Terms and conditions applicable to changes of use of water rights from agricultural irrigation purposes to other beneficial uses include reasonable provisions designed to accomplish the revegetation of lands from which irrigation water is removed. The applicant may, at any time, request a final determination under the court's retained jurisdiction that no further application of water will be necessary in order to satisfy the revegetation provi-

sions. Dry land agriculture may not be subject to revegetation order of the court. § 37–92–305(4.5), 15 C.R.S. (1995 Supp.). By its terms, however, this provision did not take effect until April 16, 1992, and applies only to applications for changes of water rights filed on or after that date. Ch. 334, sec. 3, § 37–92–305(4.5), 1992 Colo. Sess. Laws 2289, 2290. Because Thornton's change application was filed in 1987, the statute is not directly applicable in this matter.

However, the absence of a direct statutory mandate requiring that revegetation conditions be imposed does not necessarily resolve this issue. We must determine whether the water court, prior to the passage of section 37–92–305(4.5), possessed the power to impose a revegetation condition on the exercise of Thornton's change in use— *i.e.*, whether section 37–92–305(4.5) vested new authority in the water court or merely codified previously existing powers and practices. Thornton initially argues that the General Assembly's limitation of the application of section 37–92–305(4.5) to applications filed after its passage indicates that the power to impose revegetation conditions was not previously within the authority of the water court and that the date restriction was intended to protect pending applications from the exercise of these new powers. This contention is refuted, however, by the legislative history of Senate Bill 92–92.[76] Senator McCormick, the sponsor of section 305(4.5), argued for passage of the bill by citing the revegetation conditions already imposed by certain water courts to protect dewatered lands. Addressing the Senate Agriculture, Natural Resources, and Energy Committee, Senator McCormick described the impact and genesis of the bill:

[T]his is perhaps a degree of a token bill . . . but I think that it's a meaningful token

---

**76.** Thornton argues for the application of the principle of statutory interpretation that subsequent modification of a statute creates a presumption that the legislature intended the statute to have a meaning different from the law as it existed prior to the modification. *Trustees of Colo. Carpenters & Millwrights Health Benefit Trust Fund v. Pinkard Constr. Co.,* 199 Colo. 35, 39, 604 P.2d 683, 685 (1979). While we acknowledge the usefulness of such presumptions in the absence of more direct evidence of legisla-

tive intent, where, as here, legislative history is available concerning the relevant provisions, we rely on that history as more reflective of the intent of the legislature. *See Vega v. People,* 893 P.2d 107, 112 (Colo.) (legislative intent in enacting a statute is determined primarily from plain language of the statute and secondarily from the statute's legislative history), *cert. denied,* —— U.S. ——, 116 S.Ct. 233, 133 L.Ed.2d 161 (1995); *General Elec. Co. v. Niemet,* 866 P.2d 1361, 1364 (Colo.1994).

and I think that it puts in the hands of the water courts, who have demonstrated extreme good faith in this regard that they can in their own geographical area, with consideration of their own hydrology, take some minimal steps to stop the desert encroachment that I foresee coming.... And I recognize the good faith effort that Aurora, for example, has put forth in the lower Arkansas Valley.... That was done only because of a judgment of the court, in what amounted to dicta in my opinion, as [the judge] enunciated in his decision that, "You shall not take that water until [you meet certain revegetation conditions]." .... And so that's what this does.

Hearings on S.B. 92–92 Before the Senate Agriculture, Natural Resources, and Energy Committee, 58th Gen. Assembly, 2d Reg. Sess., Feb. 4, 1992, Audio Tape No. 92–7. Senator McCormick also gave the following explanation of the bill to the full Senate immediately before the Senate voted to approve the bill on second reading:

> The purpose of this [bill] is to make sure that we take some planned legal steps to prevent the intrusion of the "Great American Desert" into large areas of rural Colorado.... The impact of [section 305(4.5) ] will be to put into statutes a formal notice of what Judge Tracey in southeastern Colorado has already ruled and is available as dicta. I think that it's proper to put this into the statute, that it will be beneficial to the state of Colorado.

Floor Debate on S.B. 92 Before the Full Senate, 58th Gen. Assembly, 2d Reg. Sess., Feb. 18, 1992, Audio Tape No. 92–11.

Senator McCormick's statements reveal a recognition that a water court had acted properly in imposing revegetation requirements prior to the consideration and passage of Senate Bill 92–92. The bill was intended to codify and institutionalize the use of these revegetation conditions and did not represent the creation of a new form of condition on changes in use of water rights. In light of the explicit recognition of previous judicially imposed revegetation conditions in the legislative history, we cannot accept Thornton's contention that the legislature's inclusion of

an effective date limitation reflects an intention by the General Assembly that the water courts be prohibited from imposing revegetation conditions on applications filed before passage of section 37–92–305(4.5). *Thurman v. Tafoya*, 895 P.2d 1050, 1055 (Colo.1995) (if statute is ambiguous, court may consider the statute's legislative · history as indicative of legislative intent); *Hyland Hills Park & Recreation Dist. v. Denver & R. Grande W.R.R.*, 864 P.2d 569, 574 n. 7 (Colo.1993) (contemporaneous statements of individual legislators made at committee hearings are relevant as indicia of legislative intent). The date limitation merely leaves the decision regarding the imposition of revegetation conditions on changes in use applied for before the passage of section 37–92–305(4.5) where it already rested—*i.e.*, in the sound discretion of the water court.

Our past decisions concerning the administration of changes of water rights further support the conclusion that section 37–92–305(4.5) merely made specific an existing implicit water court discretionary power. Thornton argues that prior to the enactment of that statute, the water court's authority to impose conditions on a change in water right was strictly limited to situations in which such conditions were necessary to prevent injury to vested water rights. Because neither the record nor the trial court decree identifies any injury to vested water rights that would occur in the absence of the revegetation condition, Thornton contends that such a condition exceeded the water court's authority. However, a brief examination of the role of the water court reveals that Thornton's contentions are without merit.

The development of Colorado water law has always been driven by the scarcity and value of this resource within the state. Accordingly, the water right administration system developed by the General Assembly focuses on alleviating the scarcity by "maximiz[ing] the beneficial use of all of the waters of this state," § 37–92–102(1)(a), 15 C.R.S. (1990), and preserving the value by protecting vested rights in state waters, *e.g., id.* § 102(2)(a); § 37–92–305(3). Under the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602, 15

C.R.S (1990 & 1995 Supp.), the water judges are given the difficult task of achieving the integration of these oft-conflicting policies. Thus, an important aspect of the water court's task is to assure the maximum beneficial use of water while adequately protecting against injury to vested water rights. *E.g., Northern Colo. Water Ass'n v. Three Peaks Water, Inc.,* 859 P.2d 836, 844 (Colo. 1993); *State Eng'r v. Castle Meadows, Inc.,* 856 P.2d 496, 505 (Colo.1993); *In re Water Rights of Cities of Aurora & Colo. Springs,* 799 P.2d 33, 37 (Colo.1990); *Orr v. Arapahoe Water & Sanitation Dist.,* 753 P.2d 1217, 1223 (Colo.1988).

■■■ In addition to this dual focus on maximum beneficial use and the protection of water rights, water judges must give consideration to the potential impact of the utilization of water on other resources. Our decisions establish that the goal of maximum utilization must be "implemented so as to ensure that water resources are utilized in harmony with the protection of other valuable state resources." *Castle Meadows,* 856 P.2d at 505. In *Southeastern Colorado Water Conservancy District v. Shelton Farms, Inc.,* 187 Colo. 181, 529 P.2d 1321 (1974), we recognized the potential dangers of adopting a water principle that would encourage the elimination of plant life to the detriment of land and other resources:

> We are not unmindful that the statute speaks of the policy of maximum beneficial and integrated use of surface and subsurface water. But efficacious use does not mean uplifting one natural resource to the detriment of another. The waters of Colorado belong to the people, but so does the land. There must be a balancing effect, and the elements of water and land must be used in harmony to the maximum *feasible* use of both.

*Id.* at 191, 529 P.2d at 1327 (emphasis in original); *accord R.J.A., Inc. v. Water Users Ass'n of Dist. 6,* 690 P.2d 823, 828–29 (Colo. 1984) (effects on other resources and preservation of the natural environment are proper considerations for the water court in implementing the beneficial use of water); *In re Rules & Regulations Governing the Use, Control, and Protection of Water Rights,* 674

P.2d 914, 935 (Colo.1983) ("Optimum use [of water] can only be achieved with proper regard for all significant factors, including environmental and economic concerns."); §§ 37–92–102(3), –103(4), 15 C.R.S. (1990) (recognizing the need for "reasonable" preservation of the natural environment and allowing minimum stream flow and natural lake surface level and volume appropriations on behalf of the people of the state of Colorado for that purpose). These provisions and precedents leave little doubt that the water court's ability to impose conditions to protect against injury to natural resources other than water existed prior to the passage of section 37–92–305(4.5).

■■■ In the present case, Thornton seeks to change the use of certain of its water rights to municipal uses, with the concomitant result that numerous farms previously irrigated by the exercise of these rights will no longer receive water. In the absence of revegetation or other suitable reuse, these previously productive lands may revert to desert or suffer weed infestation that would threaten their future usefulness. Given these potentially deleterious effects on a significant quantity of land, we find the revegetation condition an acceptable and important tool to accomplish the goal of maximum feasible use of both land and water. Thus, we hold that imposition of the revegetation condition was within the trial court's authority, existing prior to the passage of section 37–92–305(4.5), to balance the beneficial use of water with the preservation of other natural resources, *see Shelton Farms,* 187 Colo. at 191, 529 P.2d at 1327; *R.J.A., Inc.,* 690 P.2d at 828–29, and we affirm the revegetation condition imposed by the trial court and the court's retention of jurisdiction to ensure the proper compliance with the terms of the condition.

## F. Dry–Up Conditions

An additional issue relating to Thornton's change of water rights concerns the trial court's decision not to impose dry-up requirements on additional farms in the WSSC service area. As a component of its Northern Project, Thornton purchased 283.354 of the 600 issued and outstanding shares in the

Water Supply and Storage Company (WSSC). Of the shares purchased by Thornton, approximately 251 shares were obtained in combination with the lands on which these shares had been used for irrigation. Thornton acquired approximately 31.5 shares, referred to as the "floating shares," independent of any accompanying land. Although evidence of the historical use of these "floating shares" is limited, a significant majority of these shares apparently were previously used to irrigate lands not among those lands later purchased by Thornton. Testimony at trial indicated that the "floating shares" had been or were soon to be transferred for use on the Thornton lands.

Thornton intends to implement its change of water rights to allow the use of its share of WSSC water in Thornton beginning in the year 2002. As part of its decree granting Thornton's proposed change, the trial court imposed certain dry-up conditions on Thornton "to prevent expansion of use of non-Thornton WSSC or JDC shares which may be moved to Thornton farms following the removal of Thornton's shares from irrigation." Decree, ¶ 54.6, at 61–63. Specifically, the court required Thornton to dry up—*i.e.,* prevent any future irrigation on—those farms that it acquired along with its WSSC shares. *Id.* However, despite NCWCD's attempts to secure additional dry-up restrictions, the court did not require Thornton to dry up any lands historically irrigated by the "floating shares."

The trial court based its decision on both findings of fact and a conclusion of law. Initially, the court made the following factual finding in its decree:

> *Water Adequacy and Dry-up.* The irrigated farmland which receives water attributable to WSSC and JDC shares is generally water-short or marginally water-adequate. There is either insufficient or merely adequate water available to satisfy the potential consumptive use of the crops grown. Historically, consumptive use of water attributable to WSSC and JDC shares was limited by the amount of water available for diversion and not by the amount of land available for irrigation. Therefore, dry-up of Thornton's farms as

provided by the terms and conditions below will be adequate to prevent injury from expanded use due to Thornton's change of water rights.

Decree, ¶ 11.4.5, at 12. Furthermore, in the Conclusions of Law section of the final decree, the trial court held:

> While prevention of injury to other vested water rights is a legal requirement which must be met by each applicant for a change of use of a water right, complete dry-up of all land on which the water has been used is not always necessary to prevent injury, and therefore is not a legal requirement. Under the circumstances of this case, the terms and conditions regarding dry-up contained in this decree are adequate to prevent injury. *Enlarged Southside Irr. Ditch Co. v. John's Flood Ditch Co.,* 116 Colo. 589, 183 P.2d 556, 557 (1947).

Decree, ¶ 42, at 38. Objector NCWCD appeals the trial court's decision not to require additional dry-up of lands historically irrigated with the "floating shares."

 As we have noted throughout this opinion, the legal requirements for approval of a change of use of a water right are codified in section 37–92–305(3), 15 C.R.S. (1990). Pursuant to this provision, the water court shall approve a change in water right "if such change ... will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right." *Id.* To ensure the protection of such rights, the parties may suggest and the water court may impose conditions on the change, including the dry-up of previously irrigated lands. *See In re Application for Water Rights of Certain Shareholders in Las Animas Consol. Canal Co.,* 688 P.2d 1102, 1105 (Colo.1984) (*Las Animas Canal*) (requiring dry-up as one of several conditions for approval of change of use of an agricultural water right). However, the statute does not mandate the complete dry-up of all lands irrigated prior to the change, and the trial court correctly held that dry-up is required only to the extent that it is necessary to serve the statute's purpose of preventing injury to water rights. Consequently, complete dry-up is not, as a

matter of law, a required condition in every change case involving irrigation water rights, and the validity of a dry-up condition turns on the facts and circumstances of each particular change application.

The applicant for a change of water right bears the initial burden of establishing the absence of injurious results from the proposed change. § 37–92–305(3), 15 C.R.S. (1990) ("The applicant shall ... have the burden of sustaining the application ... and in the case of a change of water right or a plan for augmentation the burden of showing absence of any injurious effect."); *Rominiecki v. McIntyre Livestock Corp.*, 633 P.2d 1064, 1068 (Colo.1981). Once the applicant successfully meets this initial burden, however, the objectors have the burden of going forward with evidence of injury to existing water rights, *Simpson v. Yale Invs., Inc.*, 886 P.2d 689, 697 (Colo.1994); *Las Animas Canal*, 688 P.2d at 1108, and such injury " 'must be demonstrated by evidential facts and not by potentialities.' " *Simpson*, 886 P.2d at 696 (quoting *Brighton Ditch Co. v. City of Englewood*, 124 Colo. 366, 371, 237 P.2d 116, 119–20 (1951) (citations omitted)). Thus, the water court's injury determination follows a factual inquiry that requires the court to assess the credibility of competing evidence presented by the parties. *See State Eng'r v. Castle Meadows, Inc.*, 856 P.2d 496, 508 (Colo.1993) ("The issue of injurious effect is inherently fact specific and one for which we have always required factual findings.").

In the present case, the trial court recognized that the possible injury to be addressed by dry-up requirements is the potential for enlarged use of non-Thornton WSSC water shares on farms previously irrigated with Thornton's WSSC shares. Decree, ¶ 54.6, at 61. Specifically, if other WSSC shareholders can improve the efficiency of their future irrigation use, they would retain additional water that could be used to irrigate the lands no longer irrigated by Thornton, with the ultimate result that consumptive use would increase and downstream users would suffer a loss of return flows. At trial, both Thornton and NCWCD, the objector appealing the trial court's decision on this issue, presented extensive expert testimony concerning the

need for dry-up requirements in the final decree and the likelihood that injurious expanded use would occur. We will not overrule the trial court's evaluation of this evidence on appeal. *Willows Water Dist. v. Mission Viejo Co.*, 854 P.2d 1246, 1251 (Colo. 1993) ("The sufficiency, probative effect, and weight of the evidence before the water court, together with the inferences and conclusions to be drawn therefrom, will not be disturbed unless they are so clearly erroneous as to find no support in the record.").

Thornton's expert, water engineer and consultant Dan Ault, testified that the WSSC system is a water-short system without sufficient water available to meet the demands of crops across the entire acreage of the system. Ault estimated that the WSSC system had available only seventy-nine percent of a full water supply, basing this testimony on a farm-by-farm and system-wide analysis of the available water supply within the WSSC system and the potential consumptive use of the crops on the farms. The impact of this testimony is that complete dry-up is unnecessary because there will be insufficient water to expand irrigation onto additional lands. Accordingly, Ault stated that Thornton's consolidated applications, as limited by the terms and conditions agreed upon by the parties, which included dry-up requirements affecting the Thornton farms but not lands irrigated by the "floating shares," could be approved and operated without injury to other water users.

NCWCD introduced the testimony of their own experts, water engineers Eric Wilkinson and Jon Althofen. Wilkinson testified that the majority of the "floating shares" have historically been used on non-Thornton farms and that the change to municipal use without the dry-up of specific lands could cause injury to existing water rights through expansion of use of other shares on these lands. Althofen's testimony centered on whether the WSSC system could be characterized as a water-short system. He offered his opinion that a system, like the WSSC system, that did not meet potential consumptive use requirements but produced both deep percolation and surface runoff should not be considered water-short because this percolation

and runoff could be captured by more efficient irrigation methods for expanded use on other available lands. Accordingly, Althofen testified that the WSSC system is water adequate and susceptible to enlarged use if complete dry-up is not required.

After reviewing the conflicting evidence and opinions presented by the parties, the trial court accepted the characterization of the WSSC system lands presented by Dan Ault, Thornton's expert. Specifically, the court found that the lands served by the WSSC water system are "generally water-short or marginally water-adequate," and that "the consumptive use of water attributable to WSSC and JDC shares was [historically] limited by the amount of water available for diversion and not by the amount of land available for irrigation." Decree, ¶ 11.4.5, at 12. Therefore, the court held that dry-up of lands historically associated with the "floating shares" was not required to prevent injury.[77] See id.; Decree, ¶ 42, at 38.

 Given the factual nature of the injury inquiry, the water court's "factual determinations and conclusions based thereon cannot be disturbed on appeal if they are based on the record." *Simpson*, 886 P.2d at 698; *accord Peterson v. Ground Water Comm'n*, 195 Colo. 508, 516, 579 P.2d 629, 634 (1978). In the present case, the trial court held that the terms and conditions relating to dry-up in the decree, which required dry-up of the Thornton farms but did not require the dry-up of lands associated with the so-called "floating shares," were sufficient to prevent injury to existing water rights.[78] Our review of the record establishes that sufficient competent evidence existed to support the water court's determination that dry-up of lands previously irrigated by the "floating shares" was not necessary to prevent injury. Accordingly, we affirm the trial court's determination and decline to require any additional dry-up conditions.

### G. Kodak Water Quality Issue

We turn now to issues relating to the potential water quality impacts of the Northern Project. The first of these issues on appeal concerns the water court's resolution of certain water quality issues raised by objector Eastman Kodak Company, Colorado Division (Kodak). Kodak operates a manufacturing plant on the Poudre River near Windsor, Colorado. As part of its industrial processes, Kodak uses between 1.1 and 1.3 million gallons of water per day. Kodak receives this water pursuant to an allotment contract with NCWCD, and the water is delivered after treatment by the City of Greeley. Following the use of this water at the plant, it is collected and treated at Kodak's on-site industrial wastewater treatment plant. After treatment, Kodak discharges the water into the Poudre River.

Kodak's discharge of treated wastewater is conducted under a wastewater discharge permit issued by the Colorado Department of Health [79] Water Quality Control Division

---

**77.** NCWCD argues that the trial court's decision creates a disincentive for parties acquiring irrigation water rights with the intent of changing their use to other purposes to acquire the irrigated lands historically associated with the water rights. This argument is without merit because the trial court's determination is limited to the factual circumstances existing in this case. Any future applicant who seeks to acquire shares of water without purchasing associated lands must still fully adjudicate a change application and satisfy the burden of showing the absence of injurious effect in the context of the affected water system.

**78.** NCWCD argues that the trial court's decision not to require dry-up of the lands historically irrigated by the "floating shares" is logically inconsistent with its decision that complete dry-up of the Thornton farms is necessary to prevent potential injury arising from the enlarged use of non-Thornton shares. According to NCWCD, the trial court had no basis on which to distinguish the potential for enlarged use associated with Thornton's "floating shares" and its other WSSC shares. Any such logical inconsistency, however, could instead suggest that the requirement to dry up the Thornton farms in this area that the trial court found to be "generally water-short or marginally water-adequate" was conservative. The trial court accepted the testimony of Thornton's expert witness that the dry-up conditions imposed would protect against injury to owners of vested water rights and decreed conditional water rights. This evidence fully supports the trial court's determination of non-injury.

**79.** This department is now known as the Colorado Department of Public Health and the Envi-

(Water Quality Division or Division). Pursuant to this permit, Kodak's discharge must meet or remain below certain effluent limits for various chemicals, including ammonia. These effluent limits are based in part on an average low-flow value in the river in the vicinity of Kodak's discharge point,[80] and Kodak has consistently met these current limitations through operation of its existing treatment facility.

Thornton's proposed Poudre River exchange (case 86CW401) will have a negative, if indirect, impact on Kodak's waste treatment operations. The exchange proposed by Thornton contemplates the diversion of water from the Poudre River above the location of Kodak's plant and return of the substitute supply into the Poudre below the plant. The water being exchanged upon is not water necessary to satisfy Kodak's appropriative rights—i.e., the amount of water remaining in the river after the exchange diversion will be sufficient to allow Kodak to divert the full amount of its appropriative right. Furthermore, as a consequence of the location of the point chosen for return of the substitute supply, none of the substituted water even passes by the Kodak facility. The effect of the exchange about which Kodak complains, however, is the substantial depletion of Poudre River flows at Kodak's plant. Kodak presented evidence that this depletion in flow will affect the average low-flow rates on which Kodak's effluent limits are based and result in stricter unionized ammonia limits on Kodak's discharged water. Kodak alleges that such more stringent standards would require the construction of an entirely new treatment facility at a cost of between nine and twelve million dollars. Kodak objected to Thornton's exchange, seeking imposition by the water court of unspecified terms and conditions to protect the company against these negative impacts on its treatment operations.

In its Memorandum of Decision, the trial court interpreted Kodak's request for protective terms and conditions as a request for a minimum instream flow right for waste dilution purposes, MOD at 37, and held that it was forbidden to decree such a right except as specifically authorized by statute, id. The court noted that "issues relating to water quality are primarily the concern of the appropriate federal and state administrative agencies." Id. The court ultimately approved the exchange subject to various conditions designed to provide protection of water quality.[81] However, these

ronment. *See* § 25-8-301, 11A C.R.S. (1995 Supp.).

**80.** Discharge permits regulate discharges through effluent limits, which set forth the permissible concentrations of pollutants in the discharged wastewater. *See* § 25-8-103(6), 11A C.R.S. (1989). The effluent limits are calculated to ensure that water quality standards developed by the Water Quality Commission will be met in each relevant area of the stream. *See* § 25-8-204, 11A C.R.S. (1989); 5 CCR 1002-8 (1995). One controlling variable in calculating effluent limits is the volume of water in the stream just upstream of the discharge point. The volume of water is measured as a statistically determined, biologically based average low flow, termed the 30 E 3 flow. 5 CCR 1002-8, § 3.1.9, at 9.12. Should a detrimental change in stream flow occur, the Division is authorized to impose stricter effluent limits to maintain the water quality standards. 5 CCR 1002-2, § 6.9.2(2), at 55 (1996). Thus, a reduction in average low-flow conditions in a stream may result in stricter effluent limits in a discharge permit.

**81.** The court imposed the following conditions on the operation of the Poudre River exchange:

55.4.3 *Quality, Quantity, and Continuity.* The substitute water provided in accordance with Thornton's Poudre River appropriative right of exchange will be of a quality and continuity to meet the requirements of use to which senior appropriations have normally been put, and will be of quality and quantity so as to meet the requirements for which the water of the senior appropriators has normally been used. Furthermore, said substitute or replacement water will meet the lawful requirements of the senior diverters at the time and location and to the extent the seniors would be deprived of their lawful entitlement by the Applicant's diversions.

55.4.3.1 *State Engineer Determination.* The State Engineer shall make such determinations as to the quality, quantity and continuity of the substitute supply as are required by applicable and lawful statutes (e.g., §§ 37-80-120, 37-83-101, et seq., C.R.S.) and regulations (e.g., those promulgated under § 25-8-202(7)) in effect at any time this exchange is being exercised.

55.4.3.2 *Enforcement by Governmental Entities in Addition to State Engineer.* This decree shall not constitute an impediment to lawful regulatory and enforcement activities by appropriate administrative agencies.

conditions assure that the substitute supply to be introduced into the river below Kodak's plant will meet statutory standards, *see* §§ 37–80–120(3) and 37–92–305(5), 15 C.R.S. (1990), and do not provide any relief to Kodak.[82] Accordingly, Kodak appeals the trial court's decision to approve the Poudre River exchange without specifically addressing the impact of the exchange on Kodak's water treatment operations.

### 1. Relation Between Appropriation Doctrine and Quality Issues

From the earliest cases, Colorado courts have given at least some recognition to water quality concerns, holding, for example, that a water right does not include the right to discharge pollutants that detrimentally affect downstream users. *See, e.g., Suffolk Gold Mining & Milling Co. v. San Miguel Consol. Mining & Milling Co.,* 9 Colo.App. 407, 48 P. 828 (1897); *see also Wilmore v. Chain O'Mines, Inc.,* 96 Colo. 319, 44 P.2d 1024 (1934); *Humphreys Tunnel & Mining Co. v. Frank,* 46 Colo. 524, 105 P. 1093 (1909). However, beyond recognition of this general prohibition on unreasonable discharges, the system of water quality regulation in Colorado reflects a continued conflict with and subordination to the prior appropriation system. Rather than consolidating the power to regulate water quantity and water quality in the same body, Colorado divides responsibilities for these matters between two very distinct entities. The prior appropriation system, embodied in the adjudication of appropriative rights to water, is presided over by the judiciary in general and the water court in particular. *See* Water Right Determination and

Administration Act of 1969, §§ 37–92–101 to –602, 15 C.R.S. (1990 & 1995 Supp.). Operating under the constitutional and statutory policy of maximum beneficial use, *see, e.g.,* Colo. Const. art. XVI, §§ 5 & 6; § 37–92–102(1)(a), 15 C.R.S. (1990); *Fellhauer v. People,* 167 Colo. 320, 336, 447 P.2d 986, 994 (1968), the water court reviews applications for adjudication of appropriative rights and evaluates compliance with the statutorily mandated components of diversion and beneficial use, *see* §§ 37–92–103(3)(a), –103(4), –103(7), –305(9)(a), 15 C.R.S. (1990). Although the water court must consider the effects on other water users when a water right owner seeks a change of water right, *see* § 37–92–305(3), 15 C.R.S. (1990), water court protection of such other users has traditionally been limited to ensuring that they do not suffer a decrease in the quantity of water available through exercise of their rights. *See, e.g., In re Application for Water Rights in Las Animas Consol. Canal Co.,* 688 P.2d 1102 (Colo.1984); *City of Colo. Springs v. Bender,* 148 Colo. 458, 366 P.2d 552 (1961). The court is explicitly required to consider water quality issues only in the case of an exchange whereby water is being actively substituted into the stream for the use of other appropriators, *see, e.g.,* § 37–80–120(3), 15 C.R.S. (1990). The water court's primary concern is thus limited to aspects of appropriations unrelated to water quality.

In the Colorado Water Quality Control Act, §§ 25–8–101 to –703, 11A C.R.S. (1989 & 1995 Supp.), the legislature delegated authority over water quality regulation to the Water Quality Control Commission and the Water Quality Division. These agencies

---

55.4.3.3 *Future Water Quality Standards.* Unless otherwise required by paragraph 55.4.3.2, Thornton's substitute supply shall comply with the provision of any lawful statute, regulation or ordinance of general applicability limiting, regulating or prescribing the quality of water which may be used for normal agricultural irrigation whether such statute, regulation or ordinance is now in existence or is adopted or enacted in the future, including future modifications thereof, and whether enacted or adopted by the State Engineer or any other governmental entity.

The court also retained jurisdiction to review the sufficiency of the water quality provisions in the decree. Decree, ¶ 63.5, at 88.

**82.** The trial court made the following ruling regarding dilution flows:

33.2.2 *Dilution Flows.* For the reasons set forth in Section VII of the Memorandum of Decision, this Court makes no provision concerning dilution flows for municipal or industrial wastewater treatment plants, however, this decree is no impediment to enforcement or other actions by administrative or other agencies.

Decree, ¶ 33.2.2, at 36.

were created to develop and enforce water quality standards across the state. *See* §§ 25–8–202, –302, 11A C.R.S. (1989 & 1995 Supp.). Although these agencies exercise considerable authority over water users, the legislature made clear its intention that this authority cannot be exercised in a manner that significantly compromises the appropriative rights of present or future water users. The Water Quality Control Act states in pertinent part:

> No provision of this article shall be interpreted so as to supersede, abrogate, or impair rights to divert water and apply water to beneficial uses in accordance with the provisions of sections 5 and 6 of article XVI of the constitution of the state of Colorado, compacts entered into by the state of Colorado, or the provisions of articles 80 to 93 of title 37, C.R.S., or Colorado court determinations with respect to the determination and administration of water rights. Nothing in this article shall be construed, enforced, or applied so as to cause or result in material injury to water rights.

§ 25–8–104(1), 11A C.R.S. (1989). Water quality regulation that affects water rights without causing material injury or impairment is not necessarily prohibited. However, section 25–8–104(1) serves notice that despite the importance of water quality regulation, the legislature's primary emphasis in enacting this scheme is to maximize beneficial use and to minimize barriers to further beneficial appropriation. The result of this policy decision is essentially to focus water quality regulation on uses culminating in unreasonable discharges, as such discharges are not part of any appropriative right under common law.

 For better or worse, this dual system limits the ability of both the water court and the water quality control agencies to address certain water quality issues. The

plight of appropriators in Kodak's situation, who allege quality impacts as a result of appropriative depletion rather than substandard discharge or supply water, is a prime example of the limitations of the present system to provide remedies for all types of injuries. The statutory scheme governing water exchange proposals places a clear limitation on the "discharge" aspect of all exchanges—*i.e.*, the provision of the substituted supply of water. *See* § 37–80–120(3) ("Any substituted water shall be of a quality and continuity to meet the requirements of use to which the senior appropriation has normally been put."); § 37–92–305(5) ("Any substituted water [in the case of plans for augmentation including exchange] shall be of a quality and quantity so as to meet the requirements for which the water of the senior appropriator has normally been used...."). These statutory provisions are intended to protect the quality of the substitute supply for those senior appropriators who receive this water. To ensure compliance with this requirement in the present case, the trial court included these conditions in the decree to be administered by the state engineer. *See* Decree, ¶ 54.4.3, at 68. Neither the statute nor the decree, however, provides relief to an appropriator in Kodak's situation. Under the decreed operation of the Poudre River exchange, Thornton will return the substitute supply water to the river below the location of Kodak's plant. Kodak is physically unable to receive any of this substitute supply. Thus, the discharge-oriented water quality provisions relating to exchanges fail to protect appropriators in Kodak's position.[83]

### 2. Relation Between Quality and Cognizable Injury

 Kodak argues, however, that under the "no-injury" statute, § 37–92–305(3), 15 C.R.S. (1990), the trial court can and must take into account quality impacts not related to substitute supply and impose any terms

---

**83.** Kodak apparently makes a separate allegation that Thornton's provision of substitute water in connection with another part of the Northern Project, the WSSC ditch exchange, will adversely affect the chemistry of the water at Kodak's discharge point. Although Kodak's plant is below the point of release for the substitute supply water for that portion of the project, the WSSC ditch exchange will exchange upon the water of WSSC shareholders in the Larimer County Canal, a great distance away from Kodak's discharge point. Kodak is certainly not one of the senior appropriators whose water is being exchanged upon; thus, the substitute supply provisions are not intended to protect Kodak in this situation.

and conditions necessary to ensure that operation of the exchange will not "injuriously affect" Kodak's water rights. Accordingly, Kodak takes issue with the trial court's decision not to include any conditions in the decree to protect Kodak against increases in its wastewater treatment costs. Whether section 37–92–305(3) applies to all water exchange projects is not clear from the statutory language. However, we need not decide that issue in the present case. Even assuming that "no-injury" review of Thornton's exchange was required, we agree with the trial court that the legislative water quality scheme is not designed to protect against quality impacts unrelated to discharges or substitute water and specifically prohibits the water court from imposing the protective measures necessary to remedy depletive impacts of upstream appropriations on an appropriator in Kodak's situation.[84]

Kodak does not allege that operation of the Poudre River exchange will reduce the quantity of water available in the river to a volume less than the amount of its appropriative right. Kodak also cannot contend that the substitute supply provided by Thornton in the Poudre River exchange will affect the quality of the water diverted to its plant. The sole negative impact of the Poudre River exchange on Kodak's treatment operations results from a diminution in the flow of excess river water—i.e., water that would otherwise flow by Kodak's plant but that is in excess of the amount that can be diverted under Kodak's water right. Because the volume of water in a stream just upstream of the discharge point is a controlling variable in the formula to set effluent limits, Kodak contends that diminution in flow caused by operation of the exchange will necessarily result in more stringent effluent limits for Kodak. However, to avoid this impact on Kodak's treatment operations, the trial court would have had to impose conditions that required maintenance of sufficient volume in the stream to preserve the average low-flow values that determine Kodak's effluent limits. Despite Kodak's arguments to the contrary, such protection would necessarily require the imposition of conditions creating a private instream flow right for Kodak for the purpose of waste dilution or assimilation.[85]

### 3. Relation Between Quality and Minimum Stream Flow

The legislature expressed a clear intent to prohibit private parties from adjudicating instream flow rights. Pursuant to section 37–92–102(3), 15 C.R.S. (1990), the General Assembly vested exclusive authority in a state entity, the Colorado Water Conservation Board (CWCB), to appropriate minimum stream flows and limited the purpose for these appropriations to "preserv[ation of] the environment to a reasonable degree." See City of Thornton v. City of Fort Collins, 830 P.2d 915, 930 (1992); Board of County Comm'rs v. Collard, 827 P.2d 546, 551 n. 10 (Colo.1992). The same provision reinforces this exclusivity with the following prohibition:

---

84. The language of the decree indicates that the trial court did apply the "no-injury" standard of § 39–92–305(3) in reviewing Thornton's proposed appropriative exchanges:

 34. *Changes of Water Rights, Appropriative Rights of Exchange, and Plan for Augmentation.* The changes of water rights, appropriative rights of exchange, and plan for augmentation approved herein will not injuriously affect the owners or persons entitled to use water under any vested water right or decreed conditional water right as long as those changes and exchanges are operated and administered in accordance with the terms and conditions of this decree.

Decree, ¶ 34, at 37. Without deciding the applicability of that standard in the present case, we affirm the result reached by the trial court.

85. In order for Kodak to maintain its current treatment system after operation of the ex-

change, conditions would have to be imposed on the exchange that would preserve the current effluent limits. Assuming the absence of other factors, these limits will remain intact so long as the statistically based average low-flow of the river remains at or above a certain rate. Kodak argues that conditions preserving this average low-flow are distinguishable from a minimum stream flow because with the former the flow can vary above and below the average on a short-term basis. We fail to see such a distinction. Whether a requested flow rate is quantified as a specific minimum flow or as an average rate, the effect of granting such a right is to remove a certain amount of water from the appropriation system by decreeing that it remain in the stream, a result prohibited by the legislature. *See infra* pp. 207–10.

In the adjudication of water rights pursuant to this article and other applicable law, no other person or entity shall be granted a decree adjudicating a right to water or interests in water for instream flows in a stream channel between specific points ... for any purpose whatsoever.

§ 37–92–102(3), 15 C.R.S. (1990). The meaning of this exclusive delegation of authority is clear—the judiciary is without authority to decree an instream flow right to any private entity.

The legislature similarly prohibited the Colorado Water Quality Commission and the Water Quality Division from imposing minimum instream flows in the course of their water quality protection activities. These agencies must perform their duties subject to the following restriction: "Nothing in this article shall be construed to allow the commission or the division to require minimum stream flows...." § 25–8–104(1), 11A C.R.S. (1989). This language reinforces the legislative intent expressed in the water right adjudication provisions that minimum stream flows are not a valid tool for protecting water quality.

Even in the absence of a specific legislative prohibition, the type of right sought by Kodak is inconsistent with Colorado law and policy concerning appropriations. Kodak currently diverts the full amount of its appropriative right, which it exercises pursuant to its water allotment contract with NCWCD, and the company does not argue that Thornton's exchange will affect its future ability to divert its maximum appropriated amount. Instead, Kodak claims an additional amount of water, above that amount which it can lawfully divert, to ensure the less expensive exercise of its right. Because this additional water exceeds the amount to which Kodak is entitled under its water right, Kodak cannot claim such water as part of its original appropriation. *See Rominiecki v. McIntyre Livestock Corp.*, 633 P.2d 1064, 1067 (Colo.1981) (appropriative right is limited to amount of water actually diverted and put to beneficial use). Without an appropriative right or otherwise established beneficial use, Kodak is not entitled to protection of its incidental use of this water against lawful appropriations by other users. *See* Colo. Const. art XVI, § 6 ("The right to divert the unappropriated water of any natural stream to beneficial uses shall never be denied."); *see also Bender*, 148 Colo. at 462, 366 P.2d at 555 ("[An appropriator] is not entitled to command the whole or a substantial flow of the stream merely to facilitate his taking the fraction of the whole flow to which he is entitled.") (citing *Schodde v. Twin Falls Water Co.*, 224 U.S. 107, 119, 32 S.Ct. 470, 472, 56 L.Ed. 686 (1912)). Absent a new appropriation, Kodak cannot establish a protected right to waters in excess of its current appropriation. We decline Kodak's invitation to avoid the effect of the specific prohibition on private instream flow rights by creating such a right in the guise of a condition imposed on the lawful appropriations of others.[86] Under the current system, with its emphasis on maximum beneficial use, Kodak's reliance on unappropriated water in excess of its appropriative right is subject to the risk that a lawful appropriator will appropriate that excess water.

### 4. Conclusion

We are not unaware of the interrelationship between water quantity and water quality concerns or the specific impact that Thornton's exchange will have on Kodak's operations. However, exchanges in the nature of Thornton's proposal are innovative methods of increasing the beneficial use of the state's waters. Under the current legislative scheme, the impact of which Kodak complains is tolerated as a consequence of the policy of maximum beneficial use. The decision whether further to integrate the consideration and administration of water

---

**86.** This court has never approved this type of indirect appropriation. Kodak cites a water court case in which the court imposed on a change of water right the very condition that Kodak seeks here, a minimum flow requirement to avoid any detrimental impact on a downstream user's sewage treatment plant. *In re Application for Water Rights of the Bd. of Waterworks of Pueblo, Colo.*, No. 84CW177 (Dist. Ct., Water Div. No. 2, February 24, 1988). That case was appealed to this court but the minimum flow condition was not one of the issues on appeal. *City of Florence v. Board of Waterworks*, 793 P.2d 148 (Colo.1990). Accordingly, we expressed no opinion as to the merits of such a requirement. *Id.* at 152–53 & n. 8.

quality concerns into the prior appropriation system is the province of the General Assembly or the electorate. Thus, we affirm the trial court's decision not to include conditions in the final decree designed to protect Kodak's waste treatment operations.

### H. Quality of Substitute Supply for WSSC Ditch Exchange

The second water quality issue on appeal concerns the provisions in the final decree that regulate the quality of the substitute supply of water to be provided by Thornton as part of its planned WSSC ditch exchange (case 86CW402).

### 1. Facts

In 1986, Thornton entered into an agreement with WSSC in which WSSC consented to the operation of the exchange subject to the terms and conditions included in the agreement. At a special meeting of WSSC shareholders on December 19, 1986, the shareholders voted to ratify the agreement by a margin, including shares voted by Thornton, of 490.23 shares to 51.25 shares. Subsequently, on December 31, 1986, Thornton filed an application with the water court to adjudicate this exchange as an appropriative right. Thornton's proposal for the ditch exchange contemplates the out-of-priority diversion of high quality water from the Larimer County Canal, the main artery in the WSSC water supply system, to the city's water service area for municipal use beginning in approximately 2029. In return, Thornton will provide a substitute supply of lower quality water to the LCC from Poudre and South Platte River sources. In Phase II of the Northern Project, this exchange will operate only on the water associated with the non-Thornton WSSC shares. In Phase III, the exchange will be expanded to operate on all WSSC water in the LCC, including Thornton's WSSC shares.

The trial court imposed the following general requirements on the quality of the substitute supply that Thornton must provide to complete the ditch exchange:

> The substitute supply returned to the Larimer County Canal consists of water to be diverted from the Poudre and South Platte Rivers and must be of a quality and continuity to meet the requirements of use to which the water of all non-Thornton WSSC shareholders has normally been put, and must be of a quality and quantity so as to meet the requirements for which the water of all non-Thornton WSSC shareholders has normally been used. Furthermore, said substitute or replacement water must meet the lawful requirements of the non-Thornton WSSC shareholders at the time and location and to the extent the seniors would be deprived of their lawful entitlement by the Applicant's diversions and shall comply with all other water quality provisions of this decree applicable to the Ditch Exchange. The substitute supply returned to the Larimer County Canal shall comply with all contractual obligations of Thornton, including but not limited to the WSSC/Thornton contract, as well as with the other provisions of this decree.... Thornton's substitute supply shall also comply with the provisions of any lawful statute, regulation or ordinance of general applicability limiting, regulating or prescribing the quality of water which may be used for agricultural irrigation whether such statute, regulation or ordinance is now in existence or is adopted or enacted in the future, including future modifications thereof, and whether enacted or adopted by the State Engineer or any other governmental entity.

Decree, ¶ 14.3.6.3, at 24.

The "WSSC/Thornton contract" referenced by the trial court is the 1986 agreement in which WSSC consented to Thornton's operation of the exchange. Paragraph 5 of that contract requires that any substitute water provided by Thornton meet minimum water quality standards. The initial standards to be met are attached to the contract as Exhibit A and set parameters for a wide variety of contaminants to preserve the quality of the water for agricultural use. The contract provides, however, that if the actual water quality in the LCC drops below the contract standards, then the ambient quality of the ditch water becomes the temporarily acceptable standard. Finally, the contract allows for the temporary or permanent modification

of the standards by mutual agreement of WSSC and Thornton. The contract does not explicitly specify the place at which the quality of the substitute supply must be measured.

In addition to the general decree provision quoted above, the trial court also placed more specific restrictions on Thornton's provision of substitute supply. The court delegated responsibility for determining the adequacy of the substitute supply to the State Engineer, Decree, ¶ 57.2.3.1, at 73, but held that the decree shall not act as an impediment to lawful regulatory and enforcement activities by other regulatory agencies, id. ¶ 57.2.3.2, at 73. The court further held that the substitute supply shall comply, "at its point of discharge to the ditch," with any statute or regulation governing the quality of water that may be used for normal agricultural irrigation. Id. ¶ 57.2.3.3, at 73. The court noted the provision of the WSSC contract allowing reduction of water quality standards to meet ambient levels of contaminants but clarified that this provision may never result in the quality of the substitute supply failing to meet the minimum water quality standards required for a discharge into a stream classified for agricultural use. Id. ¶ 57.2.3.5.1, at 74. The decree imposes monitoring requirements to be conducted throughout the operation of the ditch exchange at both the intake of the pump stations returning the substitute supply to the LCC, id. ¶ 57.2.3.5.2, at 74, and at various points along the WSSC system, id. ¶ 57.2.3.5, at 73–74. Finally, as a remedy specifically enforceable by WSSC shareholders who demonstrate a material impairment of their historical uses due to the quality of Thornton's substitute supply water, the court required Thornton to acquire at fair market value the lands and shares of such shareholders. Id. ¶ 57.2.3.4, at 73.

 Notwithstanding these provisions, certain objectors argue that the decree is not sufficient to guarantee the protection of their uses at their points of diversion from the LCC. Objectors Amen, Hutcheson, and Yetter (the objecting shareholders) are WSSC shareholders who irrigate lands by diversion from the LCC below the point where Thornton will return the substituted water required to complete the exchange. They concede that the trial court applied the proper standard in the decree by requiring that Thornton provide substitute supply of a quality and continuity to meet the requirements of use to which the water of all non-Thornton shareholders has normally been put. However, the objecting shareholders contend that the provisions of the decree allow the measurement of the quality of the substitute supply to take place at the point of entry into the LCC rather than at the point at which the downstream senior appropriators divert it for their use. Due to general deterioration in the water quality as it progresses down the LCC, the objecting shareholders contend that measurement at the point of discharge will not provide adequate protection to users with headgates many miles downstream of the discharge point. We are satisfied, however, that the decree provisions are adequate to ensure that the substitute supply standards will be met.

### 2. Standards and Application to Facts

The principal standard governing the provision of substitute supply as part of a water exchange is codified in section 37–80–120(3), 15 C.R.S. (1990). The trial court correctly utilized this standard, which states that "[a]ny substituted water shall be of a quality and continuity to meet the requirements of use to which the senior appropriation has normally been put," as the standard that Thornton must meet with its substitute supply water.[87] This statutory standard is clearly directed at protecting the beneficial uses to which water has been applied by senior appropriators prior to the exchange. However, the objecting shareholders argue that inclusion of the statutory standard in the decree and delegation of its enforcement to the state engineer is not sufficient to protect senior appropriators. They seek an inter-

---

**87.** Section 37–92–305(5), 15 C.R.S. (1990), addressing "plans for augmentation including exchange," imposes an essentially identical standard: "Any substituted water shall be of a quality and quantity so as to meet the requirements for which the water of the senior appropriator has normally been used...."

pretation by this court that the standard set forth in section 37–80–120(3) can be met only by measuring water quality at the headgate of each downstream user forced to accept the substitute supply. We are convinced that the administrative structure set forth in the applicable statutes and regulations is sufficient to ensure protection of these downstream seniors. Thus, we decline to identify a particular point or points of compliance that the state engineer must utilize in enforcing the statutory requirements.

The trial court's decree delegates authority to the state engineer to make the necessary determinations under the statutes and regulations governing the quality of the substitute supply. Decree, ¶ 57.2.3.1, at 73. This delegation is consistent with the exchange statute, which confers certain authority on the state engineer to regulate exchanges in the absence of adjudication by the applicant. See § 37–80–120, 15 C.R.S. (1990). Pursuant to section 25–8–202(7), 11A C.R.S. (1989), the state engineer's water quality control responsibilities are integrated into the general administration of water quality under the Water Quality Control Act, and regulations have been promulgated to guide the actions of the state engineer in this role. See 2 CCR 402–8 (1992). The parties urge conflicting interpretations regarding the proper points of compliance under these regulations, but we need not resolve these differences here. Under both the statute and the regulations, the mandate of the state engineer in reviewing the quality aspects of an exchange is clear: the substitute supply must be of a quality to meet the requirements of use to which the senior appropriation has normally been put. The regulations are sufficiently broad to allow the state engineer's office to exercise its professional judgment in adopting a method of regulation that will ensure that the statutory standard is met, and the absence of more specific direction will not compromise the protective goals of the statute. Accordingly, we hold that the state engineer is capable of ensuring compliance with these provisions without specific instructions on where to measure the quality of the substituted water.

In accord with this holding, we do not read the provisions of the decree or of the WSSC/Thornton contract to infringe upon the ability of the state engineer to enforce the mandate of section 37–80–120(3), 15 C.R.S. (1990). Under the terms of the decree, the state engineer must protect the historical beneficial uses of senior appropriators receiving substitute water. Paragraph 57.2.3.3 of the decree, which requires that quality standards in all lawful statutes be met at the point of discharge of the substitute supply into the ditch, does not override the statutory purpose of protecting downstream users, and the state engineer's office must conduct its evaluation using whatever measurement techniques it deems necessary. If water quality monitoring at the point of discharge is insufficient to ensure compliance with section 37–80–120(3), the decree does not prevent the state engineer's office from taking additional action to fulfill its statutory duty to protect downstream users.

Similarly, compliance with the water quality standards in the WSSC/Thornton contract does not necessarily relieve Thornton of its statutory duty to comply with section 37–80–120(3).[88] If Thornton can establish to the satisfaction of the state engineer that compliance with the contractual standards will also protect downstream historical uses, then it need not implement further quality control efforts for the purpose of complying with section 37–80–120(3). However, if compliance with the standards is not sufficient to satisfy the statutory requirements, then Thornton's contractual compliance will not be sufficient to fulfill the terms of the decree.

### 3. Additional Safeguards

Our holding finds support in the facts and circumstances of this case and in the additional protective provisions included within the decree. Thornton will not begin operating the exchange or providing substitute supply water until approximately 2029. Thus,

---

[88]. Because we determine that the provisions of the WSSC contract do not compromise the protection afforded senior appropriators under section 37–80–120(3), we need not address the issue of whether the actions of the WSSC board or the ratification by other shareholders could bind the objecting shareholders to the terms of the contract.

the facts concerning the historical usage of water by senior appropriators and the existing water quality standards may change in such a manner as to render this entire dispute moot. In anticipation of potential changes, the decree fully incorporates any future water quality standards in effect at any time during operation of the exchange. *See* Decree, ¶ 57.2.3.3, at 73. Moreover, the decree provides that the trial court will retain jurisdiction in two relevant areas: (1) to review all determinations of the state engineer, Decree, ¶ 63.4, at 88, and (2) until ten years after the ditch exchange becomes fully operational, to reconsider the question of whether the decree provisions relating to water quality are adequate, *id.* ¶ 63.5, at 88. In addition, the WSSC/Thornton contract provides for court adjudication of disputes over proposed changes in the water quality standards adopted in that agreement. Thornton is also required to conduct a monitoring program during the operation of the ditch exchange, which would logically include sampling at points in the vicinity of the headgates of downstream appropriators affected by the exchange. *See* Decree, ¶ 57.2.3.5, at 73–74.[89] These provisions substantially supplement the statutory protection granted to the objecting shareholders and, together with the requirements of section 37–80–120(3), provide adequate assurance that historical uses of affected appropriators will be protected. For the foregoing reasons, we affirm the trial court's determination that the provisions relating to the substitute supply for the ditch exchange are sufficient to protect the historical uses of recipients of that substitute supply.

### I. Payment of Division Engineer's Expenses of Administration

The final issue on appeal concerns the trial court's inclusion in the decree of a provision creating the possibility that Thornton may be required to pay certain future expenses of the division engineer associated with that office's supervision of the operation of the Northern Project. The Northern Project is unquestionably a municipal water project of great magnitude and complexity. Not only does the project require enormous investment by Thornton, but it also requires the division engineer to play a critical role in the oversight and administration of the provisions of the final decree. By the state engineer's count, the division engineer has been assigned thirty-nine specific duties to ensure compliance with the forty pages of terms and conditions included in the final decree. Anticipating the potential resource drain from its role in the Northern Project, the state engineer (on behalf of the division engineer) successfully sought a decree provision allowing it to petition the court to mandate contribution of funds by Thornton in the event that the division engineer's resources fall short of the amount needed to complete its duties under the decree. The resulting provision reads as follows:

> *Administrative Assistance to Division Engineer.* The terms of this decree may impose responsibilities on the Division Engineer in addition to those duties which he is normally required to perform. In addition, the complexity of this decree may complicate the performance of normal duties of the Division Engineer's Office. In the event that the Division Engineer is unable to perform such additional duties because of the shortage of funding for adequate support personnel, the Division Engineer may petition this Court for a determination, upon good cause shown, that Thornton shall pay the cost of such administrative assistance as is necessary for the performance of said additional duties. Said payment shall be in the amount and subject to terms and conditions then determined by the Court.

Decree, ¶ 60.6, at 86.

Thornton argues that this potential contribution requirement improperly involves the court in resource allocation decisions outside of its sphere of authority. We agree and remand to the trial court with directions

---

89. We also note that in the event that a senior appropriator can establish a material impairment to historical uses resulting from the adverse quality impacts of the substitute supply, the appropriator may compel Thornton to purchase the affected lands and shares at fair market value. Decree ¶ 57.2.3.4, at 73.

to remove the above provision from the final decree.

The state engineer and division engineer are legislatively assigned broad powers and responsibilities for administration, distribution, and regulation of waters of the state. *See generally* §§ 37–92–501, –501.5, –502, 15 C.R.S. (1990). We have discovered no statutory authority that would authorize a court to impose on a private party any part of the expense incident to exercise of those powers or fulfillment of those responsibilities. Rather, section 37–92–202(4), 15 C.R.S. (1990), specifically provides that "[t]he expenses of the offices and staffs of the division engineers shall be provided for out of state funds."

In *Kelly Ranch v. Southeastern Colorado Water Conservancy District,* we discussed the proper division of authority between the branches of government in the context of resources available to the State Engineer's office:

> We give short shrift to the argument, mentioned in the water court's ruling, that the plan [for augmentation] should not be approved by reason of manpower shortages in the State Engineer's office. . . . [This], we submit, [is] not [a] problem[ ] for the judiciary, but [is] rather for the Executive Branch in general and the State Engineer in particular, and for the General Assembly.

191 Colo. 65, 79, 550 P.2d 297, 307–08 (1976). The decision to adopt a policy that requires water users to fund the administrative activities of the state or division engineer is squarely within the province of the legislature.

The state engineer argues that legislative authority for imposition of the costs of administration of the Northern Project is to be found in section 37–92–502(4). That section provides, in relevant part:

> Each division engineer with the approval of the state engineer shall administer the movement of water involved in any plan for augmentation or water use project which is in effect in his division. If any such plan or project involves the movement of water from one division to another, then the administration of such movement shall be the direct responsibility of the state engineer, but he may act through the appropriate division engineers. In such administration the division engineers and the state engineer shall issue such orders as are necessary and appropriate and may utilize any funds, public or private, and any other resources made available to them.

§ 37–92–502(4), 15 C.R.S. (1990). Section 37–92–502(4) was enacted prior to our decision in *Kelly Ranch* as part of the Water Right Determination and Administration Act of 1969. *See* ch. 373, sec. 1, § 148–21–35, 1969 Colo. Sess. Laws 1200, 1217. Giving its words their plain meaning, the statute merely authorizes the state engineer and division engineer in the performance of their water administration functions to utilize private funds that may be made available to them. It does not empower a court to impose obligations on private parties to provide such funds.

In the present case, the trial court exceeded the scope of its judicial authority by involving itself in questions concerning the funding of the Division Engineer's activities. Accordingly, this provision of the decree cannot stand, and we remand to the trial court with directions to delete the challenged paragraph from the final decree.

### V. Conclusion

In summary, we affirm the trial court's conclusion that the applications and resumes provided adequate notice to support the decree (*supra* part II). We also affirm the conclusion that Thornton satisfied the requirements to support the decree for conditional water rights with an appropriation date of December 31, 1986 (*supra* part III). We affirm as well the adoption of volumetric limits and reality checks (*supra* part IV(A)), the rejection of the use of CBT water (*supra* part IV(B)), the requirement to supply replacement water to tributary well owners (*supra* part IV(D)), the revegetation requirement (*supra* part IV(E)), the dry-up conditions (*supra* part IV(F)), the rejection of Kodak's water quality injury argument (*supra* part IV(G)), and the condition concerning

the monitoring of the quality of substitute water for the WSSC ditch exchange (*supra* part IV(H)). We reverse the trial court's ruling concerning the quantification of volumetric limits (*supra* part IV(A)) and remand for further proceedings on that issue. We also reverse the judgment denying reuse of transmountain water and hold that transmountain water rights are not subject to an intent to reuse requirement and are not subject to abandonment (*supra* part IV(C)(1)–(4) and (6)). We also hold that Thornton's rights to reuse transmountain water have not been lost by laches or equitable estoppel (*supra* part IV(C)(5)). Additionally, we reverse the requirement to supply replacement water to wells decreed nontributary (*supra* part IV(D)(2)) and the condition concerning a possible future requirement for payment of the division engineer's costs of administration (*supra* part IV(I)). Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

KOURLIS, J., concurs in part and dissents in part, and MULLARKEY, J., joins in the concurrence and dissent.

HOBBS, J., does not participate.

Justice KOURLIS, concurring in part and dissenting in part:

I concur with Sections I, II, III, and IV(A)–(H) of the majority opinion; however, I respectfully dissent from Section IV(I) and that portion of Section V in which the majority remands the case to the trial court with directions to delete paragraph 60.6 of the Decree. I believe that the issue of whether Thornton may be required to pay some cost of administrative assistance necessary for the performance of additional duties imposed upon the division engineer by the terms of

the Decree is prematurely presented. Therefore, I would decline to address the validity of paragraph 60.6 at this time.

Paragraph 60.6 will only have operative effect in the event that the division engineer is unable to perform duties imposed under the terms of the Decree "in addition to those duties which he is normally required to perform" and only if that inability to perform is based on a "shortage of funding for adequate support personnel." Decree, ¶ 60.6, at 86.[1] These responsibilities will only be activated when part or all of the Northern Project is operational. Construction on Phase I, Phase II, and Phase III is proposed to begin in the years 2000, 2026, and 2034, respectively. *See* Maj. op. at 20–21. There is necessarily some uncertainty as to whether any of the three Phases of the Northern Project will be completed. *See* Maj. op. at 43–45. Under these circumstances, I consider it prudent to defer consideration of the validity of paragraph 60.6 of the Decree until such time as the division engineer may seek to invoke its provisions.

Further, in addressing this issue, I believe the majority unnecessarily limits the authority of the trial court and constrains the powers of the state engineer. Because it is not clear to me that the trial court lacks the power to implement paragraph 60.6 or that the state engineer lacks the statutory authority to petition the trial court for costs associated with additional duties imposed by the Decree, I would not take such a restrictive view.[2]

The majority holds that the "trial court exceeded the scope of its judicial authority by involving itself in questions concerning the funding of the Division Engineer's activities." Maj. op. at 99. The majority reaches this result because of the absence of any

---

1. The majority states that the state engineer sought the insertion of the provision contained in paragraph 60.6 in the Decree. Maj. op. at 98. The record does not contain any motion brought by the state seeking such a remedy. The lack of a *documented motion detailing circumstances* under which fees could be imposed further supports my concern that this issue is being addressed prematurely and in the absence of a real controversy.

2. Although paragraph 60.6 specifically authorizes the division engineer to petition the trial

court for costs, the state engineer is ultimately responsible for the work of the division engineer. *See* §§ 37–80–102(1), 37–80–105, 15 C.R.S. (1990). The additional duties created by the Decree are effectively imposed upon the state engineer. Thus, for purposes of this dissent, I will assume that it is the state engineer who would be making application for the costs of administrative assistance on behalf of the division engineer.

"statutory authority that would authorize a court to impose on a private party any part of the expense incident to exercise" of the state and division engineer's legislatively assigned powers and responsibilities for regulation of waters of the state. Maj. op. at 98. The plain impact of the Decree, however, involves the creation of numerous additional duties for the division engineer. Some statutory authority for creating these duties is contained in section 37–92–304(6), 15 C.R.S. (1990), which, in relevant part, provides:

> Any decision [of the water judge] may contain any other provision which the water judge deems proper in determining the rights and interests of the persons involved.

If this broad grant of authority enables the trial court to create new duties for the state and division engineers, it may similarly be read to authorize the trial court to impose costs to pay for these duties if the water judge deems such costs "proper in determining the rights and interests of the persons involved." If the trial court can impose a duty, it is conceivable that it may also apportion the costs associated with that duty.[3]

The majority further holds that "the decision to adopt a policy that requires water users to fund the administrative activities of the state or division engineer is squarely within the province of the legislature." Maj. op. at 99. In my view, the legislature has already authorized the state engineer to charge an individual water user for the cost of services which specifically benefit that user.

Section 37–80–102(1), 15 C.R.S. (1990), provides:

> (1) [The state engineer] has executive responsibility and authority with respect to:
>
> . . . . .
>
> (k) Such other acts as may be reasonably necessary to enable him to secure the effective and efficient operation of the division of water resources, including power and authority to make and enforce such rules or regulations as he may find necessary or desirable to effectuate the performance of his duties.

Citing, in part, the authority granted by this section, the state engineer has promulgated rules and regulations imposing fees on those persons who use data provided by the state engineer about the water supplies of the state. *See* Rules 4–6, 2 C.C.R. 402–9 (1994).[4] These fees cover the costs of collecting, studying, and distributing the data. *Id.* Section 37–80–102(1)(k) can be read to authorize the state engineer to promulgate rules and regulations imposing fees in other contexts if such fees are necessary to enable the state engineer to "secure the effective and efficient operation of the division of water resources."

Here, the division engineer must carry out the provisions of the Decree to secure the effective operation of the division of water resources. Paragraph 60.6 only authorizes the state engineer to petition the court for costs associated with additional duties imposed by the Decree if funds are necessary to enable the division engineer to carry out these duties. Thus, section 37–80–102(1)(k) authorizes the state engineer to promulgate necessary rules and regulations, including the charging of fees, to enable the division engineer to perform such additional duties as are imposed by the Decree.[5]

**3.** It should be noted that § 37–92–202, 15 C.R.S. (1990), provides that "[t]he expenses of the offices and staffs of the division engineers shall be provided for out of state funds." An issue to be addressed would be whether the cost of administrative assistance necessary for the performance of additional duties imposed by the Decree is an expense of the office or staff of the division engineer. Resolution of this question will depend upon the nature of the assistance rendered and thus cannot be addressed in the absence of an actual request for specified costs.

**4.** Several other statutes also support the state engineer's authority to promulgate these regula-

tions. The most specific of the statutes is § 37–80–111.5(1)(a), 15 C.R.S. (1996 Supp.), which provides that "[t]he state engineer shall set and collect fees by rules and regulation for the distribution of data generated, collected, studied, and compiled about the water supplies of this state, which fees shall reflect the direct and indirect costs of such distribution."

**5.** I note that this interpretation of § 37–80–102(1)(k) is consistent with the general principle that a property owner may be required to pay the costs of public improvements if the property is specially benefited by the improvements over and above the general benefit to the public at large.

There is no evidence in the record that the state engineer promulgated a rule or regulation applicable to this case. However, an agency is not required to promulgate rules or regulations as long as the enabling statute provides adequate constraints for administrative actions. *Douglas County v. Public Utils. Comm'n*, 829 P.2d 1303, 1311 (Colo. 1992). "The guiding consideration is whether these constraints are sufficient to insure that administrative action will be rational and consistent in the first instance and that subsequent judicial review of that action is available and will be effective." *Cottrell v. City & County of Denver*, 636 P.2d 703, 709–10 (Colo.1981).

The method of imposing costs created by paragraph 60.6 is both rational and subject to judicial review. The state engineer can only recover costs if the division engineer is unable to perform duties imposed under the terms of the Decree "in addition to those duties which he is normally required to perform." Decree, ¶ 60.6, at 86. This condition ensures that Thornton is only required to pay costs for additional duties performed specifically for Thornton's benefit. In addition, the state engineer must petition the court for a determination "upon good cause shown." *Id.* This requirement ensures judicial review before any payments are made. Thus, the authority granted to the state engineer by section 37–80–102(1)(k) coupled with the restrictions imposed by paragraph 60.6 entitles the state engineer to collect costs for administrative assistance.

Thus, as an initial matter, I would decline to reach the issue of the validity of paragraph 60.6 at this time because I believe that facts could exist in which such fees would be appropriate, and we are currently evaluating the provision in a vacuum devoid of any factual context. If I were to decide the issue, I would hold the provisions of paragraph 60.6 valid. Hence, I dissent in part.

*Bethlehem Evangelical Lutheran Church v. City of Lakewood*, 626 P.2d 668, 672 (Colo.1981). *See also Beaver Meadows v. Board of County Comm'rs*, 709 P.2d 928, 935 (Colo.1985) (it is within the police power of the state to impose on

I am authorized to say that Justice MULLARKEY joins in this concurrence and dissent.

a developer the burden of providing reasonable improvements to public facilities made necessary by a development as a condition of approval of that development).